```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2                    MIAMI DIVISION

3        CASE NO.  16-cv-20924-MARTINEZ/GOODMAN

4             AT LAW AND IN ADMIRALTY

5    DONNA INCARDONE, et al.,

6         Plaintiffs,

7    vs.

8    ROYAL CARIBBEAN CRUISES, LTD.,

9         Defendant.
     _____/
10

11

12                 Law Offices of John B. Ostrow, P.A.
                   777 Brickell Avenue, Suite 400
13                 Miami, Florida 33131
                   October 10, 2017
14                 Tuesday, 2:37 p.m.

15

16                 DEPOSITION OF GERRY ELLIS

17

18        Taken before Violet Varga Smith, Florida

19   Professional Reporter and Notary Public in and

20   for the State of Florida at Large, pursuant to a

21   Re-Notice of Taking Deposition filed in the

22   above-styled cause.

23

24

25
```

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFFS:
      LAW OFFICES OF JOHN B. OSTROW, P.A.
 3    777 Brickell Avenue, Suite 400
      Miami, Florida 33131
 4    BY:  JOHN B. OSTROW, ESQ.

 5

 6    ON BEHALF OF THE DEFENDANT:
      MASE TINELLI, P.A.
 7    2601 South Bayshore Drive, Suite 800
      Miami, Florida 33133
 8    BY:  CURTIS MASE, ESQ.

 9                    I N D E X

10

11    WITNESS:

12    GERRY ELLIS
      Direct Examination by Mr. Ostrow    3
13    Cross Examination by Mr. Mase      --

14

15               E X H I B I T S

16     (Exhibits retained by John B. Ostrow, Esquire)

17    Plaintiff          Description          Page

18    Composite No. 1   Heavy Weather Incident   19
      Composite No. 2       Handover notes       24
19    No. 3                 Evaluation           26
      No. 4                   E-mail             50
20    No. 5             Master's Standing Orders 64
      No. 6             Stability report, etc.   65
21

22

23

24

25
```

JEANNIE REPORTING (305) 577-1705

1    Thereupon,

2                    GERRY ELLIS

3    after having been first duly sworn, was examined

4    and testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. OSTROW:

7           Q.    Tell us your name, please?

8           A.    Gered Ellis.

9           Q.    Mr. Ellis, my name is John Ostrow.

10   I represent a group of individuals who were

11   passengers on the ANTHEM OF THE SEA voyage back

12   in February of 2016, the voyage that was cut

13   short because of the weather problem.  We are

14   here today to elicit information that you might

15   possess concerning that incident and the

16   investigation of the incident and other issues

17   concerning Royal Caribbean.

18              If I ask you a question -- and let

19   me stop there.  I assume that you've been

20   deposed before?

21          A.    Yes.

22          Q.    And you know that drill.  So I

23   apologize if I'm being redundant for things

24   you've already heard.

25              If I ask you a question that is

1    unclear to you or that you don't understand,

2    tell me that.  Don't guess at what I'm asking.

3    Nor should you guess at your answers to anything

4    that I am asking.  If you're not totally sure

5    and wish to qualify an answer, that's perfectly

6    okay, but qualify it if it needs to be

7    qualified, an answer.

8          A.   Yes, sir.

9          Q.   If I ask you a question that calls

10   for a yes or no answer, please give your answer

11   out loud as a yes or no, and then if you need to

12   explain or wish to explain, you can do that.

13   But some witnesses respond with huh-uh or an

14   uh-huh or a shake or a nod of the head.  That

15   makes the recording of our conversation very

16   difficult for the court reporter, and it's

17   important to us that we have an accurate

18   recording of our conversation.

19         A.   Yes.

20         Q.   If during the course of the

21   examination you wish for a comfort break, let us

22   know and we'll accommodate that.  If you wish to

23   stand and stretch while I'm asking a question,

24   feel free to do that.  Some people have

25   difficulty sitting in one place for too long a



```
 1    time, for back conditions or whatever.  So just
 2    feel free to move, stretch, however you will be
 3    most comfortable.
 4         A.   Thank you.
 5         Q.   During the course of the deposition,
 6    Mr. Mase may object to a question or more that I
 7    might ask.  You may give him that opportunity to
 8    interpose his objection, and unless he tells you
 9    not to answer the question, you should go ahead
10    and answer the question.
11         A.   Yes, sir.
12          MR. MASE:  It's very unlikely.
13          THE WITNESS:  Understood.
14    BY MR. OSTROW:
15         Q.   It's very unlikely.
16              Is Mr. Mase representing you in this
17    deposition?
18         A.   No.
19         Q.   Okay.
20         A.   I don't believe so.
21          MR. MASE:  That is true.  Mr. Ellis,
22       however, is a former employee of Royal
23       Caribbean with knowledge of information that
24       may be privileged.  So in the rare event
25       that that were to occur, I might give him an
```

```
 1          instruction, but I kind of doubt that's
 2          going to even happen.  So let's not worry
 3          about it too much.
 4    BY MR. OSTROW:
 5          Q.   Okay.  Tell me a little bit about
 6    your educational background.
 7          A.   I was 20 years at sea as a master
 8    mariner.  So my qualifications are all of a
 9    professional nature.  And then I have been
10    ashore since then, 20 years since, in management
11    ashore.
12          Q.   Did you have any formal training in
13    seamanship?
14          A.   Yes.
15          Q.   Where was that?
16          A.   In various universities in the U.K.,
17    depending on the level I got into.
18          Q.   Okay.  And did you receive a degree
19    of some nature in seamanship?
20          A.   Master mariner.
21          Q.   Master mariner?
22          A.   Master mariner.
23          Q.   And who issued that degree?
24          A.   The U.K. government.
25          Q.   And was that -- well, let me strike
```



7

```
1      that.
2              Do you have a college degree in
3      marine-related matters?
4         A.    It's -- yes, part of the structure
5      of the qualifications of the technical training
6      is involved in nautical science.  So it's the
7      equivalent of a master's degree in nautical
8      science.  And then beyond that, a professional
9      license.
10        Q.    How long did -- so you mastered
11     various vessels, I assume, and you have a
12     certificate entitling you to do that?
13        A.    Yes.
14        Q.    And that's the master mariner
15     certificate?
16        A.    Master mariner.  It's a class 1
17     master mariner unlimited.  So it's not limited
18     to any particular ways.
19        Q.    Okay.  When did you first become
20     employed by Royal Caribbean or any of its
21     sub-companies?
22        A.    About six years ago.  So I left a
23     year ago.
24        Q.    And what were you hired -- initially
25     hired by them to do?
```



 1          **A.**    Initially, project management of dry

 2     dockings.

 3          **Q.**    And how long did you do that?

 4          **A.**    A year and a half.

 5          **Q.**    And then what happened?

 6          **A.**    And then I worked -- then I was

 7     promoted into maritime safety.  So I became a

 8     director of maritime safety.

 9          **Q.**    Is there a department at Royal

10     Caribbean, a maritime safety department?

11          **A.**    Yes.  It's a corporate position.

12          **Q.**    Gotcha.  And how long did you hold

13     that position?

14          **A.**    About three and a half years.

15          **Q.**    When did you leave?

16          **A.**    Almost a year ago.  Just before

17     Thanksgiving last year.

18          **Q.**    So that would be --

19          **A.**    November.

20          **Q.**    -- the fall of 2016?

21          **A.**    Yes.

22          **Q.**    And you went to Carnival Cruise

23     Lines?

24          **A.**    Carnival Corporation, yes.

25           MR. MASE:  You said it's another



1      corporation?

2           THE WITNESS:  Oh, the cruise line is a

3      subsidiary of Carnival Cruise.

4           MR. MASE:  I thought you said another

5      corporation.

6           THE WITNESS:  No, Carnival Corporation.

7           MR. MASE:  I'm sorry.  I thought I heard

8      that.  That's why I laughed.  That's why I

9      made the face.  Corporation.

10  BY MR. OSTROW:

11      Q.    What do you do at Carnival?

12      A.    I'm director of maritime -- I'm

13  sorry, of corporate safety policy.

14      Q.    In doing some research and

15  preparation for this deposition, I came across

16  an advertisement from Royal Caribbean from July

17  of 2014 for maritime navigation nautical ops

18  superintendent.  Is that different from the

19  position that you have?

20      A.    Yes, that sounds like it's Royal

21  Caribbean International Cruise Line.

22      Q.    Yeah.

23      A.    I had a corporate position.

24      Q.    And it says for this position, "The

25  maritime navigation nautical ops superintendent

1   is responsible for developing, implementing and

2   sustaining shipboard marine navigation and

3   safety programs as they relate to nautical

4   operations."  Is that different than what you

5   did?

6          A.   Yes.  The position I had was a

7   corporate one of all of the brands that are

8   owned by Royal.  So I was -- I had oversights of

9   these type of individuals.

10          Q.   Okay.  So then your department had

11   oversight of training, investigations and

12   emergency planning?

13          A.   Not training per say.  Training

14   policy, but not management of training.

15          Q.   Okay.  Training policy, but not

16   management of training.  Gotcha.

17          A.   Yes, sir.

18          Q.   Did your department develop and

19   maintain the shipboard navigation assurance

20   program?

21          A.   We set the navigation policy and

22   procedures.

23          Q.   What is the navigation assurance

24   program?

25          A.   I don't know.  That's something for

 JEANNIE REPORTING (305) 577-1705

11

1   Royal Caribbean International.  I was corporate.

2         **Q.**  Did your -- was your department

3   involved in VDR monitoring or the policy for VDR

4   monitoring?

5         **A.**  We -- no.  VDR -- we didn't monitor.

6   Nobody monitored VDRs.  There was no policy per

7   say of monitoring VDRs.

8         **Q.**  Do they do it at Carnival?

9         **A.**  No.

10        **Q.**  Did Royal Caribbean have the

11  technical capacity to monitor VDRs?

12        **A.**  Well, can you clarify what you mean

13  by monitor?  Because if you're talking about

14  live monitoring, no.

15        **Q.**  Yes.

16        **A.**  No.

17        **Q.**  Not live, but you did have the

18  ability to read them after a casualty, so to

19  speak?

20        MR. MASE:  Objection to form.  Go ahead.

21        THE WITNESS:  In a limited capacity.

22  BY MR. OSTROW:

23        **Q.**  Okay.  And what does that mean, a

24  limited capacity?

25        **A.**  Well, VDRs are not really designed

 JEANNIE REPORTING (305) 577-1705

1  for that purpose.  They are not really for

2  investigative purposes for us.  They are for

3  government, Coast Guard, NTSB, similar to what

4  you would find in a black box in an aircraft.

5  So it's not really for lessons learned for

6  investigations for the cruise line.  It's more

7  if the ship is lost.

8      Q.  As you sit here today, are you

9  unfamiliar with any companies that use VDRs in

10  their training programs and also monitor --

11  and/or monitor their VDRs live?

12      A.  I'm not aware of anybody that

13  monitors VDRs live, no.  They have a limited --

14  they are very user unfriendly, VDRs, and they

15  are very difficult to get information out of.

16  So for the guys on board to use them in their

17  learning function, it's very difficult for them.

18  They have other ways to do that with navigation

19  systems.

20      Q.  So in your position, you did set

21  training guidelines?

22      A.  Training policy.  We would set what

23  type of training the cruise lines would have to

24  have.

25      Q.  Okay.  And was Azipod operation



JEANNIE REPORTING (305) 577-1705

1    among those things that you would train?

2          A.   No, that would be ship specific.  We

3    had a very generic high level -- much higher

4    level training requirements.

5          Q.   So are you saying that whether or

6    not a particular ship trained its officers on

7    use of Azipods, dependent upon whether or not

8    the master preferred to do that?

9          A.   No, no.  The people within the

10   cruise line would have that kind of training,

11   but it would be managed by the cruise line at an

12   operating line level.  That wasn't part of our

13   agreement.

14         Q.   Okay.  But the cruise line would do

15   that?

16         A.   Yes.

17         Q.   Are you familiar with AIRTS,

18   A-I-R-T-S, Accident Incident Recording and

19   Tracking System?

20         A.   Yes.

21         Q.   What is that?

22         A.   Exactly what you just described.  It

23   tracks and records accidents and incidents.

24         Q.   Is that different from a VDR?

25         A.   Yes.



JEANNIE REPORTING (305) 577-1705

1      **Q.**   How is it different?

2      **A.**   VDR is a statutory requirement for

3   each ship to have, like a black box on an

4   aircraft.  The AIRTS system is a software

5   management system used ashore to track

6   incidents.

7      **Q.**   So onshore you can track what's

8   going on, on the ship through the use of AIRTS?

9      **A.**   No.  No, it's a dumb system.  The

10   cruise line have to input details of an

11   accident.

12      **Q.**   I see.  So it's an analytical

13   program of some sort?

14      **A.**   Yes, it's not much more than an

15   access database.

16      **Q.**   What's the Safety First Program?

17   Are you familiar with that?

18      **A.**   Not specifically, no.

19      **Q.**   Was the AIRTS system used in the

20   review of the incident that we are here about?

21      **A.**   No.  No, it really is only a

22   database of very limited information.  So it's

23   used for analytical purposes for trending data.

24   It's not really a detailed function.

25      **Q.**   What is the IMO?

```
 1              A.    The International Maritime
 2      Organization.
 3              Q.    And is Royal Caribbean a signator or
 4      member of the IMO?
 5              A.    No.   The IMO is a branch of the UN.
 6      So it's governments.   Governments are members,
 7      government states.
 8              Q.    And do they issue regulations?
 9              A.    Yes.
10              Q.    And do the cruise line -- are the
11      cruise lines somehow compelled to follow those
12      regulations?
13              MR. MASE:   Objection to form.
14      BY MR. OSTROW:
15              Q.    Go ahead and answer.
16              MR. MASE:   When I do that, all I'm doing
17         is preserving something for later to argue.
18         Whether your testimony at that point may be
19         admissible or not, you're still going to
20         answer.   I'm just making a legal objection.
21      I'm sorry.   It is disruptive, I know.
22              THE WITNESS:   No, no, I understand.
23              MR. MASE:   I try not to do it too much.
24              THE WITNESS:   I'm sorry.   Can you repeat
25         the question again, please?
```

```
 1              MR. OSTROW:  Yes.

 2          Would you read it back, please?

 3       (Thereupon, the pending question was read

 4   back by the reporter.)

 5              THE WITNESS:  Yes.  It's the

 6       international law of the sea, yes.

 7   BY MR. OSTROW:

 8       Q.   Does the IMO require casualty

 9   investigations?

10       A.   It is not required.  It's up to the

11   flag state.  It's up to the individual

12   governments to make that determination.

13       Q.   And then if the flag state does an

14   investigation, does the IMO require the cruise

15   line to participate in the investigation?

16       A.   No.

17       Q.   In this instance there was a flag

18   state investigation; correct?

19       A.   Yes.

20       Q.   Was there a separate investigation

21   by Royal Caribbean?

22       A.   Yes.

23       Q.   What other investigations were there

24   that you're aware of?

