UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 16-cv-20924-MARTINEZ/GOODMAN

DONNA INCARDONE, *et al*.,

Plaintiffs,

vs.

ROYAL CARIBBEAN CRUISES, LTD.,

Defendant.

_____/

SPOLIATION MOTION ON CCTV AND VDR

COME NOW, the Plaintiffs' hereby file a Spoliation Motion concerning Defendant, ROYAL CARIBBEAN CRUISES, LTD's, failure to produce all CCTV and VDR recordings and state as follows:

Defendant's cruise ship, Anthem of the Seas, is equipped with a closed-circuit television ("CCTV") system. The ship contains over 200 CCTV cameras distributed throughout the vessel. [Ex.1 Andersen Dep. 8/19/17 p. 100-110] All of the CCTV camera recordings are viewable from the bridge, recorded continuously throughout the 72-hour voyage and are stored on a DVR. [Id.] During discovery the Plaintiffs sought production of all the CCTV recordings during the voyage. The CCTV videos depict the violence of the storm and damage done to the ship as a result. The Plaintiffs' medical conditions were caused by that violence which would be best appreciated by a jury seeing video evidence of it.

During the February 7, 2016 hurricane, Captain Andersen ordered all the passengers to their staterooms because of the severe weather. [Ex.1, p.176] The Plaintiffs were confined to their staterooms for 12-13 hours and ordered not to move. [Id. p.221] The injuries suffered by the Plaintiffs were caused by the hurricane weather and 12 hours of violent movement by Anthem, as they experienced winds up to 160 knots and waves up to 60 feet.  These conditions should have been thoroughly captured on the 200 CCTV cameras.

Additionally, the Plaintiffs sought production of VDR recordings from the bridge. The VDR recordings would contain conversations by the Captain and crew concerning the voyage. Most importantly, the VDR recordings would reflect any course corrections or alterations that were made in relation to the storm threat.  The Plaintiffs have alleged that improper pre-voyage planning and improper voyage course corrections took place, resulting in Anthem's sailing into a force 5 hurricane.

During discovery, the Plaintiffs requested production of all recordings on the ship.  On May 5, 2017 Plaintiffs' sought to compel production of the missing CCTV recordings at a discovery hearing. [DE 68 & 85 p.59-65] During that hearing the Plaintiffs discussed recordings from the CCTV monitors located on the bridge of the ship. [Id] The Court ordered production of all CCTV recordings viewable from monitors on the bridge of Anthem of the Seas during the voyage. [DE 85 & 69] The Plaintiffs only received eighteen of the CCTV clips amounting to a total of 26 minutes of video.  All of the CCTV recordings from the voyage should have resulted in approximately 14,400 hours of video.

On November 27, 2017 in a discovery conference, Defense Counsel represented it had produced all CCTV recordings in its possession. [Ex. 2]. However, the CCTV recordings produced were sparse and inconsistent with what Defendant's employees have represented were

in Defendant's possession.  The Defendant's employees, Staff Captain Wendy Williams, First Officer Gerry Ellis and Captain Claus Andersen testified to recordings that were taken during the voyage and should have been preserved but were not produced to the Plaintiffs.  Captain Andersen testified that he ordered the CCTV and VDR recordings be preserved and that all video from February 6 through February 10 should have been preserved based on his order and the nature of the incident. [Ex.3 Andersen 8/18/17 depo. p.44-57] Captain Andersen also testified he reviewed "the CCTV afterwards showing some scary photos or movies." (Id. p. 24).  It is likely the Defendant chose not to produce the CCTV's because they were indeed scary and would potentially impact the jury's perception of this case.

The Defendant did produce VDR recordings but they were inaudible and thus improperly preserved.  Gerry Ellis testified that, although difficult, he was able to access the VDR recordings and gather the information he needed for his investigation.  When Plaintiffs' counsel inquired about the files, Defense counsel stated that it also could not open the files and would put Plaintiffs' counsel in touch with the manufacturer to troubleshoot. [Ex.2] However, the Defendant already attempted to have the manufacturer cure the problem without success.  It was Defendant's burden to preserve and produce the VDR in working condition, yet the Defendant failed to do so.

