# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 16-20924-CIV-MARTINEZ/GOODMAN

DONNA INCARDONE, et al.,

      Plaintiffs,

v.

ROYAL CARRIBEAN CRUISES, LTD.,

      Defendant.

_____/

## OMNIBUS REPORT AND RECOMMENDATIONS ON *DAUBERT* MOTIONS

Robert Louis Stevenson (1850–1894), the Scottish novelist and essayist who wrote "Treasure Island" and "Strange Case of Dr. Jekyll and Mr. Hyde," provided insight that could easily apply to a failure to follow rules: "Everybody, sooner or later, sits down to a banquet of consequences."

As outlined in this Report and Recommendations, Plaintiffs appear to have set their own banquet of consequences by failing (once again) to comply with Local Rule 7.1.

Local Rule 7.1 is straightforward. With exceptions inapplicable here, it requires a party to first confer with the opposing party before filing a motion and to include a certificate of conferral. The rule also provides that a failure to comply can alone cause the motion to be denied. Because Plaintiffs failed to confer and to include the required conferral certificate for their two *Daubert* motions and because these two motions are

not the first time they have failed to confer in this case, the Undersigned **recommends** that the motions be **denied**. If District Judge Jose E. Martinez were to not adopt the recommendation for rule-based denials, though, then the Undersigned recommends that Judge Martinez **grant in part** and **deny in part** those motions on the merits. The Undersigned also recommends that Defendant's *Daubert* motions be **granted in part** and **denied in part.**

Both parties move to exclude each other's experts (or to limit expert testimony) under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiffs filed motions to strike the expert testimony of rebuttal defense experts Oscar Padron and John McKay. [ECF Nos. 242; 243]. Defendant Royal Caribbean Cruises, Ltd. ("RCCL") filed responses in opposition [ECF Nos. 251; 252], and Plaintiffs filed replies [ECF Nos. 257; 258]. RCCL filed a motion to strike or alternatively limit the testimony of Plaintiffs' expert witnesses Captain Joseph Ahlstrom, David Nolan, Dr. Roy Lubit, Lawrence Forman, and Loretta Fabricant. [ECF No. 247].[1] Plaintiffs filed a response in opposition [ECF No. 250], and RCCL filed a reply [ECF No. 256]. Judge Martinez referred all matters relating to the *Daubert* motions to the Undersigned. [ECF Nos. 244; 253].

For the reasons detailed below, the Undersigned **respectfully recommends** that the Court **deny** Plaintiffs' motions to strike rebuttal defense experts Oscar Padron and

---

[1] RCCL filed an earlier *Daubert* motion [ECF No. 240], but it was amended by ECF No. 247 to include citations from expert witness depositions.

John McKay;[2] and **grant in part** and **deny in part** RCCL's motion to strike or limit the testimony of Captain Ahlstrom, David Nolan, Dr. Roy Lubit, Lawrence Forman, and Loretta Fabricant.

## I.    Background

Plaintiffs, a group of autistic children and their families, seek compensation for alleged psychological injuries they sustained when their cruise on RCCL's *Anthem of the Seas* encountered a winter storm with hurricane-force winds. [ECF Nos. 243, p. 1; 247, p. 1]. Plaintiffs allege that RCCL negligently and recklessly sailed the *Anthem of the Seas* into the path of the storm even though it received severe weather warnings prior to embarking and knew its propulsion system would experience difficulties in severe weather. [ECF No. 55, ¶¶ 14-16, 27]. RCCL argues that the storm was an unexpected Act of God and that Plaintiffs cannot recover under maritime law for the stand-alone emotional distress damages they are claiming. [ECF No. 241, p. 2].

Plaintiffs rely on the following expert witnesses (who are the subject of RCCL's *Daubert* motion):

***Captain Joseph Ahlstrom.*** Plaintiffs rely on Captain Ahlstrom for his experience relating to shipboard safety management, shipboard security, and shipboard operations. [ECF No. 250, pp. 3-4]. Ahlstrom is a longtime professor and former

---

[2]      As discussed further below, should Judge Martinez decide to reach the merits of Plaintiffs' motions, the Undersigned recommends that Plaintiffs' Motion to Exclude Expert Testimony of McKay [ECF No. 243] be granted in part and denied in part and that Plaintiffs' Motion to Strike Expert Testimony of Padron [ECF No. 242] be denied.

chairman of the Department of Marine Transportation at SUNY Maritime College. [ECF No. 247-1, p. 1]. Ahlstrom opines that RCCL recklessly, intentionally, and/or negligently sailed the *Anthem* into hurricane-force winds in violation of various maritime safety procedures. [ECF No. 247-1, p. 2].

*David S. Nolan*. Plaintiffs rely on Nolan to opine on the weather forecasts available to the captain and crew of the *Anthem* and the interpretation of those forecasts before and during its voyage. [ECF No. 247-4, p. 1]. Nolan is a Professor and Chair of the Department of Atmospheric Sciences Rosenstiel School of Marine and Atmospheric Science at the University of Miami. [ECF No. 247-4, p. 12]. Nolan opines that, based on weather reports and forecasts available to the captain and crew, the planned route would take the *Anthem* directly through the worst part of the storm. [ECF No. 247-4, p. 3].

*Dr. Roy Lubit, M.D., Ph.D.* Plaintiffs rely on Dr. Lubit to conduct forensic psychiatric evaluations of the Plaintiffs and to assess what psychological damages, if any, they suffered as a result of the cruise ship enduring a hurricane. [ECF No. 247-5, p. 1]. Dr. Lubit is a psychiatrist and is board certified in Psychology, Neurology, Child and Adolescent Psychiatry, and Forensic Psychiatry. [ECF No. 247-5, p. 1]. Dr. Lubit opines that the Plaintiffs have suffered Post Traumatic Stress Disorder ("PTSD") and other psychological injuries as a result of experiencing the hurricane while aboard the *Anthem*. [ECF No. 248-19].

*Lawrence Forman, M.Ed., J.D., CRA, CRC, CDMS, FIALCP.* Plaintiffs rely on Forman to act as a vocational rehabilitation specialist and life care planner. [ECF No. 250-5]. Forman created life care plans for each plaintiff, including prices for the future care and services as it relates to psychological injuries alleged to be the result of the *Anthem* experiencing hurricane-force winds. [ECF No. 258-1].

*Loretta Fabricant, CPA, CFF, ABV.* Fabricant, an accountant, was hired to prepare economic damages reports for Plaintiffs. [ECF No. 252-3]. Fabricant used Forman's life care plans to calculate the present money value of future economic damages. [ECF No. 252-3].

