UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT OF
FLORIDA MIAMI DIVISION

CASE NO.: 16-cv-20924-
MARTINEZ/GOODMAN

DONNA INCARDONE, *et al.*,

     Plaintiffs,

vs.

ROYAL CARIBBEAN CRUISES, LTD.,

     Defendant.

_____/

## PLAINTIFFS' MOTION FOR  SANCTIONS

The Plaintiffs hereby move for sanctions against Defendant pursuant to FRCP 11 and FRCP 37, and the inherent power of the Court, and state:

From the beginning of this case the Defendant has acted in bad faith.  The Defendant has exhibited vexatious conduct,, wantonly, and for oppressive reasons, and has exhibited dishonest conduct through the following actions: (1) filing and litigating frivolous, unsupported and unsupportable affirmative defenses; (2) offering a false affidavit and made false representations to the Court; (3) hiding or destroying crucial documents and recordings; (4) refusing to make crucial employees/witnesses available for deposition; (5) misrepresenting essential facts to the Court; (6) misrepresenting compliance with Rule 7.1/7.3 to the Court; (7)  attempting to sow confusion in its document production; (8) withholding evidence; and (9) making unsupportable and fraudulent attorneys' fees claims.  Those actions illustrate a pattern of wrongdoing that prejudiced the Plaintiff in prosecuting this case.  The Defendant has engaged in sordid schemes which have effectively

limited the Plaintiffs' knowledge and ability to secure evidence and prove the extent of Defendant's liability, as well as the full damages at stake in this case.

Fed. R. Civ .P. 11 provides: The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.[1] See Aetna Ins. Co. v. Meeker, 953 F.2d 1328 (11th Cir. 1992).  In a case of a clear pattern of bad faith and vexatious contract, with resulting prejudice to Plaintiffs, as here, dismissal of the pleading is an appropriate sanction, pursuant to a court's inherent authority. See Chambers v. NASCO, Inc., 501 U.S. 32, 44–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

## I.   Defendant Presented Frivolous and Factually Unsupported Affirmative Defenses

Defendant filed the Answer and Affirmative Defenses on March 8, 2016. [D.E. 61] Defendant offered a number of unsupported and unsupportable "shotgun" Affirmative Defenses. Although the Plaintiffs have challenged the Affirmative Defenses on various occasions, the Defendant has obstinately refused to provide factual support for them or withdraw them.

---

[1] Rule 11 imposes on trial courts an objective standard of reasonableness under the circumstances. See Business Guides, Inc. v. Chromatic Commun. Enter., Inc., 498 U.S. 533, 546–549 (1991); see also Hashemi v. Campaigner Publications, Inc., 784 F.2d 1581 (11th Cir.1986

Plaintiffs moved to strike and moved in limine regarding the Affirmative Defenses [D.E. 152, 155 & 174]. Defendant filed, in bad faith, amended Affirmative Defenses and responses to Plaintiffs Motions. [ D.E. 153, 182 & 296] For example, the Defendant raised an Affirmative Defense claiming Plaintiffs' negligence and comparative negligence, which is false on its face. [DE 164 #42 & 43].  Plaintiffs, families with autistic children, had no control of the vessel. Nothing on their part caused or contributed to the damages they suffered and they therefore could not have been negligent.  In fact, the Court has already pointed to the absurdity of this Affirmative Defense. [DE 85, p. 22-26]. Yet, the Defendant refuses to remove it.

Affirmative defense #45 alleges Royal Caribbean discharged its duty to Plaintiffs by warning them of the anticipated heavy weather. [DE 164 #45] There is no dispute, however, that notice of bad weather did not include "developing hurricane winds" and only took place after Plaintiffs boarded Anthem and were unable to leave the ship.

Affirmative defense #56 claims the risk creating the conditions of Plaintiffs' injuries was open and obvious.  [DE 164 #56]. This is frivolous and nonsensical. Throughout the case the Defendant has, in fact, argued the storm conditions were not open and obvious to its own ship Captain.  Even if the storm was open and obvious, there was nothing the passengers could do but endure what they were driven into.

Defendant has proceeded with those Affirmative Defenses despite knowing they are not factually supported.  The Defendant's affirmative defenses are improper under Eleventh Circuit and Southern District Law. See Bell Atl. Corp. v. Twombly, 550 U.S. 544 at 570 (2007); see also Castillo v. Roche Laboratories Inc., 2010 WL 3027726 (S.D. Fla. 2010); In re Rawson Food Service, Inc., 846 F.2d 1343, 1349 (11th Cir.1988); Royal Caribbean Cruises, Ltd. v. Jackson, 921 F.Supp.2d 1366 (S.D. Fla. 2013).  Affirmative defenses are unsatisfactory where they are patently

frivolous or insufficient as a matter of law. See <u>Adams v. Jumpstart Wireless Corp</u>., 294 F.R.D. 668 at 671 (S.D. Fla. 2013).

Even after interrogatories, emails, conferences and motions, Plaintiffs never obtained the factual basis for the Affirmative Defenses. [DE 274-1; 274-2] Defendant forced Plaintiffs to chase after the underlying facts of the Affirmative Defenses for years.  Unsurprisingly, the Defendant did not list any of its Affirmative Defenses on the pre-trial stipulation as issues it intends to litigate at trial. [DE 283]

On May 8, 2017, the Court Ordered Defendant to provide Plaintiffs with responses, under oath, indicating whether it had any facts to support each Affirmative Defense referenced in Plaintiffs' Second Interrogatories. [DE 69] Defendant failed to provide such report stating it needed to complete discovery. [D.E. 85, p.22] After additional requests, the Defendant continued to refuse to provide factual support. [DE 274-2] Because of Defendant's intransigence, Plaintiffs Moved to Strike the Affirmative Defenses based on lack of factual support. [DE 152] On January 6, 2018, Defendant Responded In Opposition To Plaintiffs' Renewed Motion To Strike Affirmative Defenses again refusing to provide any further factual basis for the Affirmative Defenses. [DE 182] Defendant claimed its Affirmative Defenses, having no additional factual detail and containing patently improper positions, are sufficient. [Id.] Plaintiffs filed a Motion in Limine to preclude those Affirmative Defenses. [DE 274] Defendant again responded insisting its Affirmative Defenses were sufficient and refused to offer facts or remove improper defenses. [DE 296]

The Defendant has purposefully perpetrated frivolous, factually insufficient and unsupportable defenses contrary to Supreme Court and Eleventh Circuit law.  It has forced

Plaintiffs to spend significant time addressing those defenses.  Yet, to this day, the Defendant's so called Affirmative Defenses have not been withdrawn.

II.       **Unsigned Passenger Tickets**

            The Defendant argued in its Motion to Dismiss that the Plaintiffs each received and signed ticket contracts which would somehow limit the Defendant's liability in this action. [DE 34] That allegation was sworn to in an affidavit by Defendant's employee, Amanda Campos, who stated under oath: "[T]his affidavit is based on my personal knowledge and records kept by Royal and Caribbean in the ordinary course of business" and "Royal Caribbean requires a valid signed contract before any passenger can board a ship. The Ticket Contract was issued to and received by the Plaintiffs prior to boarding the ship." [DE 39-4] (emphasis added) That representation and affidavit were false.  Defendant relied on that affidavit in its Response to Plaintiffs' Motion for class certification (later withdrawn), which was signed by counsel for Defendant. [DE 39] At a January 6, 2017 hearing, counsel for Defendant falsely represented to the Court that it produced "electronic ticket signatures". [DE 241 p.9] Defendant continued this charade by stating in its Motion for Summary Judgment: "[T]he parties contemplated "Acts of God" and "Perils of the Sea" as part of the cruise ticket contract, and Royal Caribbean asserted same as an Affirmative Defense. [ECF No. 153 ¶52]".[D.E.160, p.12] This is untrue.

            Since the beginning of this case, the Plaintiffs have sought production of any such signed ticket booklet, passenger ticket, or cruise ticket contract. But, the Defendant has failed to produce any such evidence. [DE 278-1; 278-2; 278-3]

            The Plaintiffs affirmed they did not receive or sign any such ticket contracts, ticket booklets, passenger tickets, or cruise ticket contracts. [DE 40-2] In a November 27, 2017 discovery conference, Defense Counsel stated it would look into what documents they may have proving the

Plaintiffs' receipt or signature on a ticket or contract. [DE 278-2] The Defendant to date failed to supplement production with any such evidence.  On January 3, 2018, Plaintiffs' Counsel emailed Defense Counsel to confirm signed tickets were not in existence and Defense Counsel failed to respond. [DE 278-3].  The Plaintiffs filed a Motion in Limine to preclude this unproduced evidence, if it indeed exists. [DE 278]  The Defendant, in Response to Plaintiffs Motion in Limine, failed to comment on the existence of this very crucial evidence and again failed to produce any such evidence. [DE 300]

Regarding the signed tickets, Defendant proffered a false affidavit, their Counsel made a false representation to the Court alleging the existence of this unproduced evidence on at least three major dispositive motions, failed to admit the non-existence of evidence it claims to possess and/or failed to produce such evidence to the Plaintiffs despite countless requests and Rule 26 obligations.  The Defendant is playing fast and loose with the Plaintiffs and the Court concerning crucial evidence.

### III.    <u>Withholding Crucial Evidence</u>

On July 21, 2017, the Magistrate observed that Defendant made multiple misrepresentations concerning document production in the past and ordered an affidavit attesting that Defendant produced all communications between Captain Andersen and Defendant. No affidavit was ever produced and subsequent to the Captain's deposition, some of the requested documents were produced (too late to be used). [Exhibit A, p. 83-84] The Magistrate warned Defendant about lack of candor and said "[H]owever, you may want to pass word back to your client that in this particular case, I am disappointed in the level of performance of the discovery responses. I am not attributing any bad faith to your client, but I am disappointed in the results

because it is very disconcerting to me to have a lawyer time and time again stand up and say there are no such documents and then months later say, oh, there are more." [Exhibit A, p. 96-97]

Later, in a May 5, 2017 Hearing, the Magistrate warned Defendant of the very same discovery sanctions Plaintiffs are seeking, striking of the Answer. The Court stated:

> Mr. Ostrow, if it turns out that there actually are some documents, my gosh, that could be the best thing for your case. Maybe you'll be able to prevail on grounds other than the merits of the case. You know, you have spoliation, misrepresentations to the court, sanctions, discovery shenanigans. [D.E. 85, p. 53]

Despite multiple warnings, the Defendant has continued to withhold pertinent discovery in this action.  Most significantly, the Defendant failed to preserve and/or produce vital CCTV recordings, VDR recordings, BVS weather maps and Captain Gerry Ellis' ("Ellis") documentary evidence to.  Defendant submits that it turned over all the "relevant" evidence concerning the CCTV and VDR and it is not required to preserve all such evidence, only "relevant" evidence. [DE 298] Defendant astonishingly claims the CCTV and VDR's were not relevant evidence. [DE 298 p.4-6] It has been Defendant's practice in this case to choose which evidence it deems relevant, without producing everything in its possession pursuant to discovery requests and Fed. R. Civ. P. 26 obligations.  Plaintiffs made a motion for spoliation regarding the CCTV and VDR [D.E. 276].

A. CCTV

Anthem has over 200 CCTV cameras distributed throughout the vessel. [DE 160-2, p. 100-110] All of the CCTV camera recordings are viewable from the bridge, recorded continuously throughout the 72-hour voyage and are stored on a DVR. [DE 276] The Court ordered production of all CCTV recordings viewable from monitors on the bridge during the voyage. [DE 85 & 69] The Plaintiffs only received eighteen of the CCTV clips amounting to a total of 28 minutes of selected video.  All of the CCTV recordings from the voyage should have resulted in approximately 14,400 hours of video.  Defendant failed to preserve or failed to produce to

Plaintiffs Anthem's CCTV footage of the February 6, 2016 cruise ordered by the Court. Defendant had an obligation to preserve the CCTV and VDR. Defendant's employees, Captain Claus Andersen, Captain Wendy Williams, and the First Officer all testified that the recordings made during the voyage should have been preserved. [DE 276 p. 3]. The Captain also testified he ordered them to be preserved. [DE 160-1, pgs. 44-57].

The Defendant admitted the CCTV was recorded 24 hours a day for the entire cruise and it elected to produce a mere 28 minutes of footage. [DE 298] The Defendant has offered the Plaintiffs and the Court **no explanation** of what happened to the remaining footage.

Captain Andersen testified he reviewed "the CCTV afterwards showing some scary photos or movies." [DE 179-5, p. 24]. It seems the Defendant chose not to produce the CCTV's because they were indeed "scary" and would potentially impact the jury's understanding of Defendant's liability and the violent conditions that caused Plaintiffs' damages.

B. VDR

The Anthem's VDR is always turned on.[2]  Whatever happens on the bridge is recorded on the VDR. [DE 160-1, pgs. 23-24] The Defendant claims to have preserved and produced the VDR. Defendant's employee, Ellis, reviewed the VDR in making Defendant's "Heavy Weather Incident, Preliminary Analysis, February 7 and 8, 2016" ("Heavy Weather Report") [D.E. 248-1]. He stated that a pre-departure briefing was held on February 6th, during which the bridge team discussed the passage plan including weather forecasting and the intention to increase speed. Ellis used the VDR to listen to voice recordings from the bridge. [DE 179-6, pgs. 30-31] These were never provided

---

[2] Voyage data recorder, or VDR, is a data recording system designed for all vessels required to comply with the IMO's International Convention SOLAS Requirements (IMO Res.A.861(20)) in order to collect data from various sensors on board the vessel. It then digitizes, compresses and stores this information in an externally mounted protective storage unit.

to Plaintiffs in a decipherable form.  Ellis admitted he was able to extract voice recordings from the VDR and hear what was going on. [DE 179-6, p. 31] Further, Defendant provided Plaintiffs with limited VDR transcripts which were made from recordings of the Captain's ship wide announcements.  Those transcripts evidence that the VDR was intelligible. [DE 192].  But no VDR transcripts of bridge conversations were produced and no comprehensible voice recordings were produced to Plaintiffs.  Defendant produced alleged recordings which could not be deciphered by Plaintiffs.

On January 23, 2018, the Magistrate Ordered Defendant to check its own materials for the VDR transcripts Ellis used to prepare Defendant's preliminary investigative report. The Court stated if Defendant does not have these transcripts, then it must contact Ellis by January 24, 2018, to obtain copies of the transcripts. [DE 192]  Plaintiffs never received copies of those transcripts. The Defendant admitted the "VDR was preserved and saved after the cruise, but, for unexplained reasons, Royal Caribbean could only extract certain portions of the voice recording." [DE 298, p. 2] The Defendant claims to have preserved and produced the VDR.  But it is not "preservation" if data is produced in an unreadable or indecipherable form.  Arguing as much is insulting to the Plaintiffs and the Court and illustrative of Defendant's bad faith.

C.  Bon Voyage System ("BVS") Weather Reports

On December 8, 2016, Plaintiffs requested any and all documents and communications concerning the anticipated weather conditions forty-eight (48) hours prior to the February 6, 2016 cruise.  Defendant responded that it produced those documents.  The Plaintiffs then objected that Defendant was unresponsive and it failed to receive the requested documents.

At a January 6, 2017 hearing, the Magistrate ordered Defendant to produce all weather maps for February 3rd through the 9th for the Anthem. [DE 312-1] On January 23, 2018, the Court

Ordered Defendant to produce, by January 24, 2018, all requested BVS weather information to Plaintiffs', including any information pre-dating the 3pm departure of Anthem. [DE 192] On February 24, 2017, Plaintiffs requested the same documents as previously requested and ordered by the Court.  Full production of the BVS weather reports was not furnished by Defendant during discovery.

On May 5, 2017, Defense counsel stated it did not possess weather reports for February 6th or the morning hours of February 7th but would look again. [DE 85 p.53-55] The Court entered an Order subsequent to the May 5, 2017 hearing requiring Defendant to provide Plaintiffs' counsel with a status report indicating which weather documents were produced and when.  During a November 27, 2017 discovery conference, the parties revisited the issue of the missing weather reports for February 6th and the morning of February 7th. [DE 268-1] The Defendant, at that point, claimed to have the reports for the February 6, 2016 cruise. [Id. p.34-35] However, the Defendant never produced the missing reports or forecasts from February 6th or the morning of February 7th. The Court entered yet another Order on January 23, 2018 requiring Defendant to produce, by January 24, 2018, all requested BVS information to Plaintiffs, including any information pre-dating the 3 P.M departure of Anthem. [DE 192] No such production was furnished.

During discovery the Defendant never produced BVS maps for February 3, 4, or 9. [DE 71-1; DE 312]. Defendant never produced annotated BVS reports from the Ellis file.  Plaintiff filed a motion in limine to preclude unproduced weather reports and Defendant made a bad faith response falsely maintaining that "Plaintiffs have all the relevant weather reports". [D.E. 268 &290].

D.  <u>Captain Gerry Ellis' Unproduced Documents</u>

Captain Ellis testified that he compiled a file to prepare Defendant's Heavy Weather Report with "a lot of data, lots of files, and lots of information", which he turned over to

Defendant's Counsel. [D.E. 248-7, p.63]. Plaintiffs did not receive this file.  On December 14, 2018, on the eve of trial, after the close of discovery, and almost a year following the Court's **third** Order regarding this evidence, Plaintiffs received a small portion of the missing BVS weather maps as Defense Exhibits to Defendant's Joint Pre-trial stipulation. [DE 283 Ex.19] The BVS defense exhibits contained thirty (30) weather forecasts from Gerry Ellis's file that had not been previously produced to the Plaintiffs.  Those forecasts have no RCCL bates stamp number (as all previously produced documents do); they have bates stamped numbers pertaining solely to Gerry Ellis's file, which file had been requested and likewise not been previously provided to the Plaintiffs; and they are marked with printed captions, which had not appeared on previously produced evidence.

The identifying markings on those newly submitted exhibits refer to "Ellis Documents 4-1-16" and a number thereafter, beginning with 000286[3] ("Ellis documents"). [DE 283 Ex. 19] This identifier demonstrates that the Ellis documents were in the possession of Defendant on April 1, 2016, well before Plaintiffs originally requested them.  It also demonstrates those documents were gathered by Captain Ellis to review for the Heavy Weather Report. [DE 248-1] These are exactly the type documents required by Rule 26.  The Plaintiffs just learned of the existence of those particular documents when they were submitted by Defendant with the pre-trial stipulation. This withholding of crucial evidence demonstrates Defendant's deceptive bad faith practices in violation of FRCP 26.  The Defendant not only failed to timely produce the BVS forecasts, but has made false representations to the Court and violated multiple Court Orders concerning them. [DE

---

[3]  Plaintiffs never received the <u>final</u> Heavy Weather Report nor all the Ellis' bates stamped documents used in preparing his report. [D.E. 271]

312][4]  What's more, the Defendant falsely assured both the Court and the undersigned that it complied with the Orders to produce these documents.

A party demonstrates bad faith by hampering enforcement of a Court Order. See Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1320 (11th Cir. 2002).

The failure of Defendant to timely produce those discovery documents prejudiced Plaintiffs by not allowing Plaintiffs or Plaintiffs' experts, Captain Ahlstrom and David Nolan, to review, consider or opine about them in their reports and depositions.

## IV.   **Defendant Withheld Critical Witnesses**

Defendant engaged in an intentional pattern of deception in refusing to allow the depositions of two key witnesses, Staff Captain Wendy Williams ("Williams") and First Navigation Officer Kyriakos Spahis ("Spahis"). [DE 160-2, p. 53] Williams was second in command on the Anthem and Spahis, the navigator, had control of the ship at a critical time while Captain Andersen was asleep. [DE 160-2, Pgs. 136-137] Spahis made handwritten notes of the chronological order of events as a recordkeeping of what took place and who did what. [DE 160-20 p. 17]. Both officers were on the bridge of Anthem prior to and during the hurricane.

The Defendant listed Williams as a witness on it its witness list.  On April 4, 2017, Plaintiffs requested deposition dates for Spahis and Williams. [D.E. 272-1] Williams was noticed for a deposition on June 26, 2017 and failed to appear. [D.E. 272-3.] Defense counsel, at a hearing on July 21, 2017, represented to the Court: "And I believe he [Mr. Ostrow] still wants Wendy Williams who was a staff captain at the time of the incident who does live in Vancouver.  She is Canadian, Judge, and she is still on contract." [Transcript, July 21, 2017,

---

[4] Defense Counsel specifically represented to the Court that from February the 6th through February the 8th, it produced all of the BVS and NOAA reports. [D.E. 312-1, p. 24-25]

Exhibit A, p. 9] Based upon that representation, the Magistrate entered an Order requiring Defendants to produce Williams in Spain or Vancouver, Canada on or before August 30, 2017. [D.E. 92] On July 28, 2017, Defendant assured Plaintiffs "[w]ith respect to the deposition of Wendy Williams, it will take place in either Vancouver, British Columbia, Canada or Vancouver Island, British Columbia, Canada. We anticipate providing you with a date in early to mid-August." [DE 272-1] Defendant agreed to schedule the deposition of Williams on August 12, 2017. On August 9, 2017 Defendant again notified Plaintiff without explanation that Williams would not appear at the August 12, 2017 deposition. [Id.] The Defendant thereafter informed the undersigned that Williams was no longer an employee of RCCL, it had no ability to produce her and she had obtained independent representation. [Id.][5]  The Plaintiffs then attempted to independently contact Williams but were not given her personal attorney's information and were unable to contact her or timely subpoena her prior to the August 30, 2017 discovery cut off.

        Williams worked for Defendant continuously since 2002, was requested and set for deposition on multiple occasions, cancelled or failed to appear for those depositions and suddenly left RCCL just two weeks prior to Plaintiffs discovery cut-off.  This sequence of events is not coincidental.  The Defendant had a Court Ordered obligation to produce Williams for a deposition and purposefully stonewalled and thwarted the Plaintiffs' efforts.

        Despite requests from Plaintiffs, the Defendant also failed to provide dates to depose Spahis.  In July 2017, on multiple occasions, the undersigned sought dates to depose Spahis. [D.E. 272-1] The Defendant failed to confirm the witness's availability, offering different locations and conflicting dates. [Id.] At a hearing on July 21, 2017, Defendant represented that Spahis was on

_____

[5] Captain Wendy Williams works for Celebrity Cruises, a wholly owned subsidiary of Royal Caribbean.

vacation and would be returning in time to be deposed. [Exhibit A, p. 16-17] On July 24, 2017, based on that representation, the Court ordered Defendant to produce Spahis in Bayonne, NJ prior to August 30, 2017. [D.E. 92] On July 25, 2017, upon Defendant's representation that Spahis was in England and Defendant was in the process of arranging for a deposition in London, the Court ordered his deposition in England. [Exhibit B, p. 8] On August 1, 2017, the Plaintiffs sought leave from the Court to enforce the July 24, 2017 order because Defense counsel was refusing to offer dates to depose Spahis. [DE 272-2] On August 10, 2017 and August 16, 2017, the undersigned again requested dates to depose Spahis. [DE 272-1] On both occasions the Defendant failed to offer dates of his availability.   Then on August 20, 2017, a week before the already extended deposition cut-off date, Defense counsel advised Plaintiffs' Counsel that Officer Spahis resigned from RCCL and would no longer be produced. [Id.] At that point, the undersigned attempted to independently contact Spahis for dates but he was out at sea and unavailable in the foreseeable future. [DE 272-1] Like Williams, the Defendant had a Court Ordered obligation to produce Spahis for a deposition and purposefully stonewalled the Plaintiffs repeated efforts.

Plaintiffs have been prejudiced by Defendant  hiding two crucial witnesses.  The failure of Defendant to timely produce these witnesses prejudiced Plaintiffs by not permitting Plaintiffs or its expert, Captain Ahlstrom, to review the depositions and comment in his report or to examine Defendant's Captain Andersen, Captain Ellis, or Defendant's other witnesses and experts, concerning their testimony.

### V.   **Defendant's False Local Rule 7.1 Certification**

Defendant made two false L.R. 7.1 certifications in its Daubert Motions to the Court.   In its original Daubert motion regarding Captain Ahlstrom and David Nolan, Defendant certified "Pursuant to S.D. Local Rule 7.1(a)(3), undersigned counsel attempted to confer with Plaintiffs'

counsel, in a good faith effort to resolve the issues raised in this motion, and has been unable to do so".  On December 15, 2017, counsel for Royal Caribbean reached out to Plaintiffs' counsel via telephone to have a Rule 7.1 conference on this motion.  Plaintiffs' counsel stated, via email, that he would only have such a conference in-person with a court reporter present.  Counsel for Royal Caribbean, through email, attempted again to arrange a telephone conference on this motion, but Plaintiffs' counsel, through email, again refused unless a court report was present." [D.E. 161]

The reason Defendant did not confer before its Daubert motion, regarding only Captain Ahlstrom and David Nolan, was that Defendant refused Plaintiffs' request to confer  before a court reporter.  The Defendant <u>chose</u> not to have a conference and its certification was disingenuous.  It is a very significant fact that Defendant refused to document a 7.1 conference with Plaintiffs with an independent witness (a court reporter) and that Plaintiffs were willing to incur a court reporter's expense they thought necessary because of prior experiences with Defendant.

Regarding the second false 7.1 certification, in Defendant filed a Renewed and Amended Daubert Motion adding Dr. Roy Lubit, Larry Forman and Loretta Fabricant. [D.E. 240]. Defendant's counsel falsely certified it had complied with Local Rule 7.1., certifying that he "<u>concurred with opposing counsel</u> in a good faith effort to resolve the issues raised in this motion." [Id, p. 17] This 7.1 certification made to the Court was false and a fraud on the Court, as was the prior certification, which falsely represented that Defendant was "unable" to confer.

In this motion, Royal Caribbean raised initial Daubert claims against certain of Plaintiffs' experts (Forman, Lubit and Fabricant) and later admitted Defendant did not confer with Plaintiffs on those points claiming "oversight." [D.E. 323, p.2] Defendant's belated claim of "oversight" is disingenuous. The oversight claim was made only after Plaintiffs pointed to the false certification.  An affirmative false representation is not an oversight.

And what's more, the Plaintiffs were inequitably sanctioned because of that fraud.[6]   The Defendant purposely refused to confer on the Daubert Motions, falsely certified conferral on its own Motions, complained of Plaintiffs' failure to confer and refused Plaintiffs calls and emails to confer after complaining to the Court.

**VI.**   <u>**False representations Regarding Lawrence Forman**</u>

In Defendant's Daubert Motion regarding Plaintiff's rehabilitation expert, Lawrence Forman, the Defendant falsely represented that Mr. Forman had not interviewed the Plaintiffs nor conducted an independent investigation before submitting his expert reports. [DE 240 p. 7].   The Defendant's Motion only referred to the first set of depositions taken of Mr. Forman where he had not yet done his interviews or issued final expert reports. [Id.] The Defendant requested and took two more depositions of Mr. Forman, where he testified extensively about his independent investigation and client interviews. [DE 250 Ex.5] Well after taking Mr. Forman's second set of depositions the Defendant moved to strike Forman for failure to conduct independent investigations and only cited to Forman's obsolete earlier depositions.  [DE 240]. The Defendant intentionally omitted Forman's more recent depositions and failed to address its omission in Reply to the Daubert Motion after Plaintiff's response highlighted that misrepresentation.  [Id.]

This was not an honest mistake or oversight.  Defense Counsel took Mr. Forman's second depositions and focused on the issue of his investigations for a significant period of time. Defendant could have easily supplemented its Motion or cured its omission on Reply when the

---

[6] Magistrate Goodman, in making his Report and Recommendation to this Court unfortunately relied upon Defendant's misrepresentations re Plaintiffs and found that because RCCL's Motion included a certificate of conferral, he would not "sort through the conflicting factual representations about Plaintiffs' challenge to RCCL's certificate of conferral and somehow discern which one is accurate (or if each is partially accurate)." [DE 240; 247]. Accordingly, based upon the Defendant's false 7.1 certification, the Magistrate did not recommend denying the defense motion, but did recommend denying the Plaintiffs' motion. [DE 279 p. 10, fn 3]

Plaintiffs' briefed the issue, yet hid this fact from the Court.  The Defendant was clearly trying to perpetrate yet another fraud on the Court by withholding this pertinent evidence in its filings with the Court.  Defendant's false portrayal of Forman's testimony to the Court is consistent with Defendant's pattern of multiple misrepresentations.

### VII.   Defendant's False Local Rule 7.3 Certification

Defendant has also made a material misrepresentation in its L.R. 7.3 certification in its Response re the attorney's fees [D.E. 327] which states:

> A good faith effort to resolve the issues described herein was made pursuant to L.R. 7.3(b). Plaintiffs' counsel did not agree to any of the fees and costs claimed except those designated in their previous Response. ***Royal Caribbean agreed to withdraw some of its claimed fees described above.*** (emphasis added)

The certification that Defendant agreed to a fee reduction during the 7.3 conferral is false and is contradicted by Defendant Counsel's email concerning the conferral, wherein Defendant refused to withdraw any of its claimed fees, stating "we think everything we identified in our Notice is rightfully taxable". (Exhibit C)

### VIII.   Defendant Fraudulently Sought Attorneys' Fees To Which It Is Not Entitled

Plaintiffs recited its position opposing Defendant's application for attorney's fees [D.E. 230-1, 331]. The facts and comments therein are incorporated herein by reference.  The Defendant submitted claims for attorneys' fees concerning Plaintiffs' replacement of two psychology experts, Dr. Whelly and Dr. Tiago. [DE 224] The Court Ordered Plaintiffs to "pay the defendant for all costs and attorney's fees arising from the involvement of the two originally named expert psychologists (who will be removed from the case) and Plaintiffs' request to obtain new experts." [DE 208 & 210]

The Defendant has claimed over $44,000 in fees regarding two experts they never deposed. [DE 224] They submitted invoices and a fee request seeking fees for matters well beyond the

replacement of the two experts.  The Defendant offered 253 entries of proposed attorney's fees, almost all of which are vague, block billed, redundant, overbilled and/or unrelated.  Many of the invoices are redacted with an improper claim of privilege.  The invoices, in almost all instances, fail to provide sufficient detail of the time claimed making it impossible to determine if the fees are properly taxable.  Defense counsel has not sworn the amounts claimed are in compliance with the Court's Order.  Significantly, the Defendant has sought fees specifically contrary to Court order, including bills for an Order to show cause regarding Dr. Whelley and Dr. Tiago. [DE 211, p.1; DE 230-1, p. 14; DE 327, p.10] The Court explicitly stated the Defendant may not seek fees for such time. [DE 207] Defendant has billed for matters related to its own expert, Dr. Hamilton, who only examined those Plaintiffs who were examined by Dr. Hohn (not Drs. Whelley or Tiago).Most egregiously, the Defendant has sought fees for conducting CME's, for seeking continuances to complete CME's, for seeking Plaintiffs' medical and school records, for seeking sanctions against Plaintiffs' counsel concerning Dr. Hamilton and for seeking to extend deadlines for its own experts to submit independent    medical    examinations. Those matters do not relate to the replacement of Drs. Whelley and Tiago.

The overbilling include time spent on experts who have not been removed from the case, including Dr. Hohn, Dr. Seigel, Dr. Nolan (Plaintiffs' weather expert), and Captain Ahlstrom (Plaintiffs' maritime expert). Many descriptions in the invoices include activities regarding "expert(s)", without further clarification.  The invoices also include economist and rehab expert

work for individual Plaintiffs not involved with the removed experts, administrative tasks, and secretarial work. These are not taxable fees.

Dr. Tiago and Dr. Whelley were not the only mental health professionals listed. Dr. Gabriela Hohn and Dr. Alice Jo Siegel were also listed in this case and evaluated many of the Plaintiffs. Those Plaintiffs were not seen by Dr. Whelley or Dr. Tiago, but Defendant includes billing entries concerning those experts and Plaintiffs on its invoices. [DE 207 entries 156, 157, 158, 165, 166, 172, 177, 178, 179, 180, 190, 191, 228, 238, 240]

Plaintiffs submitted entry-by-entry, point by point objections to Defendant's claimed fees or costs. [DE 230-1]. The Magistrate gave Defendant the opportunity to explain its time entries, by allowing for a twenty-page Response to Plaintiffs objections [D.E. 286]. In spite of Plaintiff pointing out clearly improper fee claims, Defendant stood by most of their improper claims.

**IX.**    <u>**Sanctions**</u>

It is patently obvious that, despite warnings from the Magistrate about its discovery shenanigans, the Defendant's continued its pattern of misconduct and bad faith. The Defendant has made false claims, false statements by affidavit or by attorney misrepresentations, false certifications, hidden discovery and witnesses and "engage[d] in a sordid scheme to defeat Plaintiffs valid claims". See <u>Goodyear Tire & Rubber Co. v. Haeger</u>, 581 U.S. —— 137 S. Ct. 1178, 197 L.Ed.2d 585 (2017).

As to Rule 37, <u>Federal Rule of Civil Procedure 37(b)(2)</u> states that "[i]f a party ... fails to obey an order to provide or permit discovery ... the court where the action is pending may issue further just orders. They may include ... dismissing the action or proceeding in whole or in part...." <u>Fed. R. Civ. P. 37(b)(2)(A)</u>. "<u>Rule 37</u> sanctions are intended to prevent unfair prejudice to

the litigants and insure the integrity of the discovery process." Gratton v. Great Am. Commc'ns, 178 F.3d 1373, 1374–75 (11th Cir. 1999).

As to Rule 11, federal courts possess inherent authority to sanction a party or attorney who has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." Quiroga v. Hasbro, Inc., 934 F.2d 497, 504–05 (3d Cir. 1991), cert. denied, 502 U.S. 940 (1991). This inherent authority includes "the ability to fashion an appropriate sanction for conduct which abuses the process." Goodyear Tire & Rubber Co. v. Haeger, *supra*. Dismissal of a lawsuit, while severe, is well within a court's discretion as a sanction to impose pursuant to a court's inherent authority. See Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991); Roadway Exp., Inc. v. Piper, 447 U.S. 752 (1980) (recognizing the "well-acknowledged inherent power of a court to levy sanctions," including dismissal, "in response to abusive litigation practices"). Where there is a "pattern of wrongdoing" or a "wrongdoing that actually prejudices the wrongdoer's opponent," the need for stronger and more severe inherent sanctions. See Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3d Cir. 1994). Government Employees Insurance Co. v. Nealey, 262 F.Supp.3d 153 (E.D. Pa., 2017).

Defendants pattern of bad faith misconduct in withholding crucial discovery and witness testimony prejudiced Plaintiffs ability to uncover the width and depth of Defendant's reckless and negligent conduct and liability for damages in this case. Because of Defendant's inability to cure the prejudice, Plaintiffs seek the sanction of striking the answer. See United States ex rel. Hayes v. Allstate Insurance Company, 686 Fed. Appx. 23 (2nd Cir., 2017) (striking of the pleading during the pendency of the case). The Plaintiffs' also seek a financial penalty commensurate with Defendant's wealth and ability to pay to punish and deter its untoward conduct. See Martin v.Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332 (11th Cir., 2002)); see also Peer v. Lewis, 571 Fed. Appx. 840 (11th Cir., 2014).

Pursuant to Local Rule 7.1, I certify that counsel for the movant has conferred with counsel for Defendant in a good faith effort to resolve the issues raised in this motion, but was unable to do so.

Respectfully Submitted,

JOHN B. OSTROW, P.A.
Counsel for Plaintiffs
777 Brickell Avenue, Suite 400
Miami, Florida 33131
Tel: 305-358-1496
Jostrow@bellsouth.net

JBOassist@gmail.com

and

LAW OFFICE OF ALAN C. TRACHTMAN
Counsel for Plaintiffs
48 Wall Street, 11th Floor
New York, NY 10005
Tel: 212-918-4750
Fax: 1212-202-4961
act@traxlaw.com

By: s/ Alan C. Trachtman

Alan C. Trachtman
Pro Hac Vice

CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/DE. I also certify that the foregoing document is being served this 27th day of February, 2019, on all counsel of record or pro se parties identified on the ECF Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/DE or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/Morgan Theodore
Morgan Theodore