UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 16-cv-20924-MARTINEZ/GOODMAN

DONNA INCARDONE, *et al.*,
Plaintiffs,

vs.

ROYAL CARIBBEAN CRUISES, LTD.,
Defendant.
_____/

## AMENDED SPOLIATION MOTION ON CCTV AND VDR

COME NOW, the Plaintiffs and hereby file an Amended Spoliation Motion concerning Defendant, ROYAL CARIBBEAN CRUISES, LTD's, failure to produce all CCTV and VDR recordings pursuant to Court Order [DE 378][1] and state as follows:

Defendant's cruise ship, Anthem of the Seas ("Anthem"), is equipped with a closed-circuit television ("CCTV") system. The ship contains over 200 CCTV cameras distributed throughout the vessel. [DE 276-1 p.100-110] All of the CCTV camera recordings are viewable from the bridge, recorded continuously throughout the 72-hour voyage and are stored on a DVR. [Id.] During discovery the Plaintiffs sought production of all the CCTV recordings during the voyage. The CCTV videos depict the violence of the storm and its impact upon the passengers and ship. The Plaintiffs' medical conditions were caused by that violence which would be best appreciated by a jury seeing video evidence of it.

---

[1] The Plaintiffs have provided the Court with a Memorandum of Law addressing the applicability of Federal Rule of Civil Procedure 37(e) to Defendant's Spoliation of Electronically Stored Information. [DE 382] Plaintiffs' arguments are incorporated herein in light of the Court's Order suggesting Plaintiffs' Supplement their Spoliation Motion. [DE 378]

1

During the February 7, 2016 hurricane, the Master of Anthem, Captain Claus Andersen ("Captain Andersen") ordered all the passengers to their staterooms because of the severe weather. [DE 276-1 p.176] The Plaintiffs were confined to their staterooms for 12-13 hours and ordered not to move. [Id. p.221] The injuries suffered by the Plaintiffs were caused by the hurricane weather and 12 hours of violent movement by Anthem, as they experienced winds up to 160 knots and waves up to 60 feet. Those conditions should have been thoroughly captured on the 200 CCTV cameras.

Additionally, the Plaintiffs sought production of VDR recordings from the bridge. The VDR recordings would contain conversations by the Captain and crew concerning the voyage. Most importantly, the VDR recordings would also display data of any course corrections or alterations that were made in relation to the storm threat. The Plaintiffs have alleged that improper pre-voyage planning and improper voyage course corrections took place, resulting in Anthem's sailing into a force 5 hurricane.

During discovery, the Plaintiffs requested production of all recordings on the ship. On May 5, 2017, Plaintiffs' sought to compel production of the missing CCTV recordings at a discovery hearing. [DE 68 & 85 p.59-65] During that hearing the Plaintiffs discussed recordings from the CCTV monitors located on the bridge of the ship. [Id.] The Court ordered production of all CCTV recordings viewable from monitors on the bridge of Anthem during the voyage. [DE 85 & 69] The Plaintiffs only received eighteen of the CCTV clips amounting to a total of 26 minutes of video. All of the CCTV recordings from the voyage should have resulted in approximately 14,400 hours of video.

On November 27, 2017, in a discovery conference, Defense Counsel represented it had produced all CCTV recordings in its possession. [DE 276-2] However, the CCTV recordings

2

produced were sparse and inconsistent with what Defendant's employees have represented were in Defendant's possession. The Defendant's employees, Staff Captain Wendy Williams, Captain Gerry Ellis ("Captain Ellis"), who prepared Defendant's internal investigative report, and Captain Andersen testified to recordings that were taken during the voyage and should have been preserved but were not produced to the Plaintiffs. Captain Andersen testified that he ordered the CCTV and VDR recordings be preserved and that all video from February 6 through February 10 should have been preserved based on his order and the nature of the incident. [DE 276-3 p.44-57] Captain Andersen also testified he reviewed "the CCTV afterwards showing some scary photos or movies." [Id. p. 24]. It is likely the Defendant chose not to produce the CCTV's because they were indeed scary and would potentially impact the jury's appreciation of the violent ship movements which caused the Plaintiffs' injuries. The Defendant did produce VDR recordings but they were inaudible and thus improperly preserved. Captain Ellis testified that, although difficult, he was able to access the VDR recordings and gather the information he needed for his investigation. Captain Ellis's notes or transcripts from his review of the VDR have never been produced. When Plaintiffs' counsel inquired about the VDR files, Defense counsel stated it also could not open the files and would put Plaintiffs' counsel in touch with the manufacturer to troubleshoot. [DE 276-2] However, the Defendant already attempted to have the manufacturer cure the problem without success. It was Defendant's burden to preserve and produce the VDR in working condition, yet the Defendant failed to do so.

All of the CCTV and VDR recordings should have been preserved in light of the Captain's Orders, standard operating procedures, the profound incident at issue and Defendants awareness of potential investigation and litigation concerning the incident. Defendant failed to take reasonable steps to preserve the electronic data and the Plaintiffs were prejudiced as a result.

## **MEMORANDUM OF LAW**

Spoliation is the "intentional destruction, mutilation, alteration, or concealment of evidence." Doe v. Miami-Dade Cnty., 797 F. Supp. 2d 1296, 1303 (S.D. Fla 2011). The duty to preserve "arises when the party in possession of the evidence knows that litigation by the party seeking the evidence is pending or probable." Point Blank Sols., Inc. v. Toyobo America, Inc., 2011 WL 1456029 at *24 (S.D. Fla. Apr. 5, 2011). Under Fed.R.Civ.P. 37(e) sanctions may be imposed on a party if electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it could not be restored or replaced through additional discovery. "[T]he court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed.R.Civ.P. 37(e).

Under Fed.R.Civ.P. 37(e) the following four factors must be met to award sanctions: (1) Electronically Stored Information ("ESI") should have been preserved in the anticipation or conduct of the litigation; (2) the ESI is lost or destroyed; (3) the loss of the ESI is due to the party's failure to take reasonable steps to preserve the ESI; (4) the ESI cannot be restored or replaced through additional discovery. In Sosa v Carnival, 2018 WL 6335178 (S.D. Fla. 2018) this Court determined CCTV footage was electronically stored information under the guise of

4

Rule 37.[2] In Sosa, the Court concluded that Carnival failed to take reasonable steps to preserve the CCTV footage and Rule 37 should be employed to govern spoliation of such evidence. See Sosa, 2018 WL 6335178. Conduct deemed undeniably reckless would meet the standard of not taking reasonable steps to preserve ESI. See Id. at *19.

## ARGUMENT

It is undisputed that the CCTV and VDR existed and were in Defendant's possession, custody and control. Captain Ellis and Captain Andersen testified to the same. Captain Andersen testified that he ordered preservation of the VDR and CCTV videos and that the Defendant should have videos and recordings from February 6 thought February 10th. In particular he testified as follows:

> Q. Did you preserve all of the video from the CCTV as well?
> A. Yes, that is done by the security department.
>  Q. All right. So let's go back to the VDR.
> A. Yes.
>  Q. And you said it was the navigation officer at the time that was supposed to punch the button to preserve the –
> A. No, he -- when I gave the order to capture the VDR, that is what we do, yes.
> Q. When was your order given to capture the VDR?
> A. When we -- on the way back into Bayonne.
> [DE 276-3 p.44]

---

[2] Should the Court determine either or both the CCTV and VDR are not ESI under Rule 37(e), the inherent authority doctrine may be invoked to award spoliation sanctions for loss of missing evidence that existed at one time. See Managed Care Sols., Inc. v. Essent Healthcare, Inc., 736 F. Supp. 2d 1317, 1323-24 (S.D. Fla. 2010). Under the inherent authority doctrine, the Court must find the alleged spoliator had a duty to preserve the evidence and the evidence was crucial to the movant being able to prove its prima facie case or defense. Id. In such a circumstance the spoliator must have acted with intentional misconduct or reckless disregard of the consequences. See Amlong & Amlong, P.A. v. Denny's, Inc., 457 F.3d 1180, 1190 (11th Cir. 2006); see also Malautea v. Suzuki Motor Co., Ltd., 987 F.2d 1536, 1544 (11th Cir. 1993); Peer v. Lewis, 606 F.3d 1306, 1314 (11th Cir. 2010).; Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1320 (11th Cir. 2002) (quoting Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998); Long v. Celebrity Cruises, Inc., Case No. 2013 WL 12092088 (S.D. Fla. 2013).

5

Q. You would agree this was a serious incident for which the VDR needed to be captured; true?
A. True.
[Id. p.48]

Q. And I will leave this, after this question. You would agree with me that the CCTV and VDR footage and audio and data, if it was preserved correctly, is something that Royal Caribbean should have from February 6th through the 10th; correct?
A. If the -- if the system was working the way it is designed, we should have it.
Q. The CCTV cameras that are on the bridge, they show the navigation screens; true?
A. True.
Q. Okay. And again, if that CCTV footage was properly preserved, then we should have the CCTV footage from February 6th through the 10th; correct?
A. The -- correct.
Q. And that includes when course alterations or course corrections were made for the weather; true?
A. This is all part of the VDR. So answer: yes.
[Id. p.56]

Q. I am sorry. When a course correction or a course alteration is going to be made, like it was in this instance, during this incident, that is something that has to be communicated to the rest of the crew members on the bridge; correct?
A. Correct.
Q. So the CCTV and the VDR, if it was properly preserved, should have that; correct?
A. Correct.
[Id. p.57]

Q. Okay. So, the cameras record -- recorded the entire -- the CCTV cameras on Anthem recorded the events for the whole trip?
A. To my knowledge, as long as a camera is working as it is supposed to, it will.
[DE 276-1 p.103]

A. So, it is normal for me to look at guest assembly stations during our guest assembly drill prior to departure. It is normal that some of the -- the -- it's normal to have one of the cameras at least up on the screen displaying the funnel of the vessel, so we can have a clear view of any emission and see if there's smoke and stuff that comes out. Ship sides, ship -- the ship sides, the side – the outside of the ship is normally on display as the ship is sailing. So, you walk by, you see it and it's not that I'm sitting in front of it and looking at it, it's there –
Q. And -- and –
A. -- for availability.
Q. And that's important to see what the waves are?
A. Not necessarily waves. It is – we can -- because you can see into the promenade deck or the boat deck, so you can see kind of activity that is there. So, it's just in case something should happen, including waves, you will -- you will -- you -- you can get – you don't have to look up those cameras, so to speak.

6

Q. And do you have any other cameras that you'd be looking at during the course of the -- of the trip?
A. We looked at cameras showing the sea state when we were moving back towards the-- the -- towards Bayonne and by –
Q. And where are those cameras facing?
A. Outside the vessel to -- to forward part, out part, sides of the vessel and so on.
Q. Do you –
A. In -- in gen -- in general, it's just several cameras.
Q. And can you see from the bridge the wave height near the vessel?
A. Yes.
Q. And from inside the -- I'm talking about inside the bridge, not on the wings, can you see from the bridge itself –
A. You can –
Q. -- the wave heights?
A. When you're on the bridge you can see where the vessel is sailing, so then you see the sea.
Q. Okay. And you had that -- you had that available to you at all times, right, to just look out the window –
A. Yes.
[Id. p.105-106]

Q. Did you review any of the CCTV footage after the ship docked in Bayonne?
A. Yes.
Q. And was that a review by you of the -- no, withdrawn. What -- what did you review and why?
A. I reviewed CCTV of February 7th in Bayonne to show corporate operation what we encountered.
[Id. p.111]

Q. Do you recall the clips that were sent to you, in general terms, the clips that were sent to you from the CCTV for you to review in your office?
A. Yes, it was to -- to -- to see the wave heights that we had on the -- on the forward part of the vessel, when we -- to – to get a better understanding how big those waves were, because during the -- the nighttime it was dark. We know we had a -- large waves but it -- it -- wanted to see it actually how large they were. And, of course, there is -- I only have two eyes when I'm up on the bridge and trying this, so to get a better input of understanding of what had taken place. So there's a -- a base -- there's -- I reviewed a clip where we had one satellite dome that -- that collapsed in the wind, and I think it's two footages that I've looked at that shows the waves around the – the bow section of the vessel.
[Id. p.112-114]

Captain Ellis testified to CCTV video and VDR recordings he reviewed to investigate the

occurrence.  [DE 276-4 p.30] He stated:

A. We were able to get periods of or sections of voice. It's a huge amount of data. So one of the reasons that I interview shoreside is to pin down exactly where I need to go search in the VDR.
Q. Okay. So the time periods that you looked in the VDR, were you able to hear what went on?
A. Yes. There were certain things I was looking for, Yes.
[Id. p.30-32]

Q. That CCTV footage -- what CCTV footage did you review?
A. Footage of the center images of the waves over the bow, hitting the windows.
[Id. p.44]

Q. Okay. And there's no company policy or any requirement that CCTV be kept?
A. We instruct -- as investigators, we instruct them to secure any relevant CCTV.
[Id. p.45]

Staff Captain Williams also testified to CCTV video footage that was not produced in evidence. [DE 276-5 p.19] In particular, she mentioned footage of other ships in the vicinity which should have been recorded on the CCTV. [Id.] The above testimony indicates that all CCTV and VDR footage existed at one time and contained footage seminal to the instant action. Captain Andersen ordered the recordings to be preserved, reviewed them personally after the voyage and showed them to the Defendant's corporate operations department.

Despite admitting that the CCTV was recorded 24 hours a day for the entire cruise, the Defendant elected to produce a mere 28 minutes of footage. [DE 298] The Defendant has offered the Plaintiffs and the Court no explanation as to where the remaining footage is. Rather, the Defendant has claimed that footage to be "irrelevant." [DE 298 p.6] The Defendant asserts the few snippets of waves it produced was sufficient. [DE 298 p.2] That decision is not up to the Defendant. The Plaintiffs were subject to unrelenting hurricane force winds and waves for 12 hours. The Plaintiffs need the CCTV footage to show the total picture and the ferocity of the winds and waves, which caused the Plaintiffs to fear for their lives.

The VDR was preserved and saved after the cruise, but, for unexplained reasons, Royal Caribbean could only extract certain portions of voice recordings from the VDR. [ECF No. 276-4 (Depo. 30-31)]. [DE 298]

There are no readily available substitutes for the missing CCTV or VDR. Therefore, through the loss of this information, Plaintiffs have suffered significant prejudice. Sosa, *supra*.

Federal law recognizes a litigant's duty to preserve evidence once it knows, or should know, that such evidence may be relevant to any potential litigation, even before litigation commences. See St. Cyr v. Flying J, Inc. 2007 U.S. Dist. LEXIS 42502, at *8 (M.D. Fla. 2007). The Captain and First Officer both testified that the CCTV and VDR footage should have been preserved in light of the incident and that both explicitly ordered it to be preserved. The Captain testified, in fact, that five days of CCTV footage should have been preserved. [DE 276-3 p.56] Yet, the Defendant only produced 26 minutes of footage, without explanation as to the whereabouts of the remaining thousands of hours of CCTV footage. During discovery and the pendency of this action the Defendant has never represented that these items were destroyed, missing or otherwise unavailable. The Defendant has simply claimed it produced everything in its possession that was "relevant". At the very least, the Defendant recklessly disregarded its duty to preserve and produce all of the CCTV recordings. At some point during and after the voyage all of the CCTV recordings were in existence and the Captain had ordered its preservation. The Defendant knew or should have known of possible litigation at the time these recordings were in existence based on common sense, precedent and the almost immediate investigation and legal filings. Because these recordings were not produced and Defendant claims not to be in possession of them, it is clear they have been destroyed or purposefully

hidden.  The Defendant has offered no excuse for its spoliation and has effectively hampered the Plaintiffs' ability to fully illustrate and support its case in chief.

Demonstrably, Defendant knew it had a duty to preserve the all of the CCTVs of the hurricane.  It had, on previous occasions, been involved in personal injury actions where CCTV preservation was an issue. "Defendant reviewed and preserved the CCTV footage that depicted the incident. That preserved piece of evidence is the most material for Plaintiff's claim as it bolsters her credibility as to the nature of the fall." Mitchell v. Royal Caribbean Cruises, Ltd., 2013 WL 12066018 (S.D. Fla., 2013).  Also, in Button v. Royal Caribbean Cruises Ltd., 2013 WL 12064489 (S.D. Fla., 2013), "[A]s Defendant articulated, there is no video depicting Plaintiff or Plaintiff's accident; however, the Court also understands that such limited-in-scope footage will show movement that is, in fact, indicative of the movement Plaintiff experienced at the time of her accident".  This is the very same situation as in the case at bar.

In Sosa, Carnival conceded the CCTV footage existed and it had a duty to preserve the footage.  See Sosa, 2018 WL 6335178Carnival claims that it did not know how or why the CCTV footage went missing after its security officer viewed the video and then (allegedly) took steps to download it to a shipboard computer drive. See Id. The Court stated the CCTV footage is (or could be) a highly relevant piece of evidence, and Carnival had not adequately explained its absence. See Id. And the loss of the video footage might have undermined Sosa's case to some degree.  See Id.

In the instant action, electronically stored CCTV footage should have been preserved in the anticipation of litigation and was lost because Defendant failed to take reasonable steps to preserve it. The footage cannot be restored or replaced through additional discovery.  Such loss

of evidence has caused prejudice to the Plaintiffs permitting the Court to award sanctions it sees fit. See Fed.R.Civ.P. 37(e).

In <u>Sosa</u>, this Court ruled: "[L]ost CCTV video footage is ESI governed and that inherent authority cannot be used." Sosa, 2018 WL 6335178. Because the Defendant has deprived Plaintiffs of use of the CCTV's and the VDR in the litigation, under Fed.R.Civ.P. 37(e) the Court may allow Plaintiffs the choice of; (1) allow all the evidence of the unavailability of the CCTV and VDR presented to the jury to determine intent and any appropriate presumption against Defendant, or (2) allow Defendant to have witnesses testify about the CCTV video and contents of the VDR and Defendant's efforts to preserve them. See <u>Id</u>.

The Plaintiffs respectfully request this Court find Defendant failed to preserve important ESI evidence and, in keeping with the ruling in <u>Sosa,</u> the Plaintiffs request that the Court rule as follows:

1) All evidence about the CCTV video and its unavailability shall be presented to the jury and Plaintiffs are entitled to argue that Defendant had the intent to deprive Plaintiffs of it (and then, if the jury finds the intent, argue that the jury may find a presumption against Defendant to be appropriate), or (2) Defendant's witnesses shall be precluded from testifying about the contents of CCTV footage and the VDR (and their efforts to preserve it) and simply have the Court advise the jury that Defendant had CCTV video footage and the VDR at one time, but it is no longer available.

The parties have had a Rule 7.1 conference prior to filing this Motion and have been unable to agree.

                                                                                   JOHN B. OSTROW, P.A.
Counsel for Plaintiffs
777 Brickell Avenue, Suite 400
Miami, Florida 33131

Tel: 305-358-1496
Jostrow@bellsouth.net
JBOassist@gmail.com

and

LAW OFFICE OF ALAN C. TRACHTMAN
48 Wall Street, 11th Floor
New York, NY 10005
Tel: 212-918-4750
Fax: 212-202-4961

act@traxlaw.com

By: s/ *Morgan P. Theodore*
MORGAN P. THEODORE
Fla. Bar No. 70188

CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this 11th day of June, 2019 on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ *Morgan P. Theodore*

Morgan Theodore