25       A.   There's our own, my investigation.
```

1    There was the flag state investigation.  The

2    U.S. Coast Guard were involved.  That's the only

3    ones I knew about at the time.

4         Q.    So just the two, yours and the flag

5    state?

6         A.    And the flag state and the Coast

7    Guard.

8         MR. MASE:  Coast Guard.  And I would

9         add, just so we're clear on the record that

10        NTSB was involved with the Coast Guard and

11        the BMA, Bahamas Maritime Authority.  So a

12        clean record.  They all kind of worked

13        together.  That's one investigation, if you

14        will.

15        Is that accurate?

16        THE WITNESS:  Yes.

17        MR. MASE:  Excuse me.

18        THE WITNESS:  We all did a concurrent

19        investigation.

20   BY MR. OSTROW:

21        Q.    To your knowledge, is the NTSB

22   investigation finished?

23        A.    No.  There was no -- the NTSB were

24   present as observers, but they stated they were

25   not going to perform an investigation.

```
 1              MR. MASE:  John, for your own
 2         information, the witness generally works --
 3         Mr. Ellis can validate this if you like, but
 4         typically in a foreign flag incident like
 5         this, the flag state, BMA, will take the
 6         lead.  Coast Guard and NTSB will be invited
 7         to participate, and if they want to create a
 8         rule, they will assert themselves.  If they
 9         don't, they won't.  And now, I believe, my
10         understanding from Mr. Ellis is that BMA
11         took the lead and that BMA will ultimately
12         issue a report which, as of today's date,
13         has not been issued.
14              THE WITNESS:  Correct.
15    BY MR. OSTROW:
16         Q.    That's correct, that the report has
17    not been issued.
18              So, and to your knowledge, there is
19    not a separate NTSB investigation?
20         A.    They declared there was not going to
21    be one.  So I haven't -- I have no knowledge of
22    it.
23              MR. MASE:  We confirm it.
24              THE WITNESS:  But they were there.  They
25         were there at the initial one.
```

```
 1              MR. MASE:  Oh, yes.  They did the

 2       interviews.

 3              I'm not trying to meddle.  I'm just

 4       trying to make it easier for you, so you

 5       know.

 6              MR. OSTROW:  Here's a 14-page composite.

 7       Would you please mark this as Plaintiff's

 8       Exhibit 1?

 9          (Thereupon, Plaintiff's Composite Exhibit

10   Number 1 was marked for identification.).

11   BY MR. OSTROW:

12          Q.   I show you what has been marked as

13   Plaintiff's Composite Exhibit 1 for today, and

14   it's entitled ANTHEM OF THE SEAS Heavy Weather

15   Incident, Preliminary Analysis, February 7 and

16   8, 2016.

17          A.   Yes.

18          Q.   Are you familiar with this document?

19          A.   Yes.

20          Q.   Was this document created under your

21   supervision?

22          A.   Yes.

23          Q.   Is this the entire document?

24          A.   I believe so, yes.  Looks like it.

25          Q.   This document contains one weather
```

```
 1   map?

 2        A.   Yes.

 3        Q.   It is on Page 7?

 4        A.   Yes.

 5        Q.   Do you know who issued that

 6   document?

 7            MR. MASE:  Are you referring to the

 8        weather map?

 9            MR. OSTROW:  The weather map.

10            THE WITNESS:  Yes.  Mr. Harned

11        (phonetic), Steve Harned.  It's on the

12        bottom of the page.

13   BY MR. OSTROW:

14        Q.   Mr. Ellis, did you complete your

15   investigation of this incident prior to leaving

16   the company?

17        A.   No.

18        Q.   This document says preliminary

19   analysis.  Was the preliminary analysis

20   completed prior to your leaving the company,

21   this document?

22        A.   This particular one, yes.

23        Q.   Okay.  Have you seen the final

24   analysis?

25        A.   No.
```



1      **Q.**   Are you aware of whether or not the

2      final analysis was completed?

3      **A.**   No.

4      **Q.**   You're unaware?

5      **A.**   I'm unaware.  I left a year ago.

6           MR. MASE:  You should get clearance from

7         him.  This particular analysis is complete,

8         despite the word preliminaries.  You should

9         clarify with him for your edification or

10        not.

11     BY MR. OSTROW:

12     **Q.**   Why does it say it's a preliminary

13     analysis?

14     **A.**   Because that's exactly what it was.

15     **Q.**   Okay.  And was there anything left

16     to do following the completion of this

17     preliminary analysis?

18     **A.**   If I recall, we were waiting on a

19     lot of different inputs from Bahamas, from the

20     working groups, the technical aspects.  And

21     they -- no, nothing specific, but it just was

22     never -- it was still in draft form when I left.

23     **Q.**   Okay.  Which is what I have in my

24     hand?

25     **A.**   No.  The report was -- the full

```
 1    report was separate, which was never finished.

 2         Q.    The full report.  Why not?

 3         A.    Because I was just waiting on

 4    certain details from the Bahamas and from the

 5    technical working groups.

 6         Q.    Okay.  Were statements taken in

 7    conjunction with the creation of this report?

 8         A.    No.

 9         Q.    You interviewed witnesses or not?

10         A.    Yes.

11         Q.    Yes.  The witnesses being the ship's

12    crew?

13         A.    Yes.

14         Q.    Any other witnesses other than the

15    ship's crew?

16         A.    No.

17         Q.    And the captain --

18         A.    I'm sorry.  Of course, yes, the

19    shoreside management as well.  Yes.

20         Q.    Okay.  And why was the shoreside

21    management interviewed?

22         A.    Of the cruise line?

23         Q.    Yes, sir.

24         A.    So the people that these folk

25    reported to, I interviewed them as well.
```



1       **Q.**   Okay.  Why?

2       **A.**   It was part of the investigation.

3       **Q.**   And what information did you seek to

4    obtain from them?

5       **A.**   Primarily to confirm what the ship's

6    staff had told me.

7       **Q.**   Were you the one that interviewed

8    the ship's officers or did someone under your

9    department?

10      **A.**   It's called a party system under the

11   IMO guidelines where the Bahamas take the lead,

12   flag state take the lead.  All of the

13   investigators are in the room together with the

14   witnesses and they question the witnesses in

15   turn.

16      **Q.**   Okay.  Were the witnesses

17   interviewed by the company at any other time?

18      **A.**   No, not that I'm aware of.  I led

19   the investigation.

20      **Q.**   There was -- according to the

21   captain, in his deposition, there was a lady

22   that interviewed him about the incident.  Do you

23   know who that might have been?

24      **A.**   There was another lady that often

25   was used for by the SVP to perform the various

```
 1    human resource type interviews.
 2          Q.    What's the SVP?
 3          A.    Senior vice president.
 4          Q.    Okay.  So did the senior vice
 5    president cause the crew to be interviewed about
 6    this incident?
 7          A.    I don't know.
 8          Q.    Do you recall her name?
 9          A.    No.
10          Q.    I have it in my notes.  I'll get
11    back to it later.
12                Among the documents that you
13    reviewed in your investigation, were the
14    master's handover notes included?
15          A.    Yes.
16          Q.    I show you what's been Bates stamped
17    Numbers 1925 through 1932 in the lower
18    right-hand corner which appears to be among
19    other Bates stamps.
20              MR. OSTROW:  Would you mark this as
21        Composite 2, please?
22          (Thereupon, Plaintiff's Composite Exhibit
23    Number 2 was marked for identification.)
24              MR. OSTROW:  Curtis, do you know why
25        there are two different Bates stamps on
```

1        this?

2            MR. MASE:  On what?  Let me see.  So are

3        you talking about this and this?

4            MR. OSTROW:  Yes.

5            MR. MASE:  So I think what happened is

6        that every document that we got from Royal

7        Caribbean, we internally Bates stamped for

8        control purposes so we know we had it or

9        didn't have it or whatever.  So I think what

10       you're going to see on a lot of documents is

11       an internal control Bates stamp for us so

12       that we know when we got it and how we got

13       it.  It really doesn't reflect production.

14       Really the only thing production is going to

15       say is CCL and the numbers.

16           MR. OSTROW:  Gotcha.  Okay.

17           MR. MASE:  Because we got a lot of stuff

18       that, quite honestly, wasn't relevant or

19       whatever, so.

20           MR. OSTROW:  Okay.

21    BY MR. OSTROW:

22       Q.   Is this Exhibit 2 the handover notes

23    that you reviewed?

24       A.   No, I don't think it was.  The

25    format -- I saw a format -- the format was

1    different, the format that's required in our

2    regulations.  I don't believe I saw this.

3    There's a specific Royal Caribbean form that

4    they need to fill out.  It's very dry.  It's not

5    normally a text like this.

6         MR. OSTROW:  I have before me what

7         appears to be the captain's evaluation,

8         Claus Andersen.  Let's mark this as Number

9         3, please.

10        (Thereupon, Plaintiff's Composite Exhibit

11    Number 3 was marked for identification.)

12    BY MR. OSTROW:

13        Q.  I show you what's been marked as

14    Exhibit 3 and ask you if you ever saw this?

15        A.  No, I don't have access to this.

16    No.  This is between the cruise line management

17    and their personnel.

18        Q.  In this evaluation, the question is

19    posed, "What can this employee do to improve,"

20    and the last sentence says, "For example, while

21    facing the challenge of the AN storm, he should

22    have contacted his shoreside support for

23    guidance and shared responsibility ahead of

24    time."  Are you familiar with that issue?

25        A.  I've not seen that, this file at

1    all.

2         **Q.**   I know that.  Are you familiar with

3    the issue that I just mentioned, about the

4    captain not contacting shoreside?

5         **A.**   Yes.  One of the required reports

6    didn't make a required report.

7         **Q.**   What report would that have been?

8         **A.**   It's within our safety management

9    system where they -- if the captain is expecting

10   weather of over -- I think it was 45 knots

11   within the next three days, he should report it.

12        **Q.**   Okay.  And had he reported it, what

13   would have happened, if you know?

14        **A.**   Responsibility would have shifted to

15   shoreside.

16        **Q.**   The captain -- to your knowledge,

17   did the captain speak to shoreside between the

18   time he left port and the time he first

19   encountered heavy weather?

20        **A.**   Yes.  He made a telephone

21   conversation to his -- a call to his boss.

22        **Q.**   Okay.  And at that time -- do you

23   know what time that was?

24        **A.**   No.  Midmorning on the first day at

25   sea.



```
 1          Q.   Okay.  So at that point, did
 2    responsibility shift to shoreside?
 3          A.   No, no, he didn't report as is
 4    required.  There is a required reporting
 5    function.
 6          Q.   He would have been required to
 7    report weather conditions?
 8          A.   If it exceeds a certain speed, yes.
 9          Q.   Okay.  The navigators do noon
10    reports.  Do you recall that?
11          MR. MASE:  Objection to form.
12          THE WITNESS:  Noon reports?  Not
13        specifically, no.  It may be something I'm
14        calling something else.
15    BY MR. OSTROW:
16          Q.   In the deposition of the captain, he
17    said the navigator does a noon report to include
18    position, speed, those issues.
19          A.   He may be referring to an internal
20    report to the captain.
21          Q.   No, to shoreside.
22          A.   Oh.  In that case, it's to the
23    cruise line, not to me.
24          Q.   Did the ANTHEM incident, while you
25    were still with the company, have a particular
```

```
 1    effect on the company that you noticed?

 2           A.   We made recommendations immediately

 3    that were -- that Royal Caribbean adopted almost

 4    at the same time, and our recommendations

 5    matched the actions they had already done.  And

 6    it was basically an enhanced reporting

 7    requirement.  And the more detailed weather

 8    support subscriptions, that was to a weather

 9    professional service, so.

10           Q.   What about hiring a weather

11    professional?

12           A.   No, it wasn't --

13           Q.   It wasn't part of your --

14           A.   No.

15           Q.   Did you become aware that they did,

16    in fact, hire a weather professional?

17           A.   Only through the press.  That was a

18    long time after I left.

19           Q.   What is the ISM?

20           A.   It's the International Safety

21    Management code.

22           Q.   And who is that promulgated by?

23           A.   By IMO.

24           Q.   By IMO.  Okay.

25           A.   It's the overarching requirement to
```

 JEANNIE REPORTING (305) 577-1705

1    have a management -- safety management system.

2         Q.    Gotcha.  That also requires or does

3    it require casualty investigations?

4         A.    No, I don't think it does in the ISM

5    code.  It's very, very high level.  It more or

6    less just says that you shall have a safety

7    management system.

8         Q.    Is it your understanding that the

9    term marine casualty would include this

10   incident?

11        A.    Yes.

12        Q.    Are there certain rules and

13   regulations that require investigations of

14   casualties to occur other than by a flag state?

15        A.    The Coast Guard has what they call a

16   2692 which is a requirement to fill in.  That's

17   why I was saying yes to that, because they

18   define a casualty to include monetary loss.

19        Q.    Loss -- certainly loss in Azipod

20   would be a casualty?

21        A.    Not necessarily, no.  But it could

22   be if it hit the limit for the cost.

23        Q.    What part did the VDR play in your

24   investigation of this incident?

25        A.    Voice, voice recordings from the



1    bridge.

2           **Q.**    And what about video recordings on

3    the bridge?

4           **A.**    No, we were -- as I mentioned

5    before, they are very user unfriendly, these VDR

6    systems.  They are not designed for analysis

7    like this.  So it's very difficult for us to

8    extract data.

9           **Q.**    Were you able to extract the voice

10   recording?

11          **A.**    We were able to get periods of or

12   sections of voice.  It's a huge amount of data.

13   So one of the reasons that I interview shoreside

14   is to pin down exactly where I need to go search

15   in the VDR.

16          **Q.**    Okay.  So the time periods that you

17   looked in the VDR, were you able to hear what

18   went on?

19          **A.**    Yes.  There were certain things I

20   was looking for, yes.

21          **Q.**    Do you know why the copies of the

22   VDR we were provided were generally inaudible?

23          **A.**    Like I said, they are very user

24   unfriendly.  We spent weeks trying to get data

25   from them, and we successfully were getting

1    voice, and that's it, really.

2         Q.    Who manufactured the VDR in this

3    case?

4         A.    It was made -- the trade name is

5    Danelec, but its parent company is SAM

6    Electronics.

7         Q.    SAM Electronics?

8         A.    Yes.

9         Q.    And you had conversations with the

10   company about accessing?

11        A.    Yes.  We tried to get their help, to

12   help us, without much success.

13        Q.    And was a warranty claim made on the

14   VDR?

15        A.    I don't know.

16        Q.    Was the system changed to -- as a

17   result of your inability to access all the

18   information, did they change the VDR on the

19   ship?

20        A.    I don't think so.  I don't know for

21   sure, but I don't think so.  As I said before,

22   really the intent of the VDR is in case of a

23   loss, like a black box in an aircraft.  It's not

24   really designed for investigation purposes.

25        Q.    In case of a loss, you would want to

 JEANNIE REPORTING (305) 577-1705

```
 1    access the video, the data, and the voice;

 2    correct?

 3         A.   The authorities would, yes.

 4         Q.   The authorities would.  And if they

 5    are unable to, then it's a worthless machine?

 6         A.   I didn't say that, but yes.

 7         Q.   Well, you understand that it's --

 8         A.   They are very difficult to access

 9    for, other than the manufacturer.  If there's a

10    real loss, such as the Alfaro incident, then the

11    manufacturer will work with the NTSB to get

12    whatever they can from them, but they are really

13    very difficult to operate.

14         Q.   Did you report to any of your

15    superiors the fact that you had difficulty

16    accessing the information on the VDR?

17         A.   Yes.  It's well known.  In all the

18    investigations we performed, VDRs are not

19    designed for that purpose.  They are inherently

20    difficult to extract data from.

21         Q.   But they are required by

22    international law?

23         A.   Yes.

24         Q.   And the same law that requires you

25    to have a VDR, am I correct to assume that it
```

```
 1    requires VDR information to be accessible?

 2             MR. MASE:  Objection to form.

 3             THE WITNESS:  I have got no insight to

 4        that.

 5    BY MR. OSTROW:

 6        Q.    It certainly would make sense,

 7    though?

 8        A.    You would think so, yes.

 9        Q.    Yes.  The technical issues --

10    according to this report, the technical issues

11    with the propulsion system exacerbated the

12    situation; is that accurate?

13        A.    Yes.

14        Q.    Made it a much more violent journey

15    than otherwise would have been anticipated?

16        A.    I don't know about violent, but it

17    reduced the ability to maneuver the ship.

18        Q.    And the purpose of maneuvering --

19    part of the purpose of maneuvering the ship

20    would be to put the ship in the safest and most

21    comfortable position; correct?

22        A.    Yes.

23        Q.    And if the captain is unable to do

24    that, then the weather is in control as opposed

25    to the captain; is that correct?
```

```
 1                    MR. MASE:  Objection to form.
 2                    THE WITNESS:  In a limited fashion, yes.
 3    BY MR. OSTROW:
 4            Q.    And that makes the experience more
 5    rugged, so to speak?
 6            A.    Possibly.
 7            Q.    The captain would have wanted, and I
 8    think he tried, didn't he, to get the bow into
 9    the wind?
10            A.    Yes.
11            Q.    And was unsuccessful in doing so?
12            A.    Yes.
13            Q.    And with the bow into the wind, the
14    passengers would not have experienced the side
15    to side rolling?
16            A.    Rolling.  He managed to get the bow
17    about 30 degrees off the wind.  He would have
18    preferred to get another 10, 15 degrees.  You
19    wouldn't have the bow directly into the wind.
20    It would be just off that.  So he probably would
21    have wanted another 15 degrees.
22            Q.    Was it known to the company before
23    this voyage that the Azipods on the ANTHEM did
24    not perform optimally in rough weather?
25            A.    There was some indications that
```



```
 1    there might have been issues in previous

 2    crossings, but very limited small indications.

 3         Q.   Did the company make the captain of

 4    the ANTHEM aware of that?

 5         A.   He was on board.  He knew.

 6         Q.   When those instances occurred?

 7         A.   Yes, sir.

 8         Q.   Did they inform the other captains

 9    that ran the ANTHEM from time to time of that

10    problem?

11         A.   I don't -- I presume so.  I don't

12    know.

13         Q.   You don't know?

14         A.   No.

15         Q.   We are not going to guess, remember.

16         A.   No.

17         Q.   Did you have access to the NOAA

18    reports that were on the ship?

19         A.   Yes.

20         Q.   You reviewed those NOAA reports?

21         A.   Yes.

22         Q.   And do you recall seeing some of the

23    NOAA reports with handwritten time notes on

24    them?

25         A.   Yes.
```



1      **Q.**   And were those time notes accurate

2   as you reviewed them?

3      **A.**   No.

4      **Q.**   They were four hours off?

5      **A.**   Yes.

6      **Q.**   So the navigator -- were those

7   navigator's notes?

8      **A.**   No, they were done after the event,

9   when we were collecting the data.

10     **Q.**   The handwritten notes were done

11  after the event?

12     **A.**   Yes.  For our benefit as

13  investigators.

14     **Q.**   Okay.  So one of the people that

15  worked for you got the times wrong?

16     **A.**   No, the ship -- one of the ship's

17  staff.  I don't know who wrote it.  It became --

18  they wrote it for us for -- during the

19  investigation, and then it became apparent later

20  on when we looked at the times.

21     **Q.**   And did the ship plan based on those

22  erroneous times?

23     **A.**   No.

24     **Q.**   They had the correct times when they

25  planned and erroneous times later?

```
 1          A.   As far as I know.  Well, I do know

 2    that they were written after the event.  That's

 3    all I can say.

 4          Q.   By Spagis (phonetic), the navigator?

 5          A.   I don't know which bridge officer.

 6    When we were given the reports, we were told

 7    that, "We have written the times in for you so

 8    you can see when the equivalent is," because we

 9    wouldn't have known inherently what the ship's

10    local time was.  So they were trying to be

11    helpful.

12          Q.   This occurred on the ship, this

13    meeting when they gave that to you?

14          A.   Yes.

15          Q.   And it was when the ship hit Bayonne

16    and you showed up?

17          A.   Yes.

18          Q.   Right after the storm?

19          A.   Yes.

20          Q.   Okay.  Well, based on the times on

21    those notes, the captain might have been able to

22    outrun the storm; is that correct?  It would

23    have given him an extra four hours?

24          MR. MASE:  Objection to form.

25          THE WITNESS:  I'd have to look at them
```

```
 1        to see, to make a calculation.  Once we
 2        realized they were erroneous, it was no
 3        longer -- you know, didn't use that with
 4        those times.
 5   BY MR. OSTROW:
 6        Q.   And you don't know whether when they
 7   planned -- or the captain planned to outrun the
 8   storm -- well, let me back up a second.
 9             Were you aware of the announcement
10   the captain made to the passengers early in the
11   journey that there was a storm out there, but he
12   was going to outrun it?
13        A.   Yes.
14        Q.   Okay.  So, and do you know whether
15   his calculation of the ability to outrun that
16   storm was based on the same numbers that were,
17   you say, erroneously written after the fact on
18   the forms?
19        A.   It is extremely unlikely.
20        Q.   Extremely unlikely?
21        A.   That he would make those errors.
22        Q.   But one of his officers did?
23        MR. MASE:  Objection, form.
24   BY MR. OSTROW:
25        Q.   Correct?
```

1          **A.**    Post event.

2          **Q.**    But did?

3          **A.**    During the questioning, yes.

4          **Q.**    Yes.  And during that questioning,

5     did you ask that officer if he used those same

6     numbers in his pre-cruise analysis?

7          **A.**    No, because the error was not

8     noticed until later.

9          **Q.**    And was it your understanding that

10     it was the navigator that gave those to you?

11          **A.**    I don't recall where we got them

12     from.  They were delivered to us in a pile of

13     documents.

14          **Q.**    So you really don't know whether

15     they relied on them at the time of planning or

16     not, only that they were -- what you received,

17     they were written on after the storm.  The

18     numbers were written on it after the storm?

19          **A.**    I know that the writing of numbers

20     like that is not a normal practice.  It's not

21     normal that they would use the UTC time in their

22     head for everything.  There's no translation of

23     time in the operation.  But for the

24     investigator's benefit, who didn't know what the

25     officer between the ship's time was and the UTC,

```
 1    they were being helpful and just added a little

 2    bit of extra help for us, which was in error.

 3         Q.   I was looking at something in this

 4    report that I noticed before when I browsed it.

 5    Let's see if I can find it.  Otherwise, we'll

 6    come back to it.

 7              What is DNVGL?

 8         A.   That's the classification society.

 9         Q.   Did they do an investigation?

10         A.   No, but they were -- they did an

11    audit, navigation audit by request of the flag

12    at the time.

13         MR. MASE:  It's called an ISM audit.

14         MR. OSTROW:  The ISM audit.  At whose

15      request?

16         THE WITNESS:  The flag, Bahamas.

17   BY MR. OSTROW:

18         Q.   And they did just one investigation

19    or a series of investigations?

20         A.   Classification society just did that

21    one ISM audit.

22         Q.   Because I thought I recalled seeing

23    in that that they had done other audits or

24    ordered additional audits.

25         A.   Not directly for this incident.
```



```
 1    They may have -- they do deal with it on a
 2    repeated basis.  That's what their function is.
 3    But if you're talking about this specific event,
 4    no, just that one.
 5          Q.   Yes, they ordered -- they claim they
 6    ordered additional audits maybe as a result of
 7    this?  Would that --
 8          A.   I don't recall that, no.
 9          Q.   No?  Okay.  I don't have it with me,
10    so.  We'll get back to it.
11               The report indicates there was a
12    breakdown in procedures for reporting
13    anticipated weather conditions; correct?
14          A.   Yes.
15          Q.   And what was the reason there was a
16    breakdown?
17          A.   Because it was not reported when it
18    should have been.
19          Q.   And that was the captain or the crew
20    that was supposed to do that report?
21          A.   The captain.
22          Q.   Do you know why the crew didn't wake
23    the captain when that NOAA report came in saying
24    there was a hurricane ahead?
25          A.   Well, it wasn't a hurricane.
```

1          Q.   Hurricane force --

2          A.   Hurricane force winds.

3          Q.   -- winds and seas?

4          A.   No, they were all party to the same

5    plan.  They had signed an agreement that they

6    understood the plan.

7          Q.   But the plan was developed before

8    the winds and seas developed into hurricane

9    strength; correct?

10         A.   A little bit, yes.  There was a

11   slight increase, yes, from 50 to 60 knots.

12         Q.   And in doing the report, you relied

13   on interviews, data from the VDR, and you're

14   saying the only data from the VDR was voice

15   data?

16         A.   Yes.

17         Q.   The CCTV footage?

18         A.   Well, we got some limited other

19   data, such as little snatches of automation

20   reports, but very little.

21         Q.   The automation reports.  What about

22   wind reports, doesn't that go to the VDR?

23         A.   No, it -- well, indirectly.  It goes

24   to the -- it's a live feed into the radar, which

25   is one of the images we couldn't get.

```
 1              Q.    And the radar is supposed to go to

 2      the VDR?

 3              A.    Yes.  It's there.  We could see the

 4      data was there.  We just couldn't access it.

 5              Q.    That CCTV footage -- what CCTV

 6      footage did you review?

 7              A.    Footage of the center images of the

 8      waves over the bow, hitting the windows.

 9              Q.    That was it?

10              A.    Pretty much, yes.  I don't know if

11      there is more because we don't -- I don't have

12      access to those.  That comes into a different

13      department.

14              Q.    What department does that come into?

15              A.    Global security.

16              Q.    Would it all have been preserved?

17              A.    I don't know.  I think probably not.

18      It's a huge amount of data.

19              Q.    Well, aren't there regulations that

20      require certain data to be preserved if there's

21      a casualty?

22              A.    No.  The VDRs have to have a

23      limited -- it's a limited amount of recording

24      time.  I think it's like 48 hours of recording

25      time for the VDR.  That doesn't include CCTV.
```

```
 1              Q.   Okay.  And there's no company policy

 2      or any requirement that CCTV be kept?

 3              A.   We instruct -- as investigators, we

 4      instruct them to secure any relevant CCTV.

 5              Q.   Okay.  And who decides which of the

 6      CCTV is relevant?

 7              A.   The ship.  The ship's management.

 8              Q.   The captain?

 9              A.   Yes.

10              Q.   Were you aware that after the

11      cruise, the captain was given a psychological

12      examination?

13              A.   Yes.

14              Q.   How did you first become aware of

15      that?

16              A.   I don't recall.  Conversation with

17      his manager, with his boss.  I don't recall when

18      or under what circumstances.

19              Q.   Why was the captain given a

20      psychological examination?

21              A.   That was a decision made by the

22      cruise line.

23              Q.   Why?

24              A.   I don't know.

25              Q.   Who made the decision?
```

1          **A.**    The management of the cruise line.

2          **Q.**    And who was -- can you put any names

3      on that?

4          **A.**    Not without guessing, no.  I know

5      who the management was, but I don't know who

6      would have decided that.

7          **Q.**    What were the reasons that you heard

8      of that the captain was given a psychological

9      examination?

10         **A.**    I wasn't given any reasons.  I just

11     heard that it happened.

12              However, it's not unusual.  It's a

13     requirement to have a psych evaluation on a

14     promotion.

15         **Q.**    On a promotion?  Was he promoted?

16         **A.**    He may have -- I don't know.  No, he

17     wasn't promoted, but he might not have had the

18     evaluation at that time.

19              The point is they all have them.

20     Every captain has them.

21         **Q.**    Every captain has them?

22         **A.**    On their promotion to captain.

23         **Q.**    Oh, on their promotion to captain?

24         **A.**    Yes.

25          MR. OSTROW:  We can go off the record.

```
 1          (Thereupon, a discussion was held off the
 2      record.)
 3      BY MR. OSTROW:
 4          Q.   I think I asked you about this
 5      earlier and you told me it's not, but the VDRs
 6      at Royal Caribbean is not used in any way for
 7      bridge management; is that correct?
 8          A.   They are meant to be able to be, but
 9      they are really not user friendly.  And there
10      are other ways that they can get the same data
11      from other machines, which they tend to use
12      instead.
13          MR. MASE:  By bridge management, you're
14      referring to on the bridge themselves using
15      it?  Just so we're clear on the record.
16      That's all.  That's what I thought you
17      meant.
18          MR. OSTROW:  Well, it's management on
19      the bridge itself and management of the
20      bridge from shore.
21          MR. MASE:  But I think you said --
22      that's what I was getting at.  He said there
23      is no remote.
24          MR. OSTROW:  Well, there is.  It's on
25      market.
```

1          MR. MASE:  I understand that.  But he's

2     talking about Royal Caribbean doesn't use

3     it, is my point.  I understand that's

4     different, but I'm just saying, just so

5     we're clear on the record, Royal Caribbean

6     doesn't use it.  So what you're talking

7     about is on the ship?

8          MR. OSTROW:  Or it could be, you know,

9     shore accessing it and going back to the

10    ship, but whatever.  As he said, it's not

11    accessible.

12   BY MR. OSTROW:

13        Q.    How does a ship generally monitor

14   barometric pressure?

15        A.    Through a barograph.

16        Q.    And where is it located?

17        A.    On the bridge.  The sensors could be

18   outside.

19        Q.    And other than the captain, who else

20   is responsible for monitoring the barometric

21   pressure?

22        A.    All of the bridge staff.

23        Q.    And in this instance, all of the

24   bridge staff failed to properly monitor the

25   barometric pressure?

```
 1                  MR. MASE:  Objection to form.

 2                  THE WITNESS:  I don't think they failed,

 3          no.

 4      BY MR. OSTROW:

 5          Q.    They monitored and didn't appreciate

 6      what it meant?

 7          A.    I think they knew what it meant,

 8      that the pressure was dropping.

 9          Q.    The captain indicated, did he not,

10      that there should have been alarms for

11      barometric pressure; are you aware of that?

12          A.    No.

13          Q.    Never heard that?

14          A.    No.

15          Q.    Never said that to you?

16          A.    No.

17          Q.    What is NACOS, N-A-C-O-S?

18          A.    It's the bridge management system.

19      So it's the combined integrated bridge system,

20      navigation.  That stands for navigation command

21      system.

22          Q.    Are you aware that it does not

23      include barometric tracking?

24          A.    It shows the barometric pressure.

25          Q.    What's the term UKC?
```



JEANNIE REPORTING (305) 577-1705

```
 1              A.    Under keel clearance.

 2              Q.    NACOS monitors under keel clearance;

 3      correct?

 4              A.    Yes.

 5              MR. OSTROW:  Let's mark -- this e-mail

 6          is from Captain Andersen to the master and

 7          the staff captain of the ANTHEM dated

 8          February 20, 2016.  I guess that would be

 9          documented 4.

10          (Thereupon, Plaintiff's Exhibit Number 4

11      was marked for identification.)

12              MR. OSTROW:  Are you familiar with that?

13              MR. MASE:  One never knows.

14              MR. OSTROW:  I'm specifically referring

15          to the third paragraph.

16      BY MR. OSTROW:

17              Q.    Okay.  So it's your understanding

18      that NACOS does monitor or track barometric

19      pressure?

20              A.    NACOS is a term for the integration

21      of the bridge equipment.  So it's not a machine

22      itself.  It's all of the machines integrated

23      together.

24              Q.    Integrated together and that is

25      readable on a particular screen, one screen?
```



1          **A.**    Yes, the multi-plots that you can

2    plot what you want.

3          **Q.**    Okay.  And if barometric tracking is

4    not available on NACOS, would you agree that it

5    should have been?

6          MR. MASE:  Objection.

7          THE WITNESS:  I don't know if it's

8       available or not.

9    BY MR. OSTROW:

10         **Q.**    Okay.  Should it be?

11         **A.**    It's -- it could be.  It's not

12    particularly -- like I say, all NACOS is, is a

13    collection of all the instruments here.  So if

14    it's available here, and not here, then it's

15    still available to me.

16         **Q.**    We did an inspection on the ship.

17    And in that inspection, one of the comments was

18    there's an awful lot of different things to look

19    at on the bridge.  You agree with that

20    assessment?

21         **A.**    Absolutely.

22         **Q.**    Okay.  A NACOS system in a way

23    consolidates a bunch of random monitors into one

24    place?

25         **A.**    Right, that's its purpose.



```
 1              Q.   That's its purpose.  Because

 2    otherwise, someone might be overwhelmed by all

 3    the different choices of things to look at?

 4              MR. MASE:  Objection to form.

 5              THE WITNESS:  No.

 6    BY MR. OSTROW:

 7              Q.   Would that be accurate?

 8              A.   No, not overwhelmed.  It's just to

 9    make things easier.

10              Q.   Okay.  I hand you this Exhibit 4.

11    Take a look at paragraph 3.  Read it and then we

12    can discuss it.

13              A.   Yes.

14              Q.   So when you interviewed the captain,

15    did he have anything similar than this to say to

16    you?

17              A.   No.

18              Q.   Would you have wanted to hear that

19    from him?

20              A.   I see this as a suggested

21    improvement for the monitoring system, not

22    necessarily in his decision.

23              Q.   Did you get the impression from

24    reading this that he wasn't aware of the certain

25    changes from high to low pressure that
```

```
 1   occurred--
 2        A.   No.
 3        Q.   -- in a timely manner?
 4        A.   No, I think the impression he's
 5   talking about would aid his bridge officers.
 6        Q.   They weren't aware?
 7        A.   No, I didn't say that.  I said it
 8   would aid his bridge officers.
 9        Q.   Okay.  Did that give you the
10   impression that his bridge officers weren't
11   timely aware of the change?
12        A.   In my opinion, yes, they were.  They
13   knew about it.
14        Q.   And they timely reported it to him
15   or not?
16        A.   I don't know.
17        Q.   You don't know?
18        A.   I don't know.  I wasn't there.
19        Q.   Okay.  Did you discuss with the
20   captain whether or not the other bridge officers
21   made him aware when he came on deck in the
22   morning of the significant changes in barometric
23   pressure?
24        A.   Yes.
25        Q.   What did he have to say about that?
```



JEANNIE REPORTING (305) 577-1705

```
 1            A.    He -- I'm trying to recall.  It was

 2     a long time ago.  I don't remember what he said

 3     specifically about that.

 4            Q.    Who assisted you in the

 5     investigation?

 6            A.    I had two managers that reported to

 7     me.

 8            Q.    And what were their names?

 9            A.    Amy Spencer and Greg McNeil.

10            Q.    What did each of them do in regard

11     to the investigation?

12            A.    Well, primarily Greg McNeil would be

13     helping me operate the VDR.  He was our VDR

14     specialist.  If anybody could make it work, it

15     was going to be him.

16            Q.    Other than the ship's officers, who

17     else -- in your department, who else was

18     involved in the investigation?

19            A.    Well, my department was only the

20     three of us.

21            Q.    Right.  And was there anyone else

22     from the company involved in the investigation?

23            A.    In my investigation, no.

24            Q.    Did you ask the captain why he

25     didn't turn around when he saw the NOAA report,
```

1    reporting hurricane force winds and seas ahead?

2         A.    That was asked of him not by me, but

3    by the flag state, yes, during the questioning.

4         Q.    But you didn't ask him?

5         A.    It was a combined questioning.  So

6    the Bahamas had the lead.  They would ask the

7    questions.  If anybody else had a follow-up

8    question, they would come along and ask them.

9         Q.    And what was his answer?

10        A.    That he made a diversion to the

11   west, to avoid the worst of it, as the forecast

12   judged that to be sufficient.

13        Q.    As he interpreted the forecast?

14        A.    Yes.

15        Q.    And it didn't help, did it?  It took

16   him into the center; is that what you found?

17        A.    No.

18        Q.    No?

19        A.    No, the forecast wasn't correct.

20        Q.    Does Royal Caribbean periodically

21   validate their VDR -- their VDRs?

22        A.    No, it's not something that is

23   doable, as far as I can be aware.  There's no

24   service that the company does on the VDRs.

25        Q.    There is no service that they do on



1    the VDRs, although there are people out there

2    that service VDRs; correct?

3         **A.**   No, usually if something goes wrong

4    with the VDR, they get replaced.  Generally,

5    they are not repaired.

6         **Q.**   So is it your testimony that there's

7    nobody out there that does certifications of

8    VDRs?

9         **A.**   I didn't say that.

10        **Q.**   Okay.  Are there --

11        **A.**   Are you asking me about Royal

12   Caribbean?

13        **Q.**   I'm asking you in general, are there

14   certification services for VDRs?

15        **A.**   There may be.  I don't know.

16        **Q.**   Do you know whether or not they are

17   required to be certified?

18        **A.**   They have to have a type approval.

19   So provided they have a type approval that's

20   approved by the IMO, then that's sufficient.

21        **Q.**   Well, that's a generic type

22   approval.  An S or a non S-VDR, is that the type

23   you're talking about?

24        **A.**   No.  A specific model has approval

25   from the IMO as being compliant.

1    **Q.**   Were you able to view any of the VDR

2    video?

3         **A.**   No.  We -- the video, it's a

4    misnomer.  It's not video -- moving video.  It's

5    a snapshot.  So it's a series of graphic still

6    images.  But we got a couple of those, but not

7    anything that we could use.

8         **Q.**   Are they intended to preserve the

9    NAD screens?

10        **A.**   The radar, yes.

11        **Q.**   In conjunction with your extraction

12   of whatever information you were able to get out

13   of the VDR, were notes, specific notes of what

14   was found made?

15        **A.**   Yes.

16        **Q.**   And that would be in addition to the

17   reports?

18        **A.**   That was part of the draft report.

19        **Q.**   Included in the draft report?

20        **A.**   Yes.

21        **Q.**   The screenshots, those screenshots,

22   although they weren't what you were looking for,

23   were they preserved?

24        **A.**   The data was there, but we couldn't

25   access much of it until -- nothing usable.

1          Q.   What is SOLAS, S-O-L-A-S?

2          A.   Safety of Life at Sea.  It's a

3    convention.  It came in, in the sixties and then

4    was amended heavily in 1974.  It covers all the

5    safety operations of ships.  Not just passenger

6    ships.

7          Q.   And it's flag states that are bound

8    to it or is it --

9          A.   Yes.

10         Q.   So, and then flag states in turn

11   require any of their flag ships to follow it?

12         A.   Yes.

13         Q.   Did you review bridge meeting

14   minutes from the cruise?

15         A.   Yes.  The bridge -- the voyage

16   planning -- the voyage review, yes.  The --

17   what's it called?  The voyage planning review,

18   yes.  That was one of the things we looked for

19   on the VDR recordings.

20         Q.   The preplanning?

21         A.   Yes.

22         Q.   The pre-voyage plan?

23         A.   Yes.  The navigation officer

24   collects, makes the plan, and it's checked by a

25   second bridge officer and then it's presented to

1        the master.

2                Q.   As a PowerPoint?

3                A.   As a plan, however it may be.  Then

4        it's presented to the rest of the team

5        pre-departure.

6                Q.   Did you, as part of your job

7        function while you were with Royal Caribbean,

8        study the ship's abilities to evacuate?

9                A.   Study them?

10               Q.   Yes.

11               A.   No.

12               Q.   Did you measure them?

13               A.   No.

14               Q.   Do you know whether or not the ships

15       were able to evacuate, all the ships were able

16       to evacuate in 30 minutes?

17               A.   Yes, they have to be able to do

18       that, yes.

19               Q.   They have to be able to do that?

20               A.   Yes.

21               Q.   Were they able -- in this instance,

22       we are talking about 6,200 people.  Could they

23       all be evacuated from the ship in 30 minutes?

24               A.   Yes.

25               Q.   And how do you know that?



JEANNIE REPORTING (305) 577-1705

1          **A.**   It's a requirement.   Everything we
2    do is designed that way.
3          **Q.**   And could they do that if the ship
4    was listing to port more than 20 degrees?
5          **A.**   23 degrees.
6          **Q.**   More than 23 degrees?
7          **A.**   Yes.
8          **Q.**   If the ship is listing more than
9    23 degrees, would all the life boats launch?
10          **A.**   That's the design criteria,
11    23 degrees.
12          **Q.**   So if it's listing more than 23,
13    then you don't have to be able to launch all the
14    life boats?
15          **A.**   You would have to get them off the
16    other side.
17          **Q.**   Half of them off the other side?
18          **A.**   No, there's more than half on the
19    other side.
20          **Q.**   There's more than half per side?
21          **A.**   Yes.
22          **Q.**   Well, the total is only 74 and a
23    half percent; correct?
24          **A.**   It's more than half.   In life boats.
25    We also have life rafts, under the regulations.

```
 1              Q.    Right.   That's the chute?

 2              A.    Right.

 3              Q.    Have you ever been down one of those

 4     chutes?

 5              A.    Yes.

 6              Q.    Is there a procedure for evacuating

 7     the disabled?

 8              A.    Yes.

 9              Q.    Is there a procedure for evacuating

10     autistic passengers?

11              A.    Yes.

12              Q.    What is that?

13              A.    I don't recall the details, but

14     there is a procedure, yes.

15              Q.    Were you aware that the assembly

16     station for my clients was decks 4 or 5?

17              A.    No, I'm not aware.

18              Q.    Do you know why their assembly

19     station would have been different from where

20     they mustered?

21              A.    No.

22              Q.    What is the policy or procedure for

23     guiding in the evacuation of autistic children?

24              A.    I don't recall the exact details,

25     but I do know that primarily around keeping them
```

```
 1    quiet in a calmer environment.  Keeping a calmer
 2    environment rather than giving them directions.
 3         Q.   A calmer environment while the ship
 4    is evacuating due to a catastrophe?
 5         A.   Yes.
 6         Q.   Where on the ship might that calmer
 7    environment be under those circumstances?
 8         A.   Depends on the ship.
 9         Q.   You weren't made privy to the
10    captain's psychological report, were you?
11         A.   No.
12         Q.   Just heard it occurred?
13         A.   Yes.
14         Q.   What, if any, voyage planning gaps
15    were identified by this incident?
16         A.   Voyage planning gaps?
17         Q.   Yes.
18         A.   I didn't identify any.
19         Q.   Are there company policies that you
20    were aware of from your department concerning
21    weather training for officers?
22         A.   No.  Because it's integral to their
23    professional training.
24         MR. OSTROW:  Curtis, did you hear back
25      from Tom about getting that file?
```

```
1              MR. MASE:  He said he's going to send
2         it.  Do you want me to just tell him to file
3         it?
4              MR. OSTROW:  He's just adding his
5         comments.
6              MR. MASE:  You know Goodman is not even
7         here.  He's back tomorrow.
8              MR. OSTROW:  Let's go off the record.
9           (Thereupon, a discussion was held off the
10       record.)
11          (Thereupon, a short recess was held.)
12       BY MR. OSTROW:
13            Q.    In connection with the creation of
14       this report, the one that's marked as Exhibit 1,
15       were there a series of e-mails involved?
16            A.    I don't think so.  Not that I
17       recall.
18            Q.    Was there a file created?
19            A.    I had a lot of data, a lot of files,
20       lots of information.
21            Q.    Okay.  And it's all contained within
22       a file for this casualty?
23            A.    It's passed to -- passed to them.
24            Q.    To the lawyers?
25            A.    Yes.  Everything I had.
```

1          Q.    Was that back at the time or

2     recently?

3          A.    Back at the time.  I've been gone

4     for a year.

5          Q.    That would also include the notes

6     that you took of your interviews?

7          A.    No, no.  My interview notes were my

8     own scribble notes.

9          Q.    What happened to those?

10         A.    I don't know.

11         Q.    They wouldn't have been in your

12    file?

13         A.    No.  My own scribbles of dates and

14    times.

15         MR. OSTROW:  Let's mark this as Master's

16      Standing Orders, Number 5.

17      (Thereupon, Plaintiff's Exhibit Number 5

18    was marked for identification.)

19    BY MR. OSTROW:

20         Q.    I show you what's been marked as

21    Exhibit 5 which are purported to be the Master's

22    Standing Orders that were in effect at the time

23    of the casualty.  Do you recognize those as

24    being the standing orders in effect at the time?

25         A.    No, I don't recall ever receiving

```
 1    them.  I have not seen them at all.
 2         Q.   So you asked for them during your
 3    investigation, they weren't provided to you, and
 4    what I've shown you now is something you're
 5    unfamiliar with?
 6         A.   I've not seen them before, no.  They
 7    are of a standard format.  There's nothing
 8    unusual about them.  There are elements that we
 9    require to be in a standing order and it appears
10    that they are in here.
11         MR. OSTROW:  Mark this composite which
12         are Bates 1278 -- well, they are not Bates.
13         I think they are internal numbers.  1278 to
14         1287.  And the first page is entitled
15         stability report dated at noon on the 7th of
16         February of 2016.
17         (Thereupon, Plaintiff's Exhibit Number 6
18    was marked for identification.)
19    BY MR. OSTROW:
20         Q.   And let me show you what we have
21    marked as Exhibit 6 and ask if you recognize
22    those documents?
23         A.   It's a loading condition, departure
24    condition that we have one of these every day
25    for every ship, or there is one for every day
```

1    for every ship.

2         Q.   What is it, basically?

3         A.   It shows the stability situation,

4    the intact stability of the ship in terms of its

5    ability to -- how stiff it is, how much it

6    rolls.

7         Q.   And is that document something

8    that's received at the home office from the ship

9    or is it something that's kept on the ship?

10        A.   I don't know if there's an automated

11   requirement to send it ashore.  I don't think

12   so.  I'm not sure.

13        Q.   It's something that the ship

14   produces automatically?

15        A.   Yes, that the ship would have to ask

16   for the report from the NAPA system.

17        Q.   What does that stand for, NAPA,

18   N-A-P-A, in this instance?

19        A.   It's a Finnish company called NAPA.

20   On board is the program that would have come

21   from.

22        Q.   Okay.  And it analyzes the stability

23   of the ship?

24        A.   Yes.  It looks at all the weights,

25   or the moveable weights inside the ship, all the



 1    fluids in the tanks.

 2         Q.    Gotcha.

 3         MR. OSTROW:  So that you know, this was

 4    represented to me as the navigator's noon

 5    reports.  It's not.

 6         MR. MASE:  No.  I'm going to guess

 7    that's because it says noon, because all

 8    that is printed is just noon.  So.

 9         THE WITNESS:  This will be very unusual

10    to a layman.  You would have to know what

11    this is.

12         MR. MASE:  Right.  Stability reports

13    loading summary, basically; right?

14         THE WITNESS:  Yes.

15         MR. MASE:  Who told you that, if I can

16    ask?  Graham?

17         MR. OSTROW:  Graham.  Yes, it's in his

18    letter.

19         MR. MASE:  Graham?

20         MR. OSTROW:  Yes, yes.  Yes, we sent him

21    a letter of our 14 points, initially, and he

22    responded.  And one of them was the

23    navigator's reports.  He says they have been

24    furnished under Bates numbers --

25         MR. MASE:  So he said these are the

```
 1          navigator's noon reports?

 2               MR. OSTROW:  Yes.

 3               MR. MASE:  Okay.  I'll see what I can

 4          find.  Thanks.

 5               If you've got anything else like that,

 6          tell me, because I'll just -- to clarify.

 7          No, I'm saying because I'm not looking to do

 8          that on purpose.  If it's just a mistake,

 9          I'll fix it.

10               MR. OSTROW:  Yes.

11               THE WITNESS:  It may be a Royal

12          Caribbean line requirement to send them

13          ashore at noon, possibly.  I don't know.

14               MR. OSTROW:  Yeah, but that's --

15               MR. MASE:  I think he's talking about

16          different items have been referenced, and

17          I'll try to get him that.

18               MR. OSTROW:  Yeah, the captain talked

19          about -- in his deposition about the

20          navigator sending noon reports that included

21          position and speed and things of that

22          nature.

23               THE WITNESS:  Yes, the speed and all

24          that.  Yes.

25     BY MR. OSTROW:
```

```
 1              Q.   Did you review through the VDR or
 2     some other way the reports by the captain to the
 3     passengers during and after the incident?
 4              A.   Yes.   The speeches that --
 5              Q.   Yes, that he made.
 6              A.   Yes.   We got that from the VDR.
 7              Q.   You got that from the VDR?
 8              A.   Yes.
 9              Q.   Were they transcribed?
10              A.   Yes.   They are in the draft report.
11     Not this.
12              Q.   Not this?   There was something --
13     when you say draft report then, what is that?
14              A.   My report is this.
15              Q.   It is very thick?
16              A.   Yes.   It was part of that.   This was
17     a preliminary analysis.
18              Q.   Okay.   So we don't have your report,
19     which is how many pages, approximately, a couple
20     of hundred?
21              A.   200.
22              Q.   200 page?
23              A.   It wasn't finished when I left.
24              MR. OSTROW:   Can we -- Curtis, can we
25        finally get his report?
```

JEANNIE REPORTING (305) 577-1705

```
 1              MR. MASE:  I don't know.  I mean, his
 2         report -- you just heard what he said.  It
 3         wasn't finished.
 4              MR. OSTROW:  It wasn't finished, but it
 5         exists.
 6              MR. MASE:  Well, I don't know what
 7         exists.  I mean, he had an unfinished
 8         report.
 9              MR. OSTROW:  That he turned over to the
10         lawyers.
11              MR. MASE:  No, I believe what he said
12         was he turned over his documents to the
13         lawyer.  There's a difference.
14    BY MR. OSTROW:
15         Q.   Was that among the documents you
16    turned over to the lawyers?
17         A.   I don't recall.  It was a long time
18    ago.
19         Q.   Would you have destroyed it?
20         A.   No.
21         Q.   So either the company has it or the
22    lawyers have it; correct?
23         A.   I would assume so.
24         Q.   200 pages, approximately?
25         A.   Yes.
```



1          MR. OSTROW:  Does that help, Curtis?

2          MR. MASE:  Uh-huh.  Well, I mean, I'll

3   go look for it.  It helps to that extent,

4   but I mean, I'll see what I can find.  I

5   mean, John, it isn't like it's sitting on my

6   desk.  That's one of the things.  I'll see

7   if we have it in our system.  But again,

8   it's an unfinished report.  So I'll see what

9   we have.

10         MR. OSTROW:  Well, I think what we'll do

11  is we'll take -- we'll adjourn at this time,

12  pending the 200-page report which I may or

13  may not have additional questions for the

14  witness.

15         MR. MASE:  So you finished all your

16  other questions, though, just so we're

17  clear?  Because I don't want to have to come

18  back for that.  It doesn't seem right.

19         MR. OSTROW:  Well, I could beat a dead

20  horse about it, you know, but I do have some

21  other questions.  But I'll wait until I get

22  that report.

23         MR. MASE:  Okay.  Just so we are clear

24  on the record, I mean, I'll -- I mean, we're

25  here and he can certainly answer any

```
 1        additional questions that he needs to now.
 2            MR. OSTROW:  Well, certainly.  And were
 3        I omnipotent -- is that the right word?  Or
 4        were I --
 5            MR. MASE:  Omnipotent works.
 6            MR. OSTROW:  -- omnipotent, maybe I
 7        would know what was in that report that I
 8        can ask him about.
 9            MR. MASE:  That's fine.  You can ask him
10        questions if we have something else on that.
11            MR. OSTROW:  Read or waive?
12            MR. MASE:  Read.
13            MR. OSTROW:  I thought you didn't
14        represent him.
15            MR. MASE:  But it doesn't matter.  Any
16        party can make the call.
17            MR. OSTROW:  Oh, really?
18            MR. MASE:  Yeah, any party under the
19        rule can require that it be read.
20            MR. OSTROW:  Can require it to be read?
21        Okay.
22            MR. MASE:  And you're right, I'm not
23        representing him.
24            MR. OSTROW:  What that means is --
25            MR. MASE:  Lawyer crap.
```

1           MR. OSTROW:  What that means is this

2      young lady will be preparing the questions

3      and answers in this form.  It's called a

4      deposition.  And you have the right as a

5      witness to read it and make any corrections

6      in the event the court reporter made an

7      error in your testimony.  Or you can waive

8      it.  And in order to read it, most reporters

9      require the witness to go to their office to

10     read it, but I don't know what Curtis has up

11     his sleeve, what he's asking you to do.  But

12     he wants you to read it.

13          MR. MASE:  It just seems to me that it's

14     important and that it makes sense that he

15     read it.  I suspect we can probably get him

16     a copy electronically to read.  But, you

17     know, anytime you're doing something in a

18     legal proceeding, I think it's just good to

19     read what you said.

20          THE WITNESS:  Okay.

21          MR. MASE:  Good.  You can make your

22     appointment.  Let's go.

23          John, always a pleasure.

24          MR. OSTROW:  Always a pleasure.

25          (Thereupon, the reading and signing of

1          the deposition was not waived and the

2          deposition adjourned at 4:33 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           <u>CERTIFICATE OF SHORTHAND REPORTER</u>

2   STATE OF FLORIDA      )
                        )  SS.

3   COUNTY OF MIAMI-DADE  )

4

5      I, Violet Varga Smith, Florida Professional

6   Reporter, do hereby certify that I was

7   authorized to and did stenographically report

8   the deposition of GERRY ELLIS; that a review of

9   the transcript WAS requested; and that the

10   foregoing pages 1 through 73 is a true record of

11   my stenographic notes.

12      I FURTHER CERTIFY that I am not a relative,

13   employee, or attorney or counsel of any of the

14   parties', nor am I a relative or employee of any

15   of the parties' attorney or counsel connected

16   with the action, nor am I financially interested

17   in the action.

18      Dated this 13th day of October, 2017.

19

20   _____

21   VIOLET VARGA SMITH,
    Florida Professional Reporter

22

23

24

25

```
1                    CERTIFICATE OF OATH

2
      STATE OF FLORIDA      )
3                           ):SS
      COUNTY OF MIAMI-DADE )
4

5       I, Violet Varga Smith, Florida Professional

6  Reporter and Notary Public for the State of

7  Florida at Large, do hereby certify that

8  personally appeared before me and was duly sworn.

9       WITNESS my hand and official seal in the City

10 of Miami, County of Miami-Dade, State of Florida,

11 this 13th day of October, 2017.

12

13 _____
              Violet Varga Smith,
14            Florida Professional Reporter
              Notary Public
15            Notary Commission #  FF 999364
              Notary Commission Expires:  7/11/2020
16

17

18

19

20

21

22

23

24

25
```

```
 1                          JURAT PAGE

 2

 3     STATE OF FLORIDA      )
                             ) :SS
 4     COUNTY OF MIAMI-DADE  )

 5

 6     I, GERRY ELLIS, hereby certify that I have read

 7     the foregoing transcript Pages 1 to 73 and find

 8     the same to be true and accurate.

 9     Any corrections made by me are set forth on the

10     errata page attached hereto.

11

12     _____
       GERRY ELLIS

13

14

15     Sworn to and subscribed before me on this ___

16     day of _____, 2017.

17

18

19     _____
       Notary Public in and for the
20     State of Florida at Large.
       My Commission expires:

21

22

23

24

25
```

```
                    JEANNIE REPORTING
          28 West Flagler Street, Suite 610
                    Miami, FL  33130
                   (305) 577-1705


                   October 14th, 2017

     GERRY ELLIS
     c/o, CURTIS MASE, ESQ.
     MASE TINELLI, P.A.
     2601 South Bayshore Drive, Suite 800
     Miami, Florida 33133

     IN RE:  Donna Incardone, etc. v. RCL
     CASE NO.:  16-cv-20924-MARTINEZ/GOODMAN

     Dear Mr. Ellis:

          With reference to the examination of
     YOURSELF, deponent in the above-styled cause,
     taken on October 10th, 2017, under oath, please
     be advised that the transcript of the deposition
     has been transcribed and is awaiting your
     signature.
          Please arrange to conclude this matter at
     your earliest convenience.  We would suggest
     that you telephone this office and arrange an
     appointment suitable for all concerned.
          However, if this has not been taken care of
     by November 15th, 2017, or at the time of trial,
     we shall conclude the reading and signing of
     said deposition has been waived and shall then
     proceed to file the original of said transcript
     with the party who took the deposition, without
     any further notice to any parties.



     Sincerely yours,
```

_____

```
     Violet Varga Smith
     Court Reporter


     cc:  All Counsel of Record
```



<u>ERRATA SHEET</u>

F.R.C.P. RULE 1.310 provides in part:

(e)"...Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."

PAGE/LINE        CHANGE/CORRECTION        REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, _____, do hereby certify that I have read the foregoing transcript of my deposition, given on October 10th, 2017, and that together with any additions or corrections made herein, it is true and correct.


                        _____
                        GERRY ELLIS

**MR. MASE: [10]**   8/24
15/22 18/25 48/25
67/18 68/2 72/4
72/14 72/17 72/21
**MR. OSTROW: [11]**
15/25 24/23 26/5
50/11 63/3 67/2 68/9
68/13 72/5 72/12
72/16
**THE WITNESS: [6]**
9/1 15/21 16/4 17/15
18/23 49/1

**.**

**...Any [1]**   79/3

**1**

**1.310 [1]**   79/2
**10 [2]**   1/13 35/18
**10th [2]**   78/11 79/20
**1278 [2]**   65/12 65/13
**1287 [1]**   65/14
**13th [2]**   75/18 76/11
**14 [1]**   67/21
**14-page [1]**   19/6
**14th [1]**   78/3
**15 [1]**   35/18
**15 degrees [1]**   35/21
**15th [1]**   78/15
**16-cv-20924-MARTINEZ/
GOODMAN [2]**   1/3 78/8
**1705 [1]**   78/2
**19 [1]**   2/18
**1925 [1]**   24/17
**1932 [1]**   24/17
**1974 [1]**   58/4

**2**

**20 [3]**   6/7 6/10 50/8
**20 degrees [1]**   60/4
**200 [3]**   69/21 69/22
70/24
**200-page [1]**   71/12
**2014 [1]**   9/17
**2016 [5]**   3/12 8/20
19/16 50/8 65/16
**2017 [8]**   1/13 75/18
76/11 77/16 78/3
78/11 78/15 79/20
**2020 [1]**   76/15
**23 [1]**   60/12
**23 degrees [4]**   60/5
60/6 60/9 60/11
**24 [1]**   2/18
**26 [1]**   2/19
**2601 [2]**   2/7 78/6
**2692 [1]**   30/16
**28 [1]**   78/1
**2:37 [1]**   1/14

**3**

**30 [2]**   59/16 59/23
**30 degrees [1]**   35/17
**305 [1]**   78/2
**33130 [1]**   78/2
**33131 [2]**   1/13 2/3
**33133 [2]**   2/7 78/6

**4**

**400 [2]**   1/12 2/3
**45 [1]**   27/10
**48 [1]**   44/24
**4:33 [1]**   74/2

**5**

**50 [2]**   2/19 43/11
**577-1705 [1]**   78/2

**6**

**6,200 [1]**   59/22
**60 [1]**   43/11
**610 [1]**   78/1
**64 [1]**   2/20
**65 [1]**   2/20

**7**

**7/11/2020 [1]**   76/15
**73 [2]**   75/10 77/7
**74 [1]**   60/22
**777 [2]**   1/12 2/3
**7th [1]**   65/15

**8**

**800 [2]**   2/7 78/6

**9**

**999364 [1]**   76/15

**:**

**:SS [2]**   76/3 77/3

**A**

**A-I-R-T-S [1]**   13/18
**abilities [1]**   59/8
**ability [4]**   11/18
34/17 39/15 66/5
**above [2]**   1/22 78/10
**above-styled [2]**
1/22 78/10
**Absolutely [1]**   51/21
**access [9]**   14/15
26/15 32/17 33/1
33/8 36/17 44/4
44/12 57/25
**accessible [2]**   34/1
48/11
**accessing [3]**   32/10
33/16 48/9
**accident [2]**   13/18
14/11
**accidents [1]**   13/23
**accommodate [1]**   4/22
**according [2]**   23/20
34/10
**across [1]**   9/15
**action [2]**   75/16
75/17
**actions [1]**   29/5
**add [1]**   17/9
**added [1]**   41/1
**adding [1]**   63/4
**addition [1]**   57/16
**additions [1]**   79/21
**adjourn [1]**   71/11
**adjourned [1]**   74/2
**ADMIRALTY [1]**   1/4
**admissible [1]**   15/19

**advertisement [1]**
9/16
**agreement [2]**   13/13
43/5
**aid [2]**   53/5 53/8
**aircraft [3]**   12/4
14/4 32/23
**AIRTS [4]**   13/17 14/4
14/8 14/19
**al [1]**   1/5
**alarms [1]**   49/10
**Alfaro [1]**   33/10
**almost [2]**   8/16 29/3
**although [2]**   56/1
57/22
**amended [1]**   58/4
**amount [2]**   31/12
44/18 44/23
**Amy [1]**   54/9
**analysis [11]**   19/15
20/19 20/19 20/24
21/2 21/7 21/13
21/17 31/6 40/6
69/17
**analytical [2]**   14/12
14/23
**analyzes [1]**   66/22
**and/or [1]**   12/11
**Andersen [2]**   26/8
50/6
**announcement [1]**
39/9
**answer [10]**   4/5 4/7
4/10 4/10 5/9 5/10
15/15 15/20 55/9
71/25
**answers [2]**   4/3 73/3
**ANTHEM [7]**   3/11
19/14 28/24 35/23
36/4 36/9 50/7
**anticipated [2]**
34/15 42/13
**anytime [1]**   73/17
**apologize [1]**   3/23
**apparent [1]**   37/19
**APPEARANCES [1]**   2/1
**appointment [2]**
73/22 78/14
**appreciate [1]**   49/5
**approval [4]**   56/18
56/19 56/22 56/24
**approved [1]**   56/20
**aren't [1]**   44/19
**argue [1]**   15/17
**arrange [2]**   78/13
78/14
**ashore [5]**   6/10 6/11
14/5 66/11 68/13
**aspects [1]**   21/20
**assembly [2]**   61/15
61/18
**assert [1]**   18/8
**assessment [2]**   51/20
**assisted [1]**   54/4
**assume [4]**   3/19 7/11
33/25 70/23
**assurance [2]**   10/19
10/23

**attorney [2]**   75/13
75/15
**audit [5]**   41/11
41/11 41/13 41/14
41/21
**audits [3]**   41/23
42/4 42/6
**authorities [2]**   33/3
33/4
**Authority [1]**   17/11
**authorized [1]**   75/7
**autistic [2]**   61/10
61/23
**automated [1]**   66/10
**automatically [1]**
66/14
**automation [2]**   43/19
43/21
**Avenue [2]**   1/12 2/3
**avoid [1]**   55/11
**awaiting [1]**   78/12
**awful [1]**   51/18
**Azipod [2]**   12/25
30/19
**Azipods [2]**   13/7
35/23

**B**

**background [1]**   6/6
**Bahamas [6]**   17/11
21/19 22/4 23/11
41/16 55/6
**barograph [1]**   48/15
**barometric [9]**   48/14
48/20 48/25 49/11
49/23 49/24 50/18
51/3 53/22
**basis [1]**   42/2
**Bates [8]**   24/16
24/19 24/25 25/7
25/11 65/12 65/12
67/24
**Bayonne [1]**   38/15
**Bayshore [2]**   2/7
78/6
**beat [1]**   71/19
**benefit [2]**   37/12
40/24
**beyond [1]**   7/8
**black [3]**   12/4 14/3
32/23
**BMA [4]**   17/11 18/5
18/10 18/11
**board [3]**   12/16 36/5
66/20
**boats [3]**   60/9 60/14
60/24
**boss [2]**   27/21 45/17
**bottom [1]**   20/12
**bound [1]**   58/7
**bow [5]**   35/8 35/13
35/16 35/19 44/8
**box [3]**   12/4 14/3
32/23
**branch [1]**   15/5
**brands [1]**   10/7
**breakdown [2]**   42/12
42/16

**Brickell [2]**  1/12 2/3
**bridge [22]**  31/1 31/3 38/5 47/7 47/13 47/14 47/19 47/20 48/17 48/22 48/24 49/18 49/19 50/21 51/19 53/5 53/8 53/10 53/20 58/13 58/15 58/25
**browsed [1]**  41/4
**bunch [1]**  51/23

**C**

**c/o [1]**  78/5
**calculation [2]**  39/1 39/15
**calmer [4]**  62/1 62/1 62/3 62/6
**capacity [3]**  11/11 11/21 11/24
**captain [35]**  22/17 23/21 27/4 27/9 27/16 27/17 28/16 28/20 34/23 34/25 35/7 36/3 38/21 39/7 39/10 42/19 42/21 42/23 45/8 45/11 45/19 46/8 46/20 46/21 46/22 46/23 48/19 49/9 50/6 50/7 52/14 53/20 54/24 68/18 69/2
**captain's [2]**  26/7 62/10
**captains [1]**  36/8
**CARIBBEAN [21]**  1/8 3/17 5/23 7/20 8/10 9/16 9/21 11/1 11/10 15/3 16/21 25/7 26/3 29/3 47/6 48/2 48/5 55/20 56/12 59/7 68/12
**Carnival [6]**  8/22 8/24 9/3 9/6 9/11 11/8
**casualties [1]**  30/14
**casualty [9]**  11/18 16/8 30/3 30/9 30/18 30/20 44/21 63/22 64/23
**catastrophe [1]**  62/4
**cc [1]**  78/24
**CCL [1]**  25/15
**CCTV [7]**  43/17 44/5 44/5 44/25 45/2 45/4 45/6
**center [2]**  44/7 55/16
**certificate [4]**  7/12 7/15 75/1 76/1
**certification [1]**  56/14
**certifications [1]**  56/7
**certified [1]**  56/17
**certify [5]**  75/6 75/12 76/7 77/6

**challenge [1]**  26/9
**CHANGE/CORRECTION [1]**  79/8
**children [1]**  61/23
**choices [1]**  52/3
**chute [1]**  61/1
**chutes [1]**  61/4
**circumstances [2]**  45/18 62/17
**City [1]**  76/9
**claim [2]**  32/13 42/5
**clarify [3]**  11/12 21/9 68/6
**class [1]**  7/16
**classification [2]**  41/8 41/20
**Claus [1]**  26/8
**clean [1]**  17/12
**clear [5]**  17/9 47/15 48/5 71/17 71/23
**clearance [3]**  21/6 50/1 50/2
**clients [1]**  61/16
**Coast [7]**  12/3 17/2 17/6 17/8 17/10 18/6 30/15
**code [2]**  29/21 30/5
**collection [1]**  51/13
**collects [1]**  58/24
**college [1]**  7/2
**combined [2]**  49/19 55/5
**comfort [1]**  4/21
**comfortable [2]**  5/3 34/21
**command [1]**  49/20
**comments [2]**  51/17 63/5
**Commission [3]**  76/15 76/15 77/20
**companies [2]**  7/21 12/9
**company [15]**  20/16 20/20 23/17 28/25 29/1 32/5 32/10 35/22 36/3 45/1 54/22 55/24 62/19 66/19 70/21
**compelled [1]**  15/11
**complete [2]**  20/14 21/7
**completed [2]**  20/20 21/2
**completion [1]**  21/16
**compliant [1]**  56/25
**composite [9]**  2/18 2/18 19/6 19/9 19/13 24/21 24/22 26/10 65/11
**conclude [2]**  78/13 78/16
**concurrent [1]**  17/18
**condition [2]**  65/23 65/24
**conditions [3]**  5/1 28/7 42/13
**confirm [2]**  18/23 23/5

57/11
**connected [1]**  75/15
**connection [1]**  63/13
**consolidates [1]**  51/23
**contained [1]**  63/21
**contains [1]**  19/25
**control [3]**  25/8 25/11 34/24
**convenience [1]**  78/13
**convention [1]**  58/3
**corner [1]**  24/18
**corporate [5]**  8/11 9/13 9/23 10/7 11/1
**corporation [5]**  8/24 9/1 9/5 9/6 9/9
**correction [2]**  79/5 79/8
**corrections [3]**  73/5 77/9 79/21
**COUNTY [4]**  75/3 76/3 76/10 77/4
**court [4]**  1/1 4/16 73/6 78/22
**covers [1]**  58/4
**crap [1]**  72/25
**create [1]**  18/7
**created [2]**  19/20 63/18
**creation [2]**  22/7 63/13
**crew [5]**  22/12 22/15 24/5 42/19 42/22
**criteria [1]**  60/10
**Cross [1]**  2/13
**crossings [1]**  36/2
**cruise [21]**  8/22 9/2 9/3 9/21 12/6 12/23 13/10 13/11 13/14 14/10 15/10 15/11 16/14 22/22 26/16 28/23 40/6 45/11 45/22 46/1 58/14
**CRUISES [1]**  1/8
**CURTIS [7]**  2/8 24/24 62/24 69/24 71/1 73/10 78/5
**cut [1]**  3/12
**cv [2]**  1/3 78/8

**D**

**DADE [4]**  75/3 76/3 76/10 77/4
**Danelec [1]**  32/5
**data [17]**  14/23 31/8 31/12 31/24 33/1 33/20 37/9 43/13 43/14 43/15 43/19 44/4 44/18 44/20 47/10 57/24 63/19
**database [2]**  14/15 14/22
**dead [1]**  71/19
**Dear [1]**  78/9
**decided [1]**  46/6
**decides [1]**  45/5
**decision [3]**  45/21

**deck [1]**  53/21
**decks [1]**  61/16
**declared [1]**  18/20
**Defendant [2]**  1/9 2/6
**delivered [1]**  40/12
**department [11]**  8/9 8/10 10/10 10/18 11/2 23/9 44/13 44/14 54/17 54/19 62/20
**departure [2]**  59/5 65/23
**dependent [1]**  13/7
**depending [1]**  6/17
**Depends [1]**  62/8
**deponent [1]**  78/10
**deposed [1]**  3/20
**deposition [16]**  1/16 1/21 5/5 5/17 9/15 23/21 28/16 68/19 73/4 74/1 74/2 75/8 78/11 78/16 78/17 79/20
**Description [1]**  2/17
**design [1]**  60/10
**desk [1]**  71/6
**despite [1]**  21/8
**destroyed [1]**  70/19
**detailed [2]**  14/24 29/7
**details [4]**  14/10 22/4 61/13 61/24
**determination [1]**  16/12
**develop [1]**  10/18
**developed [2]**  43/7 43/8
**developing [1]**  10/1
**difference [1]**  70/13
**difficult [7]**  4/16 12/15 12/17 31/7 33/8 33/13 33/20
**difficulty [2]**  4/25 33/15
**Direct [2]**  2/12 3/5
**directions [1]**  62/2
**director [2]**  8/8 9/12
**disabled [1]**  61/7
**discussion [2]**  47/1 63/9
**disruptive [1]**  15/21
**DISTRICT [2]**  1/1 1/1
**diversion [1]**  55/10
**DIVISION [1]**  1/2
**DNVGL [1]**  41/7
**doable [1]**  55/23
**dockings [1]**  8/2
**document [9]**  19/18 19/20 19/23 19/25 20/6 20/18 20/21 25/6 66/7
**documented [1]**  50/9
**documents [6]**  24/12 25/10 40/13 65/22 70/12 70/15
**DONNA [2]**  1/5 78/7

**doubt [1]** 6/1
**draft [5]** 21/22 57/18 57/19 69/10 69/13
**drill [1]** 3/22
**dropping [1]** 49/8
**dry [2]** 8/1 26/4
**duly [2]** 3/3 76/8
**dumb [1]** 14/9

**E**

**e-mail [2]** 2/19 50/5
**e-mails [1]** 63/15
**earliest [1]** 78/13
**early [1]** 39/10
**easier [2]** 19/4 52/9
**edification [1]** 21/9
**educational [1]** 6/6
**effect [3]** 29/1 64/22 64/24
**electronically [1]** 73/16
**Electronics [2]** 32/6 32/7
**elements [1]** 65/8
**elicit [1]** 3/14
**ELLIS [15]** 1/16 2/12 3/2 3/8 3/9 5/21 18/3 18/10 20/14 75/8 77/6 77/12 78/4 78/9 79/24
**emergency [1]** 10/12
**employee [4]** 5/22 26/19 75/13 75/14
**encountered [1]** 27/19
**enhanced [1]** 29/6
**entitled [2]** 19/14 65/14
**entitling [1]** 7/12
**environment [4]** 62/1 62/2 62/3 62/7
**equipment [1]** 50/21
**equivalent [2]** 7/7 38/8
**errata [2]** 77/10 79/1
**erroneous [3]** 37/22 37/25 39/2
**erroneously [1]** 39/17
**error [3]** 40/7 41/2 73/7
**errors [1]** 39/21
**ESQ [3]** 2/4 2/8 78/5
**Esquire [1]** 2/16
**et [1]** 1/5
**etc [2]** 2/20 78/7
**evacuate [3]** 59/8 59/15 59/16
**evacuated [1]** 59/23
**evacuating [3]** 61/6 61/9 62/4
**evacuation [1]** 61/23
**evaluation [5]** 2/19 26/7 26/18 46/13 46/18
**event [7]** 5/24 37/8

73/6
**exacerbated [1]** 34/11
**examination [8]** 2/12 2/13 3/5 4/21 45/12 45/20 46/9 78/10
**examined [1]** 3/3
**exceeds [1]** 28/8
**Excuse [1]** 17/17
**exists [2]** 70/5 70/7
**experience [1]** 35/4
**experienced [1]** 35/14
**expires [2]** 76/15 77/20
**extent [1]** 71/3
**extra [2]** 38/23 41/2
**extract [3]** 31/8 31/9 33/20
**extraction [1]** 57/11
**extremely [2]** 39/19 39/20

**F**

**F.R.C.P [1]** 79/2
**face [1]** 9/9
**facing [1]** 26/21
**fact [3]** 29/16 33/15 39/17
**failed [2]** 48/24 49/2
**fall [1]** 8/20
**fashion [1]** 35/2
**February [4]** 3/12 19/15 50/8 65/16
**February 20 [1]** 50/8
**February 7 [1]** 19/15
**feed [1]** 43/24
**FF [1]** 76/15
**file [7]** 26/25 62/25 63/2 63/18 63/22 64/12 78/17
**files [1]** 63/19
**fill [2]** 26/4 30/16
**final [2]** 20/23 21/2
**finally [1]** 69/25
**financially [1]** 75/16
**finished [6]** 17/22 22/1 69/23 70/3 70/4 71/15
**Finnish [1]** 66/19
**fix [1]** 68/9
**FL [1]** 78/2
**flag [16]** 16/11 16/13 16/17 17/1 17/4 17/6 18/4 18/5 23/12 30/14 41/11 41/16 55/3 58/7 58/10 58/11
**Flagler [1]** 78/1
**FLORIDA [17]** 1/1 1/13 1/18 1/20 2/3 2/7 75/2 75/5 75/21 76/2 76/5 76/7 76/10 76/14 77/3 77/20 78/6
**fluids [1]** 67/1

**follow-up [1]** 55/7
**footage [4]** 43/17 44/5 44/6 44/7
**force [3]** 43/1 43/2 55/1
**forecast [3]** 55/11 55/13 55/19
**foregoing [3]** 75/10 77/7 79/19
**foreign [1]** 18/4
**form [13]** 11/20 15/13 21/22 26/3 28/11 34/2 35/1 38/24 39/23 49/1 52/4 73/3 79/3
**formal [1]** 6/12
**format [5]** 25/25 25/25 25/25 26/1 65/7
**former [1]** 5/22
**forms [1]** 39/18
**free [2]** 4/24 5/2
**friendly [1]** 47/9
**function [5]** 12/17 14/24 28/5 42/2 59/7
**furnished [1]** 67/24

**G**

**gaps [2]** 62/14 62/16
**general [1]** 56/13
**generic [2]** 13/3 56/21
**Gered [1]** 3/8
**GERRY [8]** 1/16 2/12 3/2 75/8 77/6 77/12 78/4 79/24
**Global [1]** 44/15
**GOODMAN [3]** 1/3 63/6 78/8
**Gotcha [5]** 8/12 10/16 25/16 30/2 67/2
**government [3]** 6/24 12/3 15/7
**governments [3]** 15/6 15/6 16/12
**Graham [3]** 67/16 67/17 67/19
**graphic [1]** 57/5
**Greg [2]** 54/9 54/12
**group [1]** 3/10
**groups [2]** 21/20 22/5
**Guard [7]** 12/3 17/2 17/7 17/8 17/10 18/6 30/15
**guidance [1]** 26/23
**guidelines [2]** 12/21 23/11
**guiding [1]** 61/23

**H**

**handover [3]** 2/18 24/14 25/22
**handwritten [2]** 36/23 37/10
**Harned [2]** 20/10 20/11

**heavy [3]** 2/18 19/14 27/19
**helpful [2]** 38/11 41/1
**Here's [1]** 19/6
**hereby [4]** 75/6 76/7 77/6 79/18
**hereto [1]** 77/10
**higher [1]** 13/3
**hire [1]** 29/16
**hired [2]** 7/24 7/25
**hiring [1]** 29/10
**hit [2]** 30/22 38/15
**hitting [1]** 44/8
**hold [1]** 8/12
**home [1]** 66/8
**honestly [1]** 25/18
**horse [1]** 71/20
**hours [3]** 37/4 38/23 44/24
**huge [2]** 31/12 44/18
**huh [3]** 4/13 4/14 71/2
**huh-uh [1]** 4/13
**human [1]** 24/1
**hundred [1]** 69/20
**hurricane [6]** 42/24 42/25 43/1 43/2 43/8 55/1

**I**

**I'd [1]** 38/25
**I'll [11]** 24/10 68/3 68/6 68/9 68/17 71/2 71/4 71/6 71/8 71/21 71/24
**I'm [27]** 3/23 4/2 4/23 9/7 9/12 9/12 12/12 15/16 15/20 15/21 15/24 19/3 19/3 21/5 22/18 23/18 28/13 48/4 50/14 54/1 56/13 61/17 66/12 67/6 68/7 68/7 72/22
**I've [4]** 26/25 64/3 65/4 65/6
**identification [6]** 19/10 24/23 26/11 50/11 64/18 65/18
**images [3]** 43/25 44/7 57/6
**immediately [1]** 29/2
**IMO [10]** 14/25 15/4 15/5 16/8 16/14 23/11 29/23 29/24 56/20 56/25
**implementing [1]** 10/1
**impression [3]** 52/23 53/4 53/10
**improve [1]** 26/19
**improvement [1]** 52/21
**inability [1]** 32/17
**inaudible [1]** 31/22
**INCARDONE [2]** 1/5 78/7

**incident [17]** 2/18
3/15 3/16 13/18
14/20 18/4 19/15
20/15 23/22 24/6
28/24 30/10 30/24
33/10 41/25 62/15
69/3
**incidents [2]** 13/23
14/6
**increase [1]** 43/11
**indications [2]**
35/25 36/2
**indirectly [1]** 43/23
**individual [1]** 16/11
**individuals [2]** 3/10
10/9
**information [6]**
3/14 5/23 12/15
14/22 18/2 23/3
32/18 33/16 34/1
57/12 63/20
**inherently [2]** 33/19
38/9
**initial [1]** 18/25
**initially [3]** 7/24
8/1 67/21
**input [1]** 14/10
**inputs [1]** 21/19
**insight [1]** 34/3
**inspection [2]** 51/16
51/17
**instance [4]** 16/17
48/23 59/21 66/18
**instances [1]** 36/6
**instead [1]** 47/12
**instruct [2]** 45/3
45/4
**instruction [1]** 6/1
**instruments [1]**
51/13
**intact [1]** 66/4
**integral [1]** 62/22
**integrated [3]** 49/19
50/22 50/24
**integration [1]**
50/20
**intended [1]** 57/8
**intent [1]** 32/22
**interested [1]** 75/14
**internal [3]** 25/11
28/19 65/13
**internally [1]** 25/7
**international [6]**
9/21 11/1 15/1 16/6
29/20 33/22
**interpose [1]** 5/8
**interview [2]** 31/13
64/7
**interviewed [8]** 22/9
22/21 22/25 23/7
23/17 23/22 24/5
52/14
**interviews [4]** 19/2
24/1 43/13 64/6
**investigation [27]**
3/16 16/14 16/15
16/18 16/20 16/25
17/1 17/13 17/19

20/15 23/2 23/19
24/13 30/24 32/24
37/19 41/9 41/18
54/5 54/11 54/18
54/22 54/23 65/3
**investigations [8]**
10/11 12/6 16/9
16/23 30/3 30/13
33/18 41/19
**investigative [1]**
12/2
**investigator's [1]**
40/24
**investigators [3]**
23/13 37/13 45/3
**invited [1]** 18/6
**ISM [5]** 29/19 30/4
41/13 41/14 41/21
**issue [4]** 15/8 18/12
26/24 27/3
**issued [4]** 6/23
18/13 18/17 20/5
**issues [5]** 3/16
28/18 34/9 34/10
36/1
**items [1]** 68/12

**J**

**JEANNIE [1]** 78/1
**job [1]** 59/6
**John [8]** 1/12 2/2
2/4 2/16 3/9 18/1
71/5 73/23
**journey [2]** 34/14
39/11
**judged [1]** 55/12
**July [1]** 9/16
**JURAT [1]** 77/1

**K**

**keel [2]** 50/1 50/2
**knots [2]** 27/10
43/11
**knows [1]** 50/13

**L**

**lady [3]** 23/21 23/24
73/2
**Large [3]** 1/20 76/7
77/20
**laughed [1]** 9/8
**launch [2]** 60/9
60/13
**law [6]** 1/4 1/12 2/2
16/6 33/22 33/24
**layman [1]** 67/10
**lead [5]** 18/6 18/11
23/11 23/12 55/6
**learned [1]** 12/5
**learning [1]** 12/17
**led [1]** 23/18
**legal [2]** 15/20
73/18
**lessons [1]** 12/5
**letter [2]** 67/18
67/21
**license [1]** 7/9
**life [5]** 58/2 60/9

**limit [1]** 30/22
**limited [10]** 7/17
11/21 11/24 12/13
14/22 35/2 36/2
43/18 44/23 44/23
**lines [3]** 8/23 12/23
15/11
**loading [2]** 65/23
67/13
**local [1]** 38/10
**loud [1]** 4/11
**lower [1]** 24/17
**LTD [1]** 1/8

**M**

**machine [2]** 33/5
50/21
**machines [2]** 47/11
50/22
**mail [2]** 2/19 50/5
**mails [1]** 63/15
**maintain [1]** 10/19
**managed [2]** 13/11
35/16
**management [21]** 6/10
8/1 10/14 10/16 14/5
22/19 22/23 26/16
27/8 29/21 30/1 30/1
30/7 45/7 46/1 46/5
47/7 47/13 47/18
47/19 49/18
**manager [1]** 45/17
**managers [1]** 54/6
**maneuver [1]** 34/17
**maneuvering [2]**
34/18 34/19
**manner [1]** 53/3
**manufactured [1]**
32/2
**manufacturer [2]**
33/9 33/11
**map [3]** 20/1 20/8
20/9
**marine [3]** 7/3 10/2
30/9
**marine-related [1]**
7/3
**mariner [7]** 6/8 6/20
6/21 6/22 7/14 7/16
7/17
**maritime [8]** 8/7 8/8
8/10 9/12 9/17 9/25
15/1 17/11
**market [1]** 47/25
**MARTINEZ [2]** 1/3
78/8
**MASE [53]** 2/6 2/8
2/13 5/6 5/12 5/16
5/21 9/4 9/7 11/20
15/13 15/16 17/8
17/17 18/1 18/23
20/7 21/6 25/2 25/5
25/17 28/11 34/2
35/1 38/24 39/23
41/13 47/13 47/21
48/1 50/13 51/6 52/4
63/1 63/6 67/6 67/12
67/15 67/25 68/15

71/15 71/23 72/9
72/12 72/25 73/13
73/21 78/5 78/5
**master [10]** 6/7 6/20
6/21 6/22 7/14 7/16
7/17 13/8 50/6 59/1
**master's [5]** 2/20
7/7 24/14 64/15
64/21
**mastered [1]** 7/10
**matched [1]** 29/5
**matter [2]** 72/15
78/13
**matters [1]** 7/3
**McNeil [2]** 54/9
54/12
**measure [1]** 59/12
**meddle [1]** 19/3
**meeting [2]** 38/13
58/13
**member [1]** 15/4
**members [1]** 15/6
**MIAMI [11]** 1/2 1/13
2/3 2/7 75/3 76/3
76/10 76/10 77/4
78/2 78/6
**MIAMI-DADE [4]** 75/3
76/3 76/10 77/4
**Midmorning [1]** 27/24
**misnomer [1]** 57/4
**mistake [1]** 68/8
**model [1]** 56/24
**monetary [1]** 30/18
**monitor [8]** 11/5
11/11 11/13 12/10
12/11 48/13 48/24
50/18
**monitored [2]** 11/6
49/5
**monitoring [6]** 11/3
11/4 11/7 11/14
48/20 52/21
**monitors [3]** 12/13
50/2 51/23
**moveable [1]** 66/25
**Mr [115]**
**Mr. [6]** 3/9 5/6 5/16
5/21 20/10 20/14
**Mr. Ellis [3]** 3/9
5/21 20/14
**Mr. Harned [1]** 20/10
**Mr. Mase [2]** 5/6
5/16
**multi [1]** 51/1
**multi-plots [1]** 51/1
**mustered [1]** 61/20

**N**

**N-A-C-O-S [1]** 49/17
**N-A-P-A [1]** 66/18
**NACOS [7]** 49/17 50/2
50/18 50/20 51/4
51/12 51/22
**NAD [1]** 57/9
**NAPA [3]** 66/16 66/17
66/19
**nature [3]** 6/9 6/19
68/22

**nautical [5]** 7/6 7/7 9/17 9/25 10/3

**navigation [11]** 9/17 9/25 10/2 10/19 10/21 10/23 12/18 41/11 49/20 49/20 58/23

**navigator [5]** 28/17 37/6 38/4 40/10 68/20

**navigator's [4]** 37/7 67/4 67/23 68/1

**navigators [1]** 28/9

**NOAA [5]** 36/17 36/20 36/23 42/23 54/25

**nobody [2]** 11/6 56/7

**nod [1]** 4/14

**non [1]** 56/22

**noon [10]** 28/9 28/12 28/17 65/15 67/4 67/7 67/8 68/1 68/13 68/20

**Notary [6]** 1/19 76/6 76/14 76/15 76/15 77/19

**notice [2]** 1/21 78/18

**noticed [3]** 29/1 40/8 41/4

**November [2]** 8/19 78/15

**NTSB [7]** 12/3 17/10 17/21 17/23 18/6 18/19 33/11

**Number [8]** 19/10 24/23 26/8 26/11 50/10 64/16 64/17 65/17

**numbers [8]** 24/17 25/15 39/16 40/6 40/18 40/19 65/13 67/24

---

**O**

**oath [2]** 76/1 78/11

**object [1]** 5/6

**objection [12]** 5/8 11/20 15/13 15/20 28/11 34/2 35/1 38/24 39/23 49/1 51/6 52/4

**observers [1]** 17/24

**obtain [1]** 23/4

**October [6]** 1/13 75/18 76/11 78/3 78/11 79/20

**office [3]** 66/8 73/9 78/14

**officer [6]** 38/5 40/5 40/25 58/23 58/25 79/5

**officers [9]** 13/6 23/8 39/22 53/5 53/8 53/10 53/20 54/16 62/21

**Offices [2]** 1/12 2/2

**official [1]** 76/9

**Oh [5]** 9/2 19/1

---

**omnipotent [3]** 72/5 72/5 72/6

**onshore [1]** 14/7

**operate [2]** 33/13 54/13

**operating [1]** 13/12

**operation [2]** 12/25 40/23

**operations [2]** 10/4 58/5

**opinion [1]** 53/12

**opportunity [1]** 5/7

**opposed [1]** 34/24

**ops [2]** 9/17 9/25

**optimally [1]** 35/24

**order [2]** 65/9 73/8

**orders [4]** 2/20 64/16 64/22 64/24

**Organization [1]** 15/2

**original [1]** 78/17

**Ostrow [70]** 1/12 2/2 2/4 2/12 2/16 3/6 3/9 5/14 6/4 9/10 11/22 15/14 16/7 17/20 18/15 19/6 19/11 20/9 20/13 21/11 24/20 25/4 25/16 25/20 25/21 26/12 28/15 34/5 35/3 39/5 39/24 41/14 41/17 46/25 47/3 47/18 47/24 48/8 48/12 49/4 50/5 50/14 50/16 51/9 52/6 62/24 63/8 63/12 64/15 64/19 65/15 65/19 67/17 67/20 68/2 68/18 68/25 69/24 70/4 70/9 70/14 71/1 71/10 71/19 72/2 72/11 72/20 72/24 73/1 73/24

**outrun [4]** 38/22 39/7 39/12 39/15

**overarching [1]** 29/25

**oversight [1]** 10/11

**oversights [1]** 10/8

**overwhelmed [2]** 52/2 52/8

**owned [1]** 10/8

---

**P**

**P.A [4]** 1/12 2/2 2/6 78/5

**p.m [2]** 1/14 74/2

**page [11]** 2/17 19/6 20/3 20/12 65/14 69/22 71/12 77/1 77/10 79/5 79/8

**PAGE/LINE [1]** 79/8

**pages [4]** 69/19 70/24 75/10 77/7

**paragraph [2]** 50/15 52/11

**parent [1]** 32/5

---

**2** 23/2 29/13 30/23 34/19 57/18 59/6 69/16 79/2

**participate [2]** 16/15 18/7

**parties [1]** 78/18

**parties' [2]** 75/14 75/15

**party [5]** 23/10 43/4 72/16 72/18 78/17

**passed [2]** 63/23 63/23

**passenger [1]** 58/5

**passengers [5]** 3/11 35/14 39/10 61/10 69/3

**pending [2]** 16/3 71/12

**people [6]** 4/24 13/9 22/24 37/14 56/1 59/22

**perfectly [1]** 4/5

**periodically [1]** 55/20

**periods [2]** 31/11 31/16

**personnel [1]** 26/17

**phonetic [2]** 20/11 38/4

**pile [1]** 40/12

**pin [1]** 31/14

**place [2]** 4/25 51/24

**Plaintiff [1]** 2/17

**Plaintiff's [8]** 19/7 19/9 19/13 24/22 26/10 50/10 64/17 65/17

**Plaintiffs [2]** 1/6 2/2

**plan [7]** 37/21 43/5 43/6 43/7 58/22 58/24 59/3

**planned [3]** 37/25 39/7 39/7

**planning [6]** 10/12 40/15 58/16 58/17 62/14 62/16

**play [1]** 30/23

**pleasure [2]** 73/23 73/24

**plot [1]** 51/2

**plots [1]** 51/1

**point [4]** 15/18 28/1 46/19 48/3

**points [1]** 67/21

**policies [1]** 62/19

**policy [9]** 9/13 10/14 10/15 10/21 11/3 11/6 12/22 45/1 61/22

**port [2]** 27/18 60/4

**posed [1]** 26/19

**position [10]** 8/11 8/13 9/19 9/23 9/24 10/6 12/20 28/18 34/21 68/21

**possess [1]** 3/15

**Post [1]** 40/1

---

**practice [1]** 40/20

**pre [3]** 40/6 58/22 59/5

**pre-cruise [1]** 40/6

**pre-departure [1]** 59/5

**pre-voyage [1]** 58/22

**preferred [2]** 13/8 35/18

**preliminaries [1]** 21/8

**preliminary [6]** 19/15 20/18 20/19 21/12 21/17 69/17

**preparation [1]** 9/15

**preplanning [1]** 58/20

**present [1]** 17/24

**preserve [1]** 57/8

**preserved [3]** 44/16 44/20 57/23

**preserving [1]** 15/17

**president [2]** 24/3 24/5

**press [1]** 29/17

**pressure [9]** 48/14 48/21 48/25 49/8 49/11 49/24 50/19 52/25 53/23

**presume [1]** 36/11

**primarily [3]** 23/5 54/12 61/25

**printed [1]** 67/8

**privileged [1]** 5/24

**privy [1]** 62/9

**problem [2]** 3/13 36/10

**procedure [4]** 61/6 61/9 61/14 61/22

**procedures [2]** 10/22 42/12

**proceed [1]** 78/17

**proceeding [1]** 73/18

**produces [1]** 66/14

**production [2]** 25/13 25/14

**professional [11]** 1/19 6/9 7/8 29/9 29/11 29/16 62/23 75/5 75/21 76/5 76/14

**program [5]** 10/20 10/24 14/13 14/16 66/20

**programs [2]** 10/3 12/10

**project [1]** 8/1

**promoted [3]** 8/7 46/15 46/17

**promotion [4]** 46/14 46/15 46/22 46/23

**promulgated [1]** 29/22

**properly [1]** 48/24

**propulsion [1]** 34/11

**psych [1]** 46/13

**psychological [4]** 45/11 45/20 46/8

**psychological... [1]**
62/10
**Public [4]** 1/19 76/6
76/14 77/19
**purported [1]** 64/21
**purposes [4]** 12/2
14/23 25/8 32/24
**pursuant [1]** 1/20

**Q**

**qualifications [2]**
6/8 7/5
**qualified [1]** 4/7
**qualify [2]** 4/5 4/6
**question [12]** 3/18
3/25 4/9 4/23 5/6
5/9 5/10 15/25 16/3
23/14 26/18 55/8
**questioning [4]** 40/3
40/4 55/3 55/5
**questions [7]** 55/7
71/13 71/16 71/21
72/1 72/10 73/2
**quiet [1]** 62/1

**R**

**radar [3]** 43/24 44/1
57/10
**rafts [1]** 60/25
**random [1]** 51/23
**rare [1]** 5/24
**RCL [1]** 78/7
**Re [2]** 1/21 78/7
**Re-Notice [1]** 1/21
**readable [1]** 50/25
**realized [1]** 39/2
**recently [1]** 64/2
**recess [1]** 63/11
**recognize [2]** 64/23
65/21
**recommendations [2]**
29/2 29/4
**record [11]** 17/9
17/12 46/25 47/2
47/15 48/5 63/8
63/10 71/24 75/10
78/24
**recording [6]** 4/15
4/18 13/18 31/10
44/23 44/24
**recordings [3]** 30/25
31/2 58/19
**records [1]** 13/23
**reduced [1]** 34/17
**redundant [1]** 3/23
**reference [1]** 78/10
**referenced [1]** 68/16
**reflect [1]** 25/13
**regulations [6]** 15/8
15/12 26/2 30/13
44/19 60/25
**relative [2]** 75/12
75/14
**relied [2]** 40/15
43/12
**remote [1]** 47/23
**repaired [1]** 56/5
**repeated [1]** 42/2

**report [40]** 2/20
18/12 18/16 21/25
22/1 22/2 22/7 27/6
27/7 27/11 28/3 28/7
28/17 28/20 33/14
34/10 41/4 42/11
42/20 42/23 43/12
54/25 57/18 57/19
62/10 63/14 65/15
66/16 69/10 69/13
69/14 69/18 69/25
70/2 70/8 71/8 71/12
71/22 72/7 75/7
**reporter [10]** 1/19
4/16 16/4 73/6 75/1
75/6 75/21 76/6
76/14 78/22
**reporters [1]** 73/8
**reporting [5]** 28/4
29/6 42/12 55/1 78/1
**reports [17]** 27/5
28/10 28/12 36/18
36/20 36/23 38/6
43/20 43/21 43/22
57/17 67/5 67/12
67/23 68/1 68/20
69/2
**request [2]** 41/11
41/15
**requested [1]** 75/9
**required [9]** 16/10
26/1 27/5 27/6 28/4
28/4 28/6 33/21
56/17
**requirement [9]** 14/2
29/7 29/25 30/16
45/2 46/13 60/1
66/11 68/12
**requirements [1]**
13/4
**research [1]** 9/14
**resource [1]** 24/1
**responsibility [3]**
26/23 27/14 28/2
**rest [1]** 59/4
**result [2]** 32/17
42/6
**retained [1]** 2/16
**review [7]** 14/20
44/6 58/13 58/16
58/17 69/1 75/8
**right-hand [1]** 24/18
**rolling [2]** 35/15
35/16
**rolls [1]** 66/6
**room [1]** 23/13
**rough [1]** 35/24
**ROYAL [22]** 1/8 3/17
5/22 7/20 8/9 9/16
9/20 10/8 11/1 11/10
15/3 16/21 25/6 26/3
29/3 47/6 48/2 48/5
55/20 56/11 59/7
68/11
**rugged [1]** 35/5
**rule [3]** 18/8 72/19
79/2
**rules [1]** 30/12

**S-O-L-A-S [1]** 58/1
**S-VDR [1]** 56/22
**safest [1]** 34/20
**safety [12]** 8/7 8/8
8/10 9/13 10/3 14/16
27/8 29/20 30/1 30/6
58/2 58/5
**SAM [2]** 32/5 32/7
**science [2]** 7/6 7/8
**screen [2]** 50/25
50/25
**screens [1]** 57/9
**screenshots [2]**
57/21 57/21
**scribble [1]** 64/8
**scribbles [1]** 64/13
**sea [5]** 3/11 6/7
16/6 27/25 58/2
**seal [1]** 76/9
**seamanship [2]** 6/13
6/19
**search [1]** 31/14
**seas [4]** 19/14 43/3
43/8 55/1
**second [2]** 39/8
58/25
**sections [1]** 31/12
**secure [1]** 45/4
**security [1]** 44/15
**seek [1]** 23/3
**senior [2]** 24/3 24/4
**sense [2]** 34/6 73/14
**sensors [1]** 48/17
**sentence [1]** 26/20
**series [3]** 41/19
57/5 63/15
**service [4]** 29/9
55/24 55/25 56/2
**services [1]** 56/14
**shake [1]** 4/14
**shall [4]** 30/6 78/16
78/16 79/4
**shared [1]** 26/23
**shift [1]** 28/2
**shifted [1]** 27/14
**ship [34]** 12/7 13/2
13/6 14/3 14/8 32/19
34/17 34/19 34/20
36/18 37/16 37/21
38/12 38/15 45/7
48/7 48/10 48/13
51/16 59/23 60/3
60/8 62/3 62/6 62/8
65/25 66/1 66/4 66/8
66/9 66/13 66/15
66/23 66/25
**ship's [10]** 22/11
22/15 23/5 23/8
37/16 38/9 40/25
45/7 54/16 59/8
**shipboard [2]** 10/2
10/19
**ships [5]** 58/5 58/6
58/11 59/14 59/15
**shore [2]** 47/20 48/9
**shoreside [9]** 22/19
22/20 26/22 27/4
27/15 27/17 28/2

**short [2]** 3/13 63/11
**SHORTHAND [1]** 75/1
**shown [1]** 65/4
**side [6]** 35/14 35/15
60/16 60/17 60/19
60/20
**signator [1]** 15/3
**signature [1]** 78/12
**signed [1]** 43/5
**Sincerely [1]** 78/19
**situation [2]** 34/12
66/3
**sixties [1]** 58/3
**sleeve [1]** 73/11
**slight [1]** 43/11
**small [1]** 36/2
**Smith [6]** 1/18 75/5
75/21 76/5 76/13
78/22
**snapshot [1]** 57/5
**snatches [1]** 43/19
**society [2]** 41/8
41/20
**software [1]** 14/4
**SOLAS [1]** 58/1
**sounds [1]** 9/20
**South [2]** 2/7 78/6
**SOUTHERN [1]** 1/1
**Spagis [1]** 38/4
**specialist [1]** 54/14
**specific [6]** 13/2
21/21 26/3 42/3
56/24 57/13
**speeches [1]** 69/4
**speed [4]** 28/8 28/18
68/21 68/23
**Spencer [1]** 54/9
**spent [1]** 31/24
**SS [1]** 75/2
**stability [6]** 2/20
65/15 66/3 66/4
66/22 67/12
**staff [5]** 23/6 37/17
48/22 48/24 50/7
**stamp [1]** 25/11
**stamped [2]** 24/16
25/7
**stamps [2]** 24/19
24/25
**stand [2]** 4/23 66/17
**standard [1]** 65/7
**standing [5]** 2/20
64/16 64/22 64/24
65/9
**stands [1]** 49/20
**state [17]** 1/20
16/11 16/13 16/18
17/1 17/5 17/6 18/5
23/12 30/14 55/3
75/2 76/2 76/6 76/10
77/3 77/20
**stated [1]** 17/24
**statement [1]** 79/6
**statements [1]** 22/6
**states [4]** 1/1 15/7
58/7 58/10
**station [2]** 61/16
61/19

**statutory [1]** 14/2
**stenographic [1]** 75/11
**stenographically [1]** 75/7
**Steve [1]** 20/11
**stiff [1]** 66/5
**storm [8]** 26/21 38/18 38/22 39/8 39/11 39/16 40/17 40/18
**Street [1]** 78/1
**strength [1]** 43/9
**stretch [2]** 4/23 5/2
**structure [1]** 7/4
**study [2]** 59/8 59/9
**styled [2]** 1/22 78/10
**sub [1]** 7/21
**sub-companies [1]** 7/21
**subscribed [1]** 77/15
**subscriptions [1]** 29/8
**subsidiary [1]** 9/3
**substance [1]** 79/3
**success [1]** 32/12
**successfully [1]** 31/25
**sufficient [2]** 55/12 56/20
**suggest [1]** 78/13
**suggested [1]** 52/20
**suitable [1]** 78/14
**Suite [5]** 1/12 2/3 2/7 78/1 78/6
**summary [1]** 67/13
**superintendent [2]** 9/18 9/25
**superiors [1]** 33/15
**supervision [1]** 19/21
**support [2]** 26/22 29/8
**suspect [1]** 73/15
**sustaining [1]** 10/2
**SVP [2]** 23/25 24/2
**sworn [3]** 3/3 76/8 77/15
**system [18]** 13/19 14/4 14/5 14/9 14/19 23/10 27/9 30/1 30/7 32/16 34/11 49/18 49/19 49/21 51/22 52/21 66/16 71/7
**systems [2]** 12/19 31/6

**T**

**tanks [1]** 67/1
**team [1]** 59/4
**technical [6]** 7/5 11/11 21/20 22/5 34/9 34/10
**telephone [2]** 27/20 78/14
**tend [1]** 47/11
**term [3]** 30/9 49/25

**terms [1]** 66/4
**testimony [3]** 15/18 56/6 73/7
**text [1]** 26/5
**Thank [1]** 5/4
**Thanks [1]** 68/4
**Thanksgiving [1]** 8/17
**thick [1]** 69/15
**thought [5]** 9/4 9/7 41/22 47/16 72/13
**time [32]** 5/1 17/3 23/17 26/24 27/18 27/18 27/22 27/23 29/4 29/18 31/16 36/9 36/9 36/23 37/1 38/10 40/15 40/21 40/23 40/25 41/12 44/24 44/25 46/18 54/2 64/1 64/3 64/22 64/24 70/17 71/11 78/15
**timely [3]** 53/3 53/11 53/14
**times [9]** 37/15 37/20 37/22 37/24 37/25 38/7 38/20 39/4 64/14
**TINELLI [2]** 2/6 78/5
**today's [1]** 18/12
**Tom [1]** 62/25
**total [1]** 60/22
**totally [1]** 4/4
**track [3]** 14/5 14/7 50/18
**tracking [3]** 13/19 49/23 51/3
**tracks [1]** 13/23
**transcribed [2]** 69/9 78/12
**transcript [5]** 75/9 77/7 78/11 78/17 79/19
**translation [1]** 40/22
**trending [1]** 14/23
**trial [1]** 78/15
**Tuesday [1]** 1/14
**typically [1]** 18/4

**U**

**U.K [2]** 6/16 6/24
**U.S [1]** 17/2
**uh [3]** 4/13 4/14 71/2
**uh-huh [2]** 4/14 71/2
**UKC [1]** 49/25
**ultimately [1]** 18/11
**UN [1]** 15/5
**unable [2]** 33/5 34/23
**unaware [2]** 21/4 21/5
**unclear [1]** 4/1
**understanding [4]** 18/10 30/8 40/9 50/17
**unfamiliar [2]** 12/9

**unfinished [2]** 70/7 71/8
**unfriendly [3]** 12/14 31/5 31/24
**UNITED [1]** 1/1
**universities [1]** 6/16
**unless [1]** 5/8
**unlikely [4]** 5/12 5/15 39/19 39/20
**unlimited [1]** 7/17
**unsuccessful [1]** 35/11
**unusual [3]** 46/12 65/8 67/9
**us [11]** 3/7 4/17 4/21 12/2 25/11 31/7 32/12 37/18 40/12 41/2 54/20
**usable [1]** 57/25
**user [4]** 12/14 31/5 31/23 47/9
**UTC [2]** 40/21 40/25

**V**

**validate [2]** 18/3 55/21
**Varga [6]** 1/18 75/5 75/21 76/5 76/13 78/22
**VDR [33]** 11/3 11/3 11/5 13/24 14/2 30/23 31/5 31/15 31/17 31/22 32/2 32/14 32/18 32/22 33/16 33/25 34/1 43/13 43/14 43/22 44/2 44/25 54/13 54/13 55/21 56/4 56/22 57/1 57/13 58/19 69/1 69/6 69/7
**VDRs [17]** 11/6 11/7 11/11 11/25 12/9 12/11 12/13 12/14 33/18 44/22 47/5 55/21 55/24 56/1 56/2 56/8 56/14
**vessels [1]** 7/11
**vice [2]** 24/3 24/4
**video [6]** 31/2 33/1 57/2 57/3 57/4 57/4
**violent [2]** 34/14 34/16
**Violet [6]** 1/18 75/5 75/21 76/5 76/13 78/22
**voice [7]** 30/25 30/25 31/9 31/12 32/1 33/1 43/14
**voyage [9]** 3/11 3/12 35/23 58/15 58/16 58/17 58/22 62/14 62/16

**W**

**waive [2]** 72/11 73/7
**waived [2]** 74/1 78/16

**warranty [1]** 32/13
**waves [1]** 44/8
**weather [17]** 2/18 3/13 19/14 19/25 20/8 20/9 27/10 27/19 28/7 29/7 29/8 29/10 29/16 34/24 35/24 42/13 62/21
**weights [2]** 66/24 66/25
**west [2]** 55/11 78/1
**wind [5]** 35/9 35/13 35/17 35/19 43/22
**windows [1]** 44/8
**winds [4]** 43/2 43/3 43/8 55/1
**wish [4]** 4/5 4/12 4/21 4/22
**witnesses [7]** 4/13 22/9 22/11 22/14 23/14 23/14 23/16
**worry [1]** 6/2
**worst [1]** 55/11
**worthless [1]** 33/5

**Y**

**young [1]** 73/2
**yours [2]** 17/4 78/19