All of the CCTV and VDR recordings should have been preserved in light of the Captain's Orders, standard operating procedures, the profound incident at issue and Defendants awareness of potential investigation and litigation concerning the incident.

## **MEMORANDUM OF LAW**

Spoliation is the "intentional destruction, mutilation, alteration, or concealment of evidence." Doe v. Miami-Dade Cnty., 797 F. Supp. 2d 1296, 1303 (S.D. Fla 2011).  For

spoliation to be established, the moving party must show "(1) that the missing evidence existed at one time; (2) the alleged spoliator had a duty to preserve the evidence; and (3) the evidence was crucial to the movant being able to prove its prima facie case or defense." Managed Care Sols., Inc. v. Essent Healthcare, Inc., 736 F. Supp. 2d 1317, 1323-24 (S.D. Fla. 2010).  The duty to preserve "arises when the party in possession of the evidence knows that litigation by the party seeking the evidence is pending or probable." Point Blank Sols., Inc. v. Toyobo America, Inc., 2011 WL 1456029 at *24 (S.D. Fla. Apr. 5, 2011).  Sanctions may be imposed on a party for spoliation of evidence, "when the absence of that evidence is predicated on bad faith." Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997).  "If direct evidence [of bad faith] is unavailable, circumstantial evidence may establish bad faith upon a showing that (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator." Id.

In the Eleventh Circuit, in a variety of contexts, bad faith is deemed to exist in either a case of intentional misconduct or reckless disregard of the consequences. See Amlong & Amlong, P.A. v. Denny's, Inc., 457 F.3d 1180, 1190 (11th Cir. 2006); Malautea v. Suzuki Motor Co., Ltd., 987 F.2d 1536, 1544 (11th Cir. 1993); Peer v. Lewis, 606 F.3d 1306, 1314 (11th Cir. 2010).  A "finding of bad faith is warranted where an attorney [or party] knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." Thomas v. Tenneco Packaging Co., 293 F.3d 1306,

1320 (11th Cir. 2002) (quoting <u>Barnes v. Dalton</u>, 158 F.3d 1212, 1214 (11th Cir. 1998)). "[O]bjectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently" because conduct is "tantamount to bad faith when he 'either carelessly or deliberately' covered up evidence." <u>Amlong</u>, 457 F.3d at 1191 (quoting <u>Malautea</u>, 987 F.2d at 1544).

In <u>Long v. Celebrity Cruises, Inc</u>., Case No. 2013 WL 12092088 (S.D. Fla. 2013) the Plaintiff claimed there was circumstantial evidence of bad faith because it was undisputed Defendant knew of the CCTV's relevance to potential litigation and understood the duty to preserve the video. There, the Court agreed spoliation had occurred, especially given the fact that Defendant was able on other occasions to identify and preserve CCTV footage onboard its ships. <u>Id</u>. The Court noted that Defendants failure to preserve the CCTV footage was a "reckless dereliction of duty." <u>Id</u>. at *7.

In the instant action, it is undisputed that the CCTV and VDR existed and were in Defendant's possession, custody and control. First Officer Gerry Ellis and Captain Andersen testified to the same. Captain Andersen testified that he ordered preservation of the VDR and CCTV videos and that the Defendant should have videos and recordings from February 6 thought February 10th. In particular he testified as follows:

Q. Did you preserve all of the video from the CCTV as well?
A. Yes, that is done by the security department.
Q. All right. So let's go back to the VDR.
A. Yes.
Q. And you said it was the navigation officer at the time that was supposed to punch the button to preserve the –
A. No, he -- when I gave the order to capture the VDR, that is what we do, yes.
Q. When was your order given to capture the VDR?
A. When we -- on the way back into Bayonne.
[Ex.3 p.44]

Q. You would agree this was a serious incident for which the VDR needed to be captured; true?

A. True.
[Id. p.48]

Q. And I will leave this, after this question. You would agree with me that the CCTV and VDR footage and audio and data, if it was preserved correctly, is something that Royal Caribbean should have from February 6th through the 10th; correct?
A. If the -- if the system was working the way it is designed, we should have it.
Q. The CCTV cameras that are on the bridge, they show the navigation screens; true?
 A. True.
Q. Okay. And again, if that CCTV footage was properly preserved, then we should have the CCTV footage from February 6th through the 10th; correct?
 A. The -- correct.
Q. And that includes when course alterations or course corrections were made for the weather; true?
A. This is all part of the VDR. So answer: yes.
[Id. p.56]

Q. I am sorry. When a course correction or a course alteration is going to be made, like it was in this instance, during this incident, that is something that has to be communicated to the rest of the crew members on the bridge; correct?
A. Correct.
Q. So the CCTV and the VDR, if it was properly preserved, should have that; correct?
A. Correct.
[Id. p.57]

Q. Okay. So, the cameras record -- recorded the entire -- the CCTV cameras on Anthem recorded the events for the whole trip?
A.  To my knowledge, as long as a camera is working as it is supposed to, it will.
[Ex.1 p.103]

A. So, it is normal for me to look at guest assembly stations during our guest assembly drill prior to departure. It is normal that some of the -- the -- it's normal to have one of the cameras at least up on the screen displaying the funnel of the vessel, so we can have a clear view of any emission and see if there's smoke and stuff that comes out. Ship sides, ship -- the ship sides, the side – the outside of the ship is normally on display as the ship is sailing. So, you walk by, you see it and it's not that I'm sitting in front of it and looking at it, it's there –
Q. And -- and –
A. -- for availability.
Q. And that's important to see what the waves are?
A. Not necessarily waves. It is – we can -- because you can see into the promenade deck or the boat deck, so you can see kind of activity that is there. So, it's just in case something should happen, including waves, you will -- you will -- you -- you can get – you don't have to look up those cameras, so to speak.
Q. And do you have any other cameras that you'd be looking at during the course of the -- of the trip?

A. We looked at cameras showing the sea state when we were moving back towards the-- the -- towards Bayonne and by –
Q. And where are those cameras facing?
A. Outside the vessel to -- to forward part, out part, sides of the vessel and so on.
Q. Do you –
A. In -- in gen -- in general, it's just several cameras.
Q. And can you see from the bridge the wave height near the vessel?
A. Yes.
Q. And from inside the -- I'm talking about inside the bridge, not on the wings, can you see from the bridge itself –
A. You can –
Q. -- the wave heights?
A. When you're on the bridge you can see where the vessel is sailing, so then you see the sea.
Q. Okay. And you had that -- you had that available to you at all times, right, to just look out the window –
A. Yes.
[Id. p.105-106]

Q. Did you review any of the CCTV footage after the ship docked in Bayonne?
A. Yes.
Q. And was that a review by you of the -- no, withdrawn. What -- what did you review and why?
A. I reviewed CCTV of February 7th in Bayonne to show corporate operation what we encountered.
[Id. p.111]

Q. Do you recall the clips that were sent to you, in general terms, the clips that were sent to you from the CCTV for you to review in your office?
A. Yes, it was to -- to -- to see the wave heights that we had on the -- on the forward part of the vessel, when we -- to – get a better understanding how big those waves were, because during the -- the nighttime it was dark. We know we had a -- large waves but it -- it -- wanted to see it actually how large they were. And, of course, there is -- I only have two eyes when I'm up on the bridge and trying this, so to get a better input of understanding of what had taken place. So there's a -- base -- there's -- I reviewed a clip where we had one satellite dome that -- that collapsed in the wind, and I think it's two footages that I've looked at that shows the waves around the – the bow section of the vessel.
[Id. p.112-114]

Gerry Ellis testified to CCTV video and VDR recordings he reviewed to investigate the

occurrence. [Ex.4 Gerry Ellis Depo p.30] He stated:

A. We were able to get periods of or sections of voice. It's a huge amount of data. So one of the reasons that I interview shoreside is to pin down exactly where I need to go search in the VDR.
Q. Okay. So the time periods that you looked in the VDR, were you able to hear what went on?
A. Yes. There were certain things I was looking for, Yes.
[Id. p.30-32]

Q. That CCTV footage -- what CCTV footage did you review?
A. Footage of the center images of the waves over the bow, hitting the windows.
[Id. p.44]

Q. Okay. And there's no company policy or any requirement that CCTV be kept?
A. We instruct -- as investigators, we instruct them to secure any relevant CCTV.
[Id. p.45]

Staff Captain Williams also testified to CCTV video footage that was not produced in evidence. [Ex.5 Captain Williams statement p.19] In particular, she mentioned footage of other ships in the vicinity which should have been recorded on the CCTV. [Id.] The above testimony indicates that all CCTV and VDR footage was preserved and contained footage seminal to the instant action.  Captain Andersen ordered the recordings to be preserved, reviewed them personally after the voyage and showed them to the Defendant's corporate operations department.  Evidence of on-board communication during the storm and all of the conditions faced by the ship would be crucial to Plaintiffs' prima facia case.  This evidence would demonstrate that improper pre-voyage planning took place and unexpectedly horrible storm conditions were encountered, causing serious injury to the Plaintiffs because of its severity.

Federal law recognizes a litigant's duty to preserve evidence once it knows, or should know, that such evidence may be relevant to any potential litigation, even before litigation commences. See St. Cyr v. Flying J, Inc. 2007 U.S. Dist. LEXIS 42502, at *8 (M.D. Fla. 2007). The Captain and First Officer both testified that the CCTV and VDR footage should have been preserved in light of the incident and that both explicitly ordered it to be preserved.  The Captain

testified, in fact, that five days of CCTV footage should have been preserved. [Ex.3 p.56] Yet, the Defendant only produced 26 minutes of footage, without explanation as to the whereabouts of the remaining thousands of hours of CCTV footage. During discovery and the pendency of this action the Defendant has never represented that these items were destroyed, missing or otherwise unavailable. The Defendant has simply claimed it produced everything in its possession. At the very least, the Defendant recklessly disregarded its duty to preserve and produce all of the CCTV recordings. At some point during and after the voyage all of the CCTV recordings were in existence and the Senior crew ordered its preservation. The Defendant knew or should have known of possible litigation at the time these recordings were in existence based on common sense, precedent and the almost immediate investigation and legal filings. Because these recordings were not produced and Defendant claims not be in possession of them, it is clear they have been destroyed or purposefully hidden. The Defendant has offered no excuse for its spoliation and has effectively hampered the Plaintiffs' ability to fully illustrate and support its case in chief.

The Plaintiffs respectfully request this Court find Defendant failed to preserve important evidence of its efforts to avoid the storm and instruct the jury that they may take an adverse inference that: (1) the Defendant made no effort to avoid the storm and (2) the storm had such a severe impact upon the vessel and its' passengers that Plaintiffs' psychological injuries would be consistent with the storm's violence.

The parties have had a Rule 7.1 conference prior to filing this Motion and have been unable to agree on this issue.

JOHN B. OSTROW, P.A.
Counsel for Plaintiffs
777 Brickell Avenue, Suite 400

Miami, Florida 33131
Tel: 305-358-1496
Jostrow@bellsouth.net
JBOassist@gmail.com


and


LAW OFFICE OF ALAN C.
TRACHTMAN
48 Wall Street, 11th Floor
New York, NY 10005
Tel: 212-918-4750
Fax: 212-202-4961

act@traxlaw.com


By: s/ Morgan P. Theodore
MORGAN P. THEODORE
Fla. Bar No. 70188


## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this 3rd day of December, 2018 on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ *Morgan P. Theodore*

Morgan Theodore