RCCL relies on the following rebuttal expert witnesses (who are the subject of Plaintiffs' motions to strike):

*John McKay, Ph.D.* RCCL hired McKay, Licensed Rehabilitation Psychologist, to rebut the findings of Plaintiffs' vocational expert, Forman. [ECF No. 242-1]. McKay, relying on RCCL's experts, including its expert psychologist, prepared rebuttal life care plans. [ECF No. 243-2]. In his reports, McKay opines that many of the Plaintiffs do not require a life care plan because the storm did not have any permanent impact or impairment on them. [ECF No. 243-2, pp. 3, 5, 7, 9, 13, 15].

*Oscar Padron, CPA, ABV, CFP, CVA.* RCCL hired Padron, an accountant, to rebut the findings of Plaintiffs' accountant, Fabricant. [ECF No. 242-1]. Padron prepared

economic damages reports for each Plaintiff, which calculated the present money value of the future economic damages provided in McKay's life care plans. [ECF No. 242-2].

## II.     The *Daubert* Legal Standard

The admission of expert testimony is governed by Federal Rule of Evidence 702, as explained and refined by the United States Supreme Court in *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993).

Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part

inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation." *U.S. v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).

However, "[i]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341; *see also Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (citation omitted). Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n. 7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps.

*See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at \*6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."). Furthermore, courts "must be careful not to conflate questions of ***admissibility*** of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *In re Trasylol Products Liab. Lit.*, No. 08-MD-01928, 2010 WL 1489793, at \*7 (S.D. Fla. Feb. 24, 2010) (quoting *Quiet Tech*, 326 F.3d at 1341) (emphasis added).

### III. Rebuttal Witness Standard

A rebuttal expert witness's testimony is permitted under Rule 26 only if it "'contradict[s] or rebut[s] evidence on the same subject matter identified by' an opposing expert." *Teledyne Instruments, Inc. v. Cairns,* No. 6:12-cv-854-ORL-28TBS, 2013 WL 5781274, at \*16 (M.D. Fla. Oct. 25, 2013) (citing Fed. R. Civ. P. 26 (a)(2)(D)(ii)); *see also In re Trasylol Prods. Liab. Litig.*, No. 09-01928, 2010 WL 4065436, at \*2 (S.D. Fla. Aug. 6, 2010) (citation omitted) (stating rebuttal testimony must "directly address[] an assertion raised by an opponent's expert[]"). A rebuttal witness cannot "advance new arguments or new evidence." *Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 17 (D.D.C. 2013) (quotation omitted).

## IV.    Analysis

### a.  Plaintiffs' Motions Should Be Denied For Failure to Confer Under Local Rule 7.1

As pointed out by RCCL, Plaintiffs failed to certify conferral as required under Local Rule 7.1(a)(3) in both of their motions to exclude testimony. [ECF Nos. 242; 243; 251, n.1; 252, n.1].  Failure to certify conferral under Local Rule 7.1(a)(3) is grounds for denial of a motion. *See* L.R. 7.1(a)(3) ("Failure to comply with the requirements of this Local Rule may be cause for the Court to grant or deny the motion and impose on counsel an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee."); *see also Muzaffarr v. Ross Dress for Less, Inc.*, 941 F. Supp. 2d 1373, 1376 (S.D. Fla. 2013) ("RCCL's failure to confer [under Rule 7.1(a)(3)] with opposing counsel is by itself grounds to deny the motion."); *Bd. of Trustees of Int'l Longshoremen's Ass'n v. Eller Mar. Servs., LLC*, No. 08-22320-CIV, 2009 WL 3584264, at *2 (S.D. Fla. Oct. 28, 2009) (stating counsel's failure to certify conferral "suppl[ies] adequate grounds to deny the motion").

This is not the first time Plaintiffs have failed to confer under Local Rule 7.1(a)(3). Plaintiffs committed other, earlier violations of Local Rule 7.1 during the discovery phase of the case, and the Undersigned admonished their counsel about failing to confer. [*See* ECF Nos. 79; 146; 170; 176 (noting "continued failures to comply with Local Rule 7.1")]. In fact, the Undersigned has previously entered orders striking Plaintiffs' submissions for failure to comply with Local Rule 7.1. [*See, e.g.*, ECF No. 79].

Plaintiffs filed an after-the-fact "certificate of conferral" here after RCCL pointed out the omission. [ECF No. 254]. But this is a classic example of "too little, too late." The belated effort is inadequate to cure or correct Plaintiffs' Rule 7.1 violation. Plaintiffs accuse RCCL of not conferring before filing its own *Daubert* motions, but RCCL includes the certificate of conferral in its motions. [ECF Nos. 254; 240; 247]. Moreover, accusing RCCL of not complying with Rule 7.1 before filing its motions to strike expert testimony does not excuse Plaintiffs' own violations.[3]

Accordingly, due to Plaintiffs' failure to confer under Local Rule 7.1(a)(3) before filing their motions, the Undersigned **respectfully recommends** that the district court **deny** Plaintiffs' Motion to Strike Expert Testimony of Padron [ECF No. 242] and Plaintiffs' Motion to Exclude Expert Testimony of McKay [ECF No. 243]. *See generally Peters-Turnball v. Bd. Of Educ.*, No. 96 CIV. 4914 (SAS), 1999 WL 959375, at *3 (S.D.N.Y. Oct. 20, 1999) (stating "[a] court need not beg a party to comply with its orders"); *Wells*

---

[3]     Even though Plaintiffs do not raise the issue of RCCL's alleged failure to confer in their response in opposition to RCCL's *Daubert* motions, the Undersigned notes that I cannot recommend denying RCCL's *Daubert* motions on this procedural ground. Unlike Plaintiffs' motions, which did not include a 7.1 certificate, RCCL's motion included the certificate of conferral. [ECF Nos. 240; 247]. And Plaintiffs admit in their after-the-fact certificate of conferral that they did not confer before filing their motions to exclude testimony. [ECF No. 254]. Thus, there is no factual dispute as to whether Plaintiffs failed to confer. They didn't. By contrast, the Undersigned cannot sort through the conflicting factual representations about Plaintiffs' challenge to RCCL's certificate of conferral and somehow discern which one is accurate (or if each is partially accurate). So the Undersigned cannot recommend denying the defense motion for a purported Rule 7.1 violation.

*Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, No. 10-CV-1762, 2011 WL 2490808, at *3 (S.D.N.Y. June 22, 2011) (same).

However, if Plaintiffs object to this recommendation and Judge Martinez decides to reach the merits of Plaintiffs' motions, then the Undersigned **respectfully recommends** that Plaintiffs' Motion to Exclude Expert Testimony of McKay [ECF No. 243] be **granted in part** and **denied in part**, and that Plaintiff's Motion to Strike Expert Testimony of Padron [ECF No. 242] be **denied** for the reasons discussed below.

> **b. If Judge Martinez Reaches the Merits of Plaintiffs' Motion to Exclude Expert Testimony of McKay [ECF No. 243], then the Undersigned recommends the motion be granted in part and denied in part.**

McKay, a life care planning expert, was hired by RCCL to **rebut** the findings of Plaintiffs' life care planning expert, *Forman*. [ECF No. 242-1]. Plaintiffs argue first that McKay is not offering legitimate rebuttal testimony. Instead, they say that he is an untimely disclosed initial expert witness who is merely bolstering the opinions of RCCL's other experts. [ECF No. 243, pp. 3-4]. Second, Plaintiffs argue that McKay does not satisfy the requirements under Rule 702 and *Daubert* because (a) McKay's opinions are based on insufficient and one-sided data, (b) his opinions are not the product of reliable methods because he simply adopts the other experts' opinions without conducting his own independent analysis, and (c) he lacks the specialized knowledge to testify regarding autistic children and Plaintiffs' financial ability to pay for treatment.

[ECF No. 243, pp. 5-11]. Last, Plaintiffs argue that Federal Rule of Evidence 403 prevents McKay's testimony as cumulative of other defense experts and unduly prejudicial.

As explained below, the Undersigned agrees that McKay's opinions regarding Plaintiffs' psychological impairments exceed the scope of rebuttal. But the Undersigned finds that McKay's remaining findings, specific to the life care plans, are proper rebuttal testimony and satisfy the *Daubert* standard.

### i. McKay's findings appear to bolster other defense experts' opinions and thus should be limited.

McKay's findings, which are included in the life care plans for the different Plaintiffs, primarily relate to the conclusions of the defense psychiatrists, i.e., whether the individual's experience on the ship resulted in any psychiatric impairment that requires future treatment. [ECF No. 243-2]. In most instances, McKay opines that the Plaintiffs' experience on the ship did not result in any impairment, based in part on defense experts' findings, and thus no life care plan is needed. [ECF No. 243-2, pp. 3, 5, 7, 9, 13, 15].

And where McKay does reference Forman's life care plan, he also includes additional analysis regarding Plaintiffs' psychological impairments resulting from being aboard the *Anthem*. [*See, e.g.*, ECF No. 243-2, p. 25]. For example, in the life care plan for Luis Dominguez, McKay states that Forman's life care plan equaling $3,440,527 is "preposterous." [ECF No. 243-2, p. 25]. McKay finds the recommendations by Plaintiffs' psychiatrist for Dominguez to be unnecessary and states that "*as a psychologist*

12

*myself*, it is difficult to see how the invalidity of the testing would correspond to such an amplified and exaggerated sense of disablement from a mental impairment." [ECF No. 243-2, p. 25 (emphasis added)].

While related in a broad sense to what future treatment is needed for Plaintiffs, McKay's findings specifically regarding Plaintiffs' psychological impairments resulting from their experience on the ship rebut Plaintiffs' *psychiatrists' findings*, not **Forman's** findings contained in his life care plans. RCCL identified McKay as a rebuttal witness to Forman, not Plaintiffs' psychiatrists. [ECF No. 242-1]. Thus, this is not proper rebuttal testimony to Forman's testimony and should be excluded. *See In re Trasylol Prods. Liab. Litig.*, 2010 WL 4065436 at *2 (citation omitted) (stating rebuttal testimony must "directly address[] an assertion raised by an opponent's expert[]").

However, where McKay provides a life care plan with a recommended plan for future treatment, McKay's testimony does directly address and rebut Forman's findings, i.e., Forman's life care plans.[4] Accordingly, the Undersigned recommends that

---

[4] The Undersigned further notes that the life care reports prepared by RCCL's expert are, by their nature, rebuttal testimony, as opposed to initial expert testimony. Here, RCCL does not believe it is liable for Plaintiffs' injuries at all. [ECF No. 241, p. 2]. Thus, it would not present the life care reports in its case-in-chief, but rely on the reports to rebut Plaintiffs' claimed damages. *See In re Trasylol Prod. Liab. Litig.*, 2010 WL 4065436 at *2 (citation omitted) ("Rebuttal testimony should not be allowed, if it logically belongs in the case-in-chief and goes to the case's central issue of causation.").

And as further discussed below as it relates to Plaintiffs' motion to strike Padron's testimony, the cases relied upon by Plaintiffs (to argue that this is not proper

McKay's testimony be limited to opining on the life care plans he prepared, such as the life care plans for Teriana Savage-Pietz, Casey Haus, Madison Haus, Angella Capurro, etc. It is inevitable that McKay, like Plaintiffs' expert, will need to reference the treatment recommended by defense experts. [ECF No. 258-1]. Thus, he may testify that, in accordance with a defense expert's diagnosis, a specific life care plan is recommended or alternatively that no life care plan is needed.

But McKay should not be permitted to testify about whether, in his opinion, a plaintiff suffered psychological impairment resulting from his or her experience on the ship because that testimony does not directly rebut Forman's findings and is duplicative of testimony by RCCL's other experts. For example, as it relates to Dominguez, McKay may testify that he believes that Forman's life care estimate of $3,440,527 is too high in light of defense experts' findings that Dominguez did not suffer impairment. But McKay should not be permitted to testify that he himself determined that Dominguez has no impairment, as this would be outside the scope of rebutting Forman's findings.[5]

rebuttal testimony) are factually distinguishable because McKay is not providing new information relating to the party's case-in-chief.

[5] Further, allowing McKay, who never personally examined Plaintiffs, to testify as to his own findings of Plaintiffs' psychological impairments raises questions as to whether, under *Daubert*, he is qualified and has employed reliable methodology in making those findings. [ECF No. 243-2].

### ii. McKay's life care plans satisfy the *Daubert* standard.

If McKay's opinions are limited to his life care plans or lack of a suggested life care plan, then his opinions satisfy the *Daubert* threshold. First, McKay is qualified to testify as an expert life care planner and rehabilitation expert. He has a Ph.D in Rehabilitation Services and is a Certified Rehabilitation Counselor. [ECF No. 251-1, p. 49]. He has also owned a private independent rehabilitation consulting company for the past 38 years. [ECF No. 251-1, p. 49].

To the extent Plaintiffs believe McKay is not qualified to opine on a treatment plan for autism because he does not have specialized training regarding autism, this argument goes to the weight of the testimony and may be raised during cross-examination. *See Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, at *3 (S.D. Fla. June 25, 2009), aff'd, 613 F.3d 1329 (11th Cir. 2010) (citation omitted) ("[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility."); *see also Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596) ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Similarly, a plaintiff's financial ability to pay for treatment appears to fall within the province of determining a life care plan, which McKay is qualified to do, and Plaintiffs can challenge the weight of these findings on cross-examination.[6]

In addition, McKay relies on a sufficiently reliable methodology to reach the conclusions in his life care plans. McKay, applying his expertise in life planning and rehabilitation, was guided by the findings of defense experts, but he also relied upon Plaintiffs' answers to interrogatories, Plaintiffs' experts' reports, and Plaintiffs' deposition testimony to prepare his life plan reports. [ECF Nos. 243-2, p. 2; 251-1, pp. 64-65]. McKay also states that some of the costs are taken from the Physicians Fee Reference 2018. [ECF Nos. 243-2, p. 2; 251-1, p. 65].

Plaintiffs' expert, Forman, relies on many of these same materials and is guided by Plaintiffs' own experts' diagnoses to recommend his life care plans. [ECF No. 258-1]. This could arguably be characterized as "one-sided" as well, but Plaintiff argues that Forman's methodology is sufficient under *Daubert*. [ECF No. 250, pp. 20-21]. Thus, RCCL's expert should be treated no differently.

Further, Plaintiffs argue that McKay should have conducted an independent examination of the Plaintiffs and met with their families to prepare his life care reports. [ECF No. 258, p. 6]. However, Plaintiffs provided no support for the proposition that

---

[6] The Undersigned notes that Plaintiffs filed a motion *in limine* to preclude RCCL from offering testimony at trial concerning Plaintiffs' financial status, including McKay's findings regarding Plaintiffs' ability to pay for psychological treatment. [ECF No. 273].

the life care planner *must* meet face-to-face with the subject of the report or his or her family. And again, this argument goes to the weight of McKay's testimony, which can be challenged on cross-examination. *See Kilpatrick*, 2009 WL 2058384 at *3.

Finally, McKay's testimony regarding the life care plans will aid the trier of fact. McKay provides life care reports that rebut those provided by Forman. If the jury agrees with RCCL's position regarding the level of impairment that the different Plaintiffs suffered, then McKay's testimony assists the jury in determining a fact at issue -- Plaintiffs' damages -- and falls outside the realm of common knowledge (as most people do not know how to prepare a life care plan). *See Rink*, 400 F.3d at 1291-92.[7]

### iii. The Undersigned does not need to further address Plaintiffs' Rule 403 argument.

Finally, because the Undersigned has determined that McKay's testimony regarding whether Plaintiffs suffered psychological impairment is not proper rebuttal testimony, the Undersigned does not need to determine whether the probative value of this testimony is substantially outweighed by its potential to confuse or mislead the jury, or is cumulative under Rule 403. To the extent that Plaintiffs' Rule 403 argument focuses on their argument that McKay's opinions are duplicative, the Undersigned has

---

[7] Because the Undersigned rejects Plaintiffs' *Daubert* arguments as they relate to McKay's limited testimony, the Undersigned need not address RCCL's claim that Plaintiffs' failure to depose McKay is fatal to Plaintiffs' *Daubert* claim. [ECF No. 251, n.2].

made a recommendation on this. Likewise, the Undersigned rejects the theory that Rule 403 bars McKay's permissible opinions as not being helpful to the jury.

### c. If Judge Martinez Reaches the Merits of Plaintiffs' Motion to Strike Expert Testimony of Padron [ECF No. 242], then the Undersigned recommends the motion be denied.

RCCL retained Padron, an accountant, to rebut the findings of Plaintiffs' accountant, Fabricant. [ECF No. 242-1]. Padron prepared economic damages reports for each Plaintiff, which calculated the present money value of the future economic damages provided in McKay's life care plans. [ECF No. 242-2]. Plaintiffs do not challenge Padron's findings under *Daubert*, but they argue that Padron is not offering rebuttal testimony. [ECF No. 243, pp. 3-4]. The Undersigned disagrees and finds that Padron is offering rebuttal testimony.

First, Padron's economic damage reports, which calculate the present money value of Plaintiffs' future economic losses as determined by McKay's life care reports, directly address **Fabricant's** calculations based on Forman's life care reports. [ECF Nos. 252-3; 242-2]; *see In re Trasylol Prods. Liab. Litig.*, 2010 WL 4065436 at *2 (citation omitted) (stating rebuttal testimony must "directly address[] an assertion raised by an opponent's expert[]"). As stated above, the Undersigned finds McKay's testimony regarding his life care reports to be permissible rebuttal. Padron's economic damage reports must (1) be read in conjunction with McKay's life care reports and (2) his opinions merely convert the information in the life care reports to present money value.

[ECF No. 242-2]. And Padron, in fact, considered Fabricant's calculations when creating his reports. [ECF No. 242-2, pp. 6, 50, 64, 210, 238, 252, 266].

This scenario is distinguishable from the facts in the cases relied upon by Plaintiffs where a "rebuttal" witness presented *new* opinions that were central to a party's case-in-chief and, thus, the expert's testimony was found not to be proper rebuttal. For example, Plaintiffs point to *Wreal, LLC v. Amazon.com, Inc.,* where the Court found that a "rebuttal" expert could not present a new theory of defense (unjust enrichment) on rebuttal. No. 14-21385-CIV, 2016 WL 8793317, at *3 (S.D. Fla. Jan. 7, 2016). And Plaintiffs point to *Trasylol*, where a "rebuttal" expert opined that a patient's death was caused by the RCCL's medication, which supported the party's case-in-chief. 2010 WL 4065436 at *2. The Court found this was not proper rebuttal testimony because it logically belonged in the party's case-in-chief. *Id.* ("Rebuttal testimony should not be allowed, if it logically belongs in the case-in-chief and goes to the case's central issue of causation.").[8]

Here, Padron's reports do not logically belong in RCCL's case-in-chief and do not "advance new arguments or new evidence" on RCCL's behalf. *See Blake*, 292 F.R.D. at 17. Accordingly, Padron's rebuttal testimony is permitted as rebuttal opinion

_____

[8] Plaintiffs also rely on *Tuscumbia City School System v. Pharmacia Corporation*, No. CV-12-S-332-NW, 2014 WL 12605648, at *1 (N.D. Ala. Sept. 3, 2014), but that case is also distinguishable because the "rebuttal" expert there testified to a central issue in the case that belonged in the party's case-in-chief regarding whether there was evidence of PCBs from ballasts in a school.

testimony to Fabricant's testimony.

### d. RCCL's Renewed and Amended Motion to Strike or Limit Plaintiffs' Expert Witnesses [ECF Nos. 240; 247]

RCCL moves to strike or limit the testimony of Plaintiffs' expert witnesses: Captain Ahlstrom, David Nolan, Dr. Roy Lubit, Lawrence Forman, and Loretta Fabricant. For the reasons detailed below, the Undersigned **respectfully recommends** that the motion to strike or limit the testimony of Captain Ahlstrom, David Nolan, and Dr. Roy Lubit be **granted in part** and **denied in part**, and that the motion to strike or limit the testimony of Lawrence Forman and Loretta Fabricant be **denied**.

### i. RCCL's motion to strike or limit the testimony of Captain Ahlstrom should be granted in part and denied in part.

Plaintiffs rely on Captain Ahlstrom, a Professor of Marine Transportation, for his experience relating to shipboard safety management, shipboard security, and shipboard operations. [ECF Nos. 247-1, p. 1; 250, pp. 3-4]. Ahlstrom was specifically asked to render an expert opinion on whether "Anthem could have avoided the Force 5 hurricane which adversely affected the passengers aboard Anthem and whether RCCL and/or the crew of Anthem acted intentionally and/or negligently by sailing into the hurricane." [ECF No. 247-1, p. 1]. Ahlstrom opines that RCCL recklessly, intentionally, and/or negligently sailed the *Anthem* into hurricane-force winds in derogation of various maritime safety procedures. [ECF No. 247-1, p. 2].

RCCL argues that Ahlstrom's testimony does not satisfy *Daubert* because (1) Ahlstrom's testimony is not supported by a reliable methodology because he came into the case with preconceived notions and simply second-guesses the actions of *Anthem's* captain, (2) his testimony is not helpful because he offers ultimate legal conclusions that are reserved for a lawyer's comments in closing argument, and (3) Ahlstrom is unqualified to testify regarding the *Anthem's* Azipod propulsion system and regarding weather forecasting. [ECF No. 247, pp. 9-11]. RCCL also argues that Ahlstrom's opinions relating to the ship sinking, including the number of life boats and references to the *Titanic*, *El Faro*, and *Costa Concordia*, are unfairly prejudicial and should be excluded under Rule 403.

### 1. The Undersigned finds that the Court should strike Ahlstrom's ultimate legal conclusions.

As a preliminary matter, the Undersigned finds that much of Ahlstrom's testimony relates to ultimate legal conclusions. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *United States v. Frazier*, 387 F.3d 1244, 1262–63 (11th Cir. 2004). An expert may testify as to his opinion on an ultimate issue of fact, "but he may not testify as to his opinion regarding ultimate legal conclusions." *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014); *see also Montgomery v. Aetna Cas. & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (holding that an expert may not merely tell the jury what result to reach and may not testify to the legal implications

of conduct and concluding that the trial court abused its broad discretion by permitting opinion testimony on whether insurer had a duty to hire tax counsel and by allowing the expert to testify about the scope of the carrier's duty under the policy).

It is clear from Ahlstrom's report that he was asked to opine on the ultimate legal conclusions in this case, i.e., whether RCCL "acted intentionally and/or negligently by sailing into the hurricane." [ECF Nos. 55; 247-1, p. 1]. And it is clear that Ahlstrom did in fact opine on these ultimate legal conclusions. [ECF No. 247-1]. For example, he states in his report that:

> This report concerns RCCL and Captain Andersen's decisions made for and on the February 6th cruise to recklessly, intentionally and/or negligently sail Anthem with 6,200 passengers and crew on board into a hurricane with up to 160 knot winds, 30 degree pitch and 60 foot seas. The conduct of RCCL and Captain Andersen demonstrates a course of conduct and such an entire want of care as to raise a presumption of a conscious indifference to consequences and which shows wantonness and recklessness and a gross disregard for the safety and welfare of the passengers and crew.

[ECF No. 247-1, p. 2]. These are impermissible ultimate legal conclusions in this case and what Plaintiffs will presumably present during their closing argument. *See Umana-Fowler*, 49 F. Supp. 3d at 1122.

Further, Ahlstrom does not distinguish between his ultimate legal conclusions, i.e., negligent conduct vs. recklessness conduct vs. intentional conduct. [ECF No. 247-2, pp. 14-16]. Ahlstrom's opinions on the ultimate legal conclusions are not helpful and risk confusing the jury. *See Umana-Fowler*, 49 F. Supp. 3d at 1122 ("[M]erely telling the

jury what result to reach is unhelpful and inappropriate."); *see also Bouton v. Ocean Properties, Ltd.*, No. 16-cv-80502, 2017 WL 4792488, at *14 (S.D. Fla. Oct. 23, 2017) (granting, in part, *Daubert* motion and excluding expert opinion testimony from cybercrime expert about whether defendants were willful or reckless in unmasking expiration dates on thousands of receipts and holding that the expert could not "testify about the legal implications of defendants' conduct as such testimony invades the province of this Court and is not helpful to the jury").

Accordingly, the Undersigned recommends that Ahlstrom be prohibited from testifying to ultimate legal conclusions, including his opinion that RCCL was negligent, acted recklessly, or engaged in intentional conduct or that RCCL "demonstrates a course of conduct and such an entire want of care as to raise a presumption of a conscious indifference to consequences and which shows wantonness and recklessness and a gross disregard for the safety and welfare of the passengers and crew." [ECF No. 247-1, p. 2]; *see FNB Bank v. Park Nat'l Corp.*, 996 F. Supp. 2d 1187, 1192 (S.D. Ala. 2014) (excluding expert testimony interpreting what a contract required); *North American Specialty Ins. Co. v. Wells*, No. CV-412-146, 2013 WL 4482455, at *3 (S.D. Ga. Aug. 19, 2013) (excluding expert's "legal conclusions regarding the interpretation of the insurance policy terms" and particularly his opinion that the insurer "has a duty to provide coverage for the event in question"); *Rosen v. Protective Life Ins. Co.*, 817 F. Supp. 2d 1357, 1385 (N.D. Ga. 2011) ("The proposed testimony seeks to displace the role of the

Court by offering Dr. Reavis's opinion on the scope of the obligations described by the unambiguous language of the Settlement Agreement, which is not allowable under the Rules of Evidence.").

### 2. Ahlstrom's opinions relating to shipboard safety and shipboard operations satisfy *Daubert*.

Ahlstrom's remaining opinions relating to safety management (marine transportation, shipboard safety management, shipboard security, and shipboard operations) satisfy the *Daubert* standard. First, Ahlstrom is qualified to testify regarding these topics. Ahlstrom is a longtime professor and former chairman of the Department of Marine Transportation at SUNY Maritime College. [ECF No. 247-1, p. 1]. Ahlstrom has captained tankers and large container ships, along with a 400-500 passenger-training vessel. [ECF No. 247-1, p. 1]. He also created a course at SUNY Maritime College that teaches the elements of safety management for large ships, and he reviews the ISM Code. [ECF No. 247-1, p. 1].

RCCL's complaint that Ahlstrom lacks specific experience with cruise ships [ECF No. 247, p. 10] goes to the weight of Ahlstrom's testimony and may be raised during cross-examination. *See Kilpatrick*, 2009 WL 2058384 at *3 (citation omitted) ("[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility.").

Second, Ahlstrom uses reliable methodologies in determining whether RCCL followed various safety procedures and followed recommended shipboard operations.

Applying primarily his expertise and experience, Ahlstrom opines on the applicable safety regulation and whether RCCL followed the regulation. [*See generally* ECF No. 247-1]. For example, Ahlstrom points to the recommendation under the International Convention for the Safety of Life at Sea (SOLAS) that a ship's voyage plan should take into consideration adverse weather conditions, which he opines was not thoroughly done by RCCL. [ECF No. 247-1, p. 7].

The Undersigned does not find persuasive RCCL's argument that Ahlstrom's testimony is not supported by a reliable methodology because he came into the case "with preconceived notions that Royal Caribbean and Captain Andersen were negligent based on what he saw on television, read in print media, or read on the internet." [ECF No. 247, p. 10]. It is difficult to imagine that an individual with Ahlstrom's experience level and who conducts case studies on shipboard safety management would not be aware of the incident and would not formulate some type of initial perspective as to whether safety protocol was followed. But Ahlstrom's lengthy list of reference materials used in preparing his report, including his own inspection of the ship, reflects that he did conduct his own investigation of the facts in formulating his opinions. [*See* ECF No. 247-1, pp. 2-3].

Third, excluding the ultimate legal conclusions discussed above, Ahlstrom's testimony is useful in assisting the jury in determining facts at issue – i.e., what safety management and operations procedures are used for large ships and whether those

were followed by RCCL -- which is outside the realm of common knowledge. *See Rink*, 400 F.3d at 1291-92.

Thus, Ahlstrom may testify about relevant shipboard safety management procedures, shipboard security, and shipboard operations that were applicable to the *Anthem*, and whether those policies were followed by RCCL. For example, this could include pre-planning procedures for inclement weather and dealing with inclement weather on the seas, such as the circumstances under which a captain is recommended to "outrun" a storm. [ECF No. 247-1, p. 3].

### 3. Ahlstrom is unqualified to testify on weather forecasting and the *specifics* of the Azipod propulsion system.

RCCL argues that Ahlstrom is unqualified to testify about weather forecasting because he has no advanced weather training or meteorological training and because he admitted that he had to look up the term "bombogenesis" (the type of weather phenomenon that occurred here). [ECF No. 247-2, pp. 69-70, 75]. The Undersigned agrees that Ahlstrom is not a weather expert, and Ahlstrom concedes that he would defer to weather professionals on those issues. [ECF No. 247-2, p. 72].

Accordingly, the Undersigned recommends that Ahlstrom not be permitted to testify as an expert on weather forecasting, such as what specifically a bombogenesis is, which will be addressed by Plaintiffs' weather expert, Nolan. *See Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1121 (S.D. Fla. 2014) ("[T]he proffered expert must

be an expert in the subject matter that he proposes to testify about."). However, this does not mean that Ahlstrom cannot *mention* weather forecasts at all. He may discuss weather forecasts as it relates to shipboard safety procedures and operations, such as which different forecasts are available to the captain and which ones should be used (hourly reports, offshore weather forecasts, etc.), and how often these forecasts should be updated on the ship. [*See* ECF No. 247-1, p. 13].

Similarly, Ahlstrom admits that he does not have expertise relating to the specifics of the *Anthem's* Azipod propulsion system. [*See* ECF No. 247-2, pp. 52, 127 ("I am not an expert on Azipods. I'm just going by what the captain said.")]. Thus, Ahlstrom may not testify as to the specifics of the Azipod propulsion system. *See Umana-Fowler*, 49 F. Supp. 3d at 1121. But he may mention the Azipod propulsion system to the extent it relates to shipboard safety management and operations generally. For example, he may testify that if a captain encounters a problem with a ship's propulsion system, protocol requires that he act in a certain manner. But he may not testify as to how an Azipod propulsion system performs in severe weather.

4. **Ahlstrom's testimony about the ship sinking should be limited by Rule 403, but, regardless, it would likely be excluded for other reasons.**

RCCL argues that Ahlstrom's opinions relating to the ship sinking, such as analogizing the experience on the *Anthem* to the sinking of the *Titanic*, *El Faro*, and *Costa Concordia*, and mentioning the number of life boats on the *Anthem* is unfairly prejudicial

and should be excluded under Rule 403. The Undersigned agrees that the probative value of comparing the experience of the *Anthem* to that of the catastrophic sinking of the *Titanic* and other ships is likely substantially outweighed by the prejudicial effect under Rule 403. But in any event, consistent with the Undersigned's earlier recommendation, Ahlstrom's testimony is limited to his findings and opinions about shipboard safety management and operations. Thus, to the extent this testimony deviates from those findings, it should be excluded anyway.[9]

### ii. RCCL's motion to strike or limit the testimony of David Nolan should be granted in part and denied in part.

Plaintiffs rely on Nolan, a Professor of Atmospheric Sciences with a Ph.D. in Earth and Planetary Sciences, to opine on the weather forecasts that were available to the captain and crew of the *Anthem* and the interpretation of those forecasts, before and during its voyage. [ECF No. 247-4, pp. 1, 4, 12]. Nolan opines that, based on weather reports and forecasts available to the captain and crew, the planned route would take the *Anthem* directly through the worst part of the storm. [ECF No. 247-4, p. 3]. Nolan also opines that the handwritten notes of the captain and crew evidence a critical misinterpretation of the forecast information -- that it was valid for 24 hours from the forecast time, as opposed to the analysis time. [ECF No. 247-4, p. 4].

---

[9]      The Undersigned notes that RCCL has also filed an Omnibus motion *in limine* to exclude this testimony under Rule 403. [ECF No. 264, p. 16].

RCCL argues that the Court should strike Nolan's testimony because (1) he is unqualified to opine on issues surrounding maritime navigation and (2) the methodology he used for his weather-based opinions is unreliable because he relied solely on the weather reports and forecasts provided by Plaintiffs' counsel.

1. **Nolan's testimony regarding maritime navigation is beyond his expertise and should be excluded.**

Nolan's report primarily discusses (1) the weather forecasts available to the captain and crew of the *Anthem* when they were planning their route and (2) what weather conditions could be expected along that route. [ECF No. 247-4, p. 5]. However, Nolan also opines that a different route could have been taken by the captain of the *Anthem.* [ECF Nos. 247-4, p. 5; 247-3, pp. 36, 14 ("[I]t's clear that alternate routes could have been taken either to return or to take some other path so as to avoid the worst part of the storm.")].

While these statements are few and far between, the Undersigned agrees that Nolan is not qualified to render opinions regarding maritime navigation based on his experience in atmospheric sciences. [*See* ECF No. 247-4, pp. 12-13]. Thus, these statements should be excluded. *See Umana-Fowler*, 49 F. Supp. 3d at 1121 ("[T]he proffered expert must be an expert in the subject matter that he proposes to testify about."). Nolan may not testify as to what routes should have been taken by the captain and crew to avoid the storm. But, as discussed below, his weather-based opinions meet the *Daubert* threshold, including his interpretation of the weather reports and

predictions before and during the storm; his explanation of how to read forecasts (i.e., the lag time between analysis and when a forecast is released); and the effects of the storm, such as what part of the ship faced the strongest winds.[10]

### 2. Nolan's methodology for his weather-based opinions is reliable under *Daubert.*

RCCL does not challenge Nolan's qualifications to interpret and discuss weather forecasts, but it argues that Nolan's methodology is unreliable because he used only "piecemeal" weather maps and forecasts provided by Plaintiff. [ECF No. 247, pp. 4, 9]. The Undersigned disagrees. Nolan's report demonstrates that he relied on graphical ocean weather forecasts from NOAA, along with documents obtained from RCCL, including the *Anthem's* Logbook, images of the Bon Voyage Software, images of ocean weather forecasts produced by the National Center for Environmental Prediction titled "Isobar Charts," and images of text weather forecasts with handwritten notes from the captain and crew. [ECF No. 247-4, pp. 1, 10]. Nolan states that he verified the data by obtaining copies of the graphical forecasts through the archives at the National Centers for Environmental Information. [ECF No. 247-4, p. 1].

---

[10] RCCL also attempts to exclude Nolan's opinion, based on handwritten notes on one of the maps turned over by RCCL, that the captain misread the forecast maps. [ECF No. 247, pp. 4-5.] Nolan opines that, based on these notes, it appears that the captain incorrectly believed that the forecasts were valid for 24 hours from the forecast time, as opposed to the analysis time. [ECF No. 247-4, p. 4]. This relates directly to weather forecasting (as opposed to maritime navigation) and thus this expert opinion should not be excluded. RCCL can challenge the weight of this testimony during cross-examination. *See Kilpatrick*, 2009 WL 2058384 at *3.

RCCL also argues that Nolan did not look at the larger scale weather maps associated with this case to determine how the storm formed and that he did not verify where the strongest winds came from. [ECF No. 247, p. 13]. The Undersigned is not convinced. Nolan used a reliable methodology and his permissible opinions meet the *Daubert* threshold. These specific attacks are properly addressed during cross-examination or by presentation of contrary evidence. *See Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596) ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### iii. RCCL's motion to strike portions of Dr. Lubit's testimony should be granted in part and denied in part.

Plaintiffs hired Dr. Lubit to conduct forensic psychiatric evaluations of Plaintiffs and to assess what psychological damages, if any, they suffered as a result of the cruise ship enduring a hurricane. [ECF No. 247-5, p. 1]. Dr. Lubit is a psychiatrist and is board certified in Psychology, Neurology, Child and Adolescent Psychiatry, and Forensic Psychiatry. [ECF No. 247-5, p. 1]. Dr. Lubit states that he has particular expertise in the assessment of emotional trauma. [ECF No. 247-5, p. 1]. Dr. Lubit opines that Plaintiffs have suffered PTSD and other psychological injuries as a result of experiencing the hurricane on the *Anthem*. [ECF No. 248-19].

RCCL argues that Dr. Lubit is unqualified to testify about any condition suffered by Plaintiffs that goes beyond psychological injury and that this type of testimony is

impermissibly speculative. [ECF No. 247, p. 14]. RCCL points specifically to Dr. Lubit's findings for Ivalisse Sepulveda, Constance Savage, and Panagoula Efthimiou. [ECF No. 247, pp. 5-7]. Regarding Sepulveda, Dr. Lubit opines that, as a result of the storm, she meets the criteria for PTSD and major depression, as evidenced by weight loss, sleep problems, concerns about dying, etc. He also opines that:

> The weight gain will significantly add to her medical expenses by increasing the risk of a number of medical problems, increasing the wear and tear on her hips and knees, and by leading her to become pre diabetic. If she becomes diabetic she will have another set of medical problems for which she will be at great risk. She may need bariatric surgery.

[ECF No. 247-5, p. 6].

With regard to Savage, Dr. Lubit finds that she meets the criteria for PTSD and shows signs of major depression. [ECF No. 247-6, pp. 6-7.]. Additionally, he states that:

> The problems that Constance has as a result of the trip go beyond psychiatric issues. She gained a great deal of weight, has developed diabetes and developed lupus. It is well known that weight gain leads to type II diabetes and that stress precipitates Lupus and diabetes, in all likelihood by its impact on the immune system. Lupus and diabetes not only decrease her functioning and cause considerable discomfort in the short run, but each leads to a series of other health problems.

[ECF No. 247-6, p. 7].

And relating to Efthimiou, Dr. Lubit opines that she is suffering from PTSD, major depression, and post-concussion syndrome as a result of her experience on the cruise. [ECF No. 247-7, p. 5]. But Dr. Lubit appears to later qualify his finding that she is suffering from post-concussion syndrome, stating, "She needs to be evaluated for

traumatic brain injury. She needs evaluation by a neurologist, and a diffusion tensor imaging scan. She needs neuropsychological testing." [ECF No. 247-7, p. 8].

Dr. Lubit admits that he is unqualified to opine on diabetes and lupus. [ECF No. 247-13, p. 153 ("I do not feel comfortable outside my expertise opining on this.")]. And Dr. Lubit admits that he did not do any testing to diagnose post-concussive syndrome or a traumatic brain injury and that additional testing is needed for Efthimiou. [ECF Nos. 247-7, p. 8; 247-10, p. 133].

Accordingly, the Undersigned agrees with RCCL that Dr. Lubit's testimony should be limited and should not be permitted to the extent his opinions involve conclusory findings that Plaintiffs suffered ailments beyond psychological disorders as a result of their experiences on the ship. *See Umana-Fowler*, 49 F. Supp. 3d at 1121. Thus, Dr. Lubit may not testify that Savage developed lupus as a result of her experience on the ship or that Efthimiou suffered post-concussive syndrome, as Dr. Lubit admits he does not have expertise in those areas and did not conduct the necessary testing to make those determinations. [ECF Nos. 247-7, p. 8; 247-10, p. 133].

However, this does *not* mean that Dr. Lubit cannot offer any expert opinion testimony about Plaintiffs' physical symptoms and manifestations relating to their alleged emotional distress and/or psychological impairments. He met with Plaintiffs, reviewed their depositions, and reviewed their medical records in order to prepare his reports. [ECF Nos. 247-5, p. 1; 247-6, p. 1; 247-7, p.1]. Dr. Lubit is a medical doctor with a

specialization in psychiatry and thus he is qualified to speak to the physical symptoms and manifestations of psychological disorders. [ECF No. 247-6, p. 1]. Dr. Lubit may testify that Plaintiffs have suffered weight gain as a symptom of depression or that emotional stress has the potential to exacerbate lupus. And Dr. Lubit may testify as to his opinion that further testing and evaluation of Efthimiou is needed to determine if she has post-concussive syndrome or traumatic brain injury. And lastly, it follows that he may opine *generally* on the risks of weight gain, such as an increased risk of diabetes, orthopedic problems, and potential need for bariatric surgery.

If RCCL disagrees with Dr. Lubit's findings or his opinions, then it may present contrary evidence and also challenge Dr. Lubit's findings and opinions on cross-examination. *See Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596) ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### iv. RCCL's motion to strike Forman's testimony should be denied.

Plaintiffs hired Forman to act as a vocational rehabilitation specialist and life care planner. [ECF No. 250-5]. Forman created life care plans, referred to as "Continuum of Care" plans, for each Plaintiff, including prices for the future care and services of Plaintiffs as it relates to psychological injuries alleged to result from the *Anthem* experiencing hurricane-force winds. [ECF No. 258-1]. RCCL moves to strike Forman's

testimony on the sole ground that Forman did not perform any independent analysis of Plaintiffs and simply relied on Plaintiffs' experts. [ECF No. 247, pp. 7-8]. The Undersigned disagrees and therefore recommends that RCCL's motion to strike Forman's testimony be denied.

Contrary to RCCL's assertion, Forman did conduct an independent analysis in formulating his life care reports and did not solely rely on Plaintiff's experts. [*See* ECF 258-1, pp. 15-16]. Forman interviewed Plaintiffs and their families, reviewed medical records and school records where applicable, reviewed the findings of Plaintiffs' experts, and reviewed the Physicians' Desk Reference 2017. [*See* ECF 258-1, pp. 15-16]. If, as RCCL argues, it believes that Forman's interviews should have been conducted differently, then this is a challenge to the weight of Forman's testimony and should therefore be addressed on cross-examination. *See Quiet Tech.*, 326 F.3d at 1341.

Further, the Undersigned notes that Plaintiffs raised a similar argument that McKay, RCCL's rebuttal life care planning expert, did not use a reliable methodology because he relied heavily on defense psychiatrists' findings. [ECF No. 243, pp. 5-11]. As discussed earlier, McKay relied on many of the same materials as Forman in preparing his rebuttal life care plans. [ECF Nos. 243-2, p. 2; 251-1, pp. 64-65]. But RCCL argued that McKay's methodology is sufficient under *Daubert*. [ECF No. 251, pp. 6-11]. Thus, Plaintiffs' expert should be treated no differently. Accordingly, the Undersigned finds

that Forman relies on a sufficiently reliable methodology to reach the conclusions in his Continuum of Care plans.

### v. RCCL's motion to strike Fabricant's testimony should be denied.

Plaintiffs hired Fabricant, an accountant, to prepare economic damages reports. [ECF No. 252-3]. Fabricant used Forman's life care plans to calculate the present money value of future economic damages. [ECF No. 252-3]. RCCL's short one-paragraph challenge to Fabricant's testimony is essentially that Fabricant should be stricken because she relies on Forman's life care plans to prepare her reports and Forman should be stricken. As explained above, the Undersigned does not recommend striking Forman's testimony, and thus Fabricant's testimony, which relies on Forman's testimony, should not be stricken.

### V.      Conclusion

The Undersigned **respectfully recommends** that the Court **deny** Plaintiffs' motions to strike rebuttal defense experts Oscar Padron and John McKay;[11] and **grant in part and deny in part** RCCL's motion to strike or limit the testimony of Captain Ahlstrom, David Nolan, Dr. Roy Lubit, Lawrence Forman, and Loretta Fabricant.

---

[11]      As discussed above, should Judge Martinez reach the merits of Plaintiffs' motions, the Undersigned recommends Plaintiffs' Motion to Exclude Expert Testimony of McKay [ECF No. 243] be granted in part and denied in part and that Plaintiffs' Motion to Strike Expert Testimony of Padron [ECF No. 242] be denied.

**Objections**

The parties will have until December 18, 2018 to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection on or before December 27, 2018.[12] Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interests of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on December 11, 2018.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Jose E. Martinez
All Counsel of Record

---

[12]    The Undersigned is shortening the deadlines for objections and responses because the issues are amply briefed and Judge Martinez needs to rule on any objections before the scheduled trial date of January 7, 2019.