**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 16-20924-CIV-MARTINEZ/GOODMAN**

DONNA INCARDONE, et al.,

      Plaintiffs,

v.

ROYAL CARRIBEAN CRUISES, LTD.,

      Defendant.

_____/

**ORDER DENYING PLAINTIFFS'**
**AMENDED SPOLIATION MOTION ON CCTV AND VDR**

The expression "a picture is worth a thousand words" is attributed to myriad sources, ranging from Confucius (551-479 BC) to Frederick R. Barnard, who published a piece commending the effectiveness of graphics in advertising with the title "One Look is worth a thousand words" in *Printer's Ink*, in December 1921.[1] Regardless of whether this phrase originated more than two thousand years ago or only almost one hundred years ago, one thing about it is certain: it was created long before cruise ships had closed circuit television video ("CCTV") monitoring on its vessels. But if a picture is worth a thousand words, then surely a *video* must be worth significantly more. And, as

---

[1]     The Phrase Finder, https://www.phrases.org.uk/meanings/a-picture-is-worth-a-thousand-words.html (last visited July 22, 2019).

is the case with Plaintiffs' Amended Spoliation Motion on CCTV and VDR [ECF No. 388], videos from **200** surveillance cameras could presumptively be worth even *more*.

But the specific question raised in Plaintiffs' motion is not, exactly, how much the videos are worth in this lawsuit. Instead, the question is reversed: how much are **missing** (i.e., overwritten) CCTV videos worth? Plaintiffs contend that the missing videos are worth, at a minimum, a spoliation-type sanctions order (under Federal Rule of Civil Procedure 37(e)(2)(B), which entitles them to argue for a mandatory or permissive adverse inference at the jury trial).

Defendant Royal Caribbean Cruises, Ltd. ("RCCL") has 200 CCTV video cameras aboard the *Anthem of the Seas*, which means that all video from all cameras during the 72-hour voyage,[2] which encountered hurricane-force winds in February 2016, would have yielded 14,400 hours of video (had the video been preserved). But RCCL preserved only approximately **91** minutes (out of 864,000 minutes) -- which is approximately .000105 % of the available video.[3]

---

[2]    The cruise was a seven-day trip, departing from Bayonne, New Jersey on February 6, 2016, but it returned a couple of days early because of the weather. [ECF No. 411, p. 29].

[3]    After significant confusion over the approximate length of the preserved video clips (a scenario described in greater detail in this Order), RCCL finally reported (after responding to the Court's questions) that it preserved approximately **140** minutes of video. But that is not correct. First, one of the 23 clips (i.e., clip 21) contains approximately 40 minutes of a black screen following 4 minutes and 7 seconds of video. Second, even after the 40 minutes of no video images is taken into consideration,

Plaintiffs contend that RCCL's failure to preserve more than 91 minutes of CCTV video and its inability to produce more than a few minutes of information from the Voyage Data Recording System ("VDR"), which is the ship equivalent of an aircraft's "black box," are the result of conduct equating to bad faith (i.e., an "intent to deprive") and should lead to a permissible adverse inference at trial. Plaintiffs say (or, to be more accurate, *predict*) that the missing CCTV videos "depict the violence of the storm and its impact upon the passengers and ship." [ECF No. 388, p. 1]. They also argue that their "medical conditions were caused by that violence which would best be appreciated by a jury seeing video evidence of it." *Id.*

Alternatively, Plaintiffs seek another type of sanction if the Court declines the request for a permissible adverse inference presumption -- an Order preventing RCCL's witnesses from testifying about the contents of CCTV footage and the VDR (and their efforts to preserve) and advising the jury that RCCL had the video footage and VDR "at one time, but it is no longer available." [ECF No. 388, p. 11].

RCCL contends that: (1) it had no duty to preserve the entirety of the ship's CCTV and similarly had no duty to preserve the VDR either; (2) it did in fact take reasonable steps to preserve the CCTV and VDR; (3) most of the VDR data was corrupted and the manufacturer could not extract any additional data; (4) the missing CCTV was replaced through discovery because CCTV clips were provided and RCCL

RCCL's 140-minute representation [ECF No. 419] is *still* overstated (by approximately 10 minutes).

produced maps showing the ship's exact position and course overlayed onto the then-current weather forecast; (5) the CCTV video clips it did produce depict images which would help *Plaintiffs'* case; (6) Plaintiffs' counsel did not request that it preserve the CCTV when he sent a representation letter and most of the CCTV was automatically overwritten by the time the lawsuit was filed; (7) unlike a typical personal injury case involving a cruise passenger, there was no specific incident or accident to capture and preserve on CCTV because "Plaintiffs are universally claiming psychological injuries and were in their cabins for the duration of the storm"; (8) Plaintiffs were not prejudiced because "more CCTV would not have shown anything of value," given that "Plaintiffs already have the VDR audio transcription that could be extracted, and they have the weather logs, forecasts, maps, and data"; and (9) it did not intentionally get "rid of" any of the evidence. [ECF No. 392, pp. 14-16].

For the reasons outlined in greater detail below, the Undersigned **denies** the Plaintiffs' motion. The presumption which Plaintiffs request requires, among other requirements, that the "lost" electronically stored information ("ESI") "cannot be restored or replaced through additional discovery," a scenario which is lacking here. *See* Fed. R. Civ. P. 37(e). That requirement applies to *all* potential sanctions under the rule, not merely for the adverse inference result.

In addition, other, less-severe sanctions require "prejudice to another party from loss of the information" and, if that exists, "measures no greater than necessary to cure

the prejudice." Fed. R. Civ. P. 37(e). Because Plaintiffs are already in possession of more than 91 minutes of video demonstrating that the ship was embroiled in a horrific storm with massive waves and huge winds, the requisite prejudice is not demonstrated for the unavailable CCTV clips.

The Undersigned concludes that RCCL *did* take steps to preserve the VDR but that a product or software failure beyond its control is responsible for the evidentiary snafu, which renders unavailable a permissible presumption or adverse inference (or any other sanction under Federal Rule of Civil Procedure 37(e), which controls these issues).

Finally, the adverse inference presumption Plaintiffs urge also requires a finding that RCCL had an intent to deprive them of all the CCTV video clips and the corrupted portions of the VDR. The Undersigned cannot make that finding. Instead, the Undersigned concludes that RCCL did *not* have a bad faith intent.

## I.    Factual and Procedural Background

Plaintiffs, a group of autistic children and their families, seek compensation for alleged psychological injuries they sustained when their cruise on RCCL's *Anthem of the Seas* encountered a major winter storm with hurricane-force winds. [ECF Nos. 243, p. 1; 247, p. 1]. Plaintiffs allege that RCCL negligently and recklessly sailed the *Anthem of the Seas* into the path of the storm even though it received severe weather warnings before embarking and knew its propulsion system would experience difficulties in severe

weather. [ECF No. 55, ¶¶ 14-16, 27]. RCCL argues that the storm was an unexpected Act of God and that Plaintiffs cannot recover under maritime law for the stand-alone emotional distress damages they are claiming. [ECF No. 241, p. 2].

The cruise at issue left port on the afternoon of February 6, 2016 at approximately 4:00 p.m. and encountered a storm with hurricane force winds. According to Plaintiffs' Second Amended Complaint, the *Anthem* encountered a predicated storm and confronted winds of more than 100 m.p.h.[4] and seas of greater than 30 feet.[5] [ECF No. 55]. The captain ordered all passengers to be confined to their staterooms until further notice. As alleged by Plaintiffs, they were holding onto their beds or whatever else they

---

[4]     At a July 9, 2019 hearing, Plaintiffs' New York counsel, who advised that he has been to sea in a hurricane, said that his clients were in their rooms for twelve hours "rocking and rolling in 160-knot winds." [ECF No. 419-1, p. 3]. In their Amended Spoliation Motion, Plaintiffs repeat the 160-knot wind allegation. [ECF No. 388, p. 2].

160 knot winds are the equivalent of **184 m.p.h.** winds. The calculation is based on the rule that something traveling at one knot is traveling at approximately 1.15 land miles per hour. *See* Calculate Me, https://www.calculateme.com/speed/knots/to-miles-per-hour/160 (last visited July 22, 2019). In her interview, Staff Captain Wendy Williams, who had taken over the role of driving the ship, said she "saw the anemometer go to 160 knots and stop." [ECF No. 276-5, p. 17].

[5]     Staff Captain Williams also said, in the same interview, that the swells, "were far greater that the 30 feet forecast they were. They were easily 15 – 15 meters, with some of them possibly even greater than that." [ECF No. 276-5, p. 18]. Fifteen meters is 49.21 feet. *See* Calculate Me, https://www.calculateme.com/lenth/meters/to-feet/15 (last visited July 23, 2019). Therefore, according to Staff Captain Williams' testimony during an onboard interview, the *Anthem* was at times being battered by **184 m.p.h. winds and swells of 50 feet or more**.

could find during the twelve or so hours they were confined to their staterooms due to "the severe crashing of waves and listing of the vessel." [ECF No. 55, p. 4].

Plaintiffs contend they were hurled against cabin walls, floors and furniture due to the "violent movements of the ship from side to side and up and down." [ECF No. 55, p. 5]. They allege that the vessel listed as far as 45 degrees for extended periods[6] and they say that their parents and aides did their best to protect them while they "were being severely battered and traumatized." *Id.*

On February 26, 2016, more than two weeks after the ship returned to port, Plaintiffs' Miami counsel sent a brief letter to RCCL, advising that he represents two individuals and their four children, all of whom he described as suffering from Autism Spectrum Disorders. [ECF No. 351-2]. The letter was one-page long, and it consisted of only three sentences, with each sentence broken out into a separate paragraph. The letter contends that the parents and children were severely traumatized by the cruise.

This representation letter did not, however, demand or request that RCCL preserve any of the CCTV video or the VDR. At the hearing, in response to a question from the Undersigned, Plaintiffs' Miami counsel said he did not include such a demand or request because he was unaware of CCTV in general and did not know that this cruise ship had CCTV monitoring. [ECF No. 411, p. 63].

---

[6] Captain Williams said, in her onboard interview, that the maximum list she noted was 20 degrees. [ECF No. 276-5, p. 10].

Plaintiffs' Miami counsel later sent another one-page letter to RCCL. It is undated, and it seems to expand the clients he represents to "the families *and aides* for a *group* of Autistic Spectrum Disorder children." [ECF No. 351-2 (emphasis supplied)]. It purports to attach a proposed complaint and suggests that RCCL might want to speak or meet with him before he files the lawsuit in order to reach a resolution. Alternatively, the letter asks if RCCL would accept service without a process server. Similar to the first letter, it did not ask that any CCTV or any other type of evidence be preserved.

Plaintiffs initially filed [ECF No. 276] a spoliation motion concerning the CCTV and VDR and United States District Judge Jose E. Martinez referred [ECF No. 376] it to the Undersigned. Plaintiffs then filed [ECF No. 388] an Amended[7] Spoliation Motion on CCTV and VDR, RCCL filed a response [ECF No. 392], and Plaintiffs filed a reply [ECF No. 393]. The Undersigned held a four-hour hearing [ECF No. 399] on the motion (and a related motion for sanctions) and directed the parties to file exhibits and affidavits to produce a more-complete record [ECF No. 402]. The parties complied.

The Undersigned has carefully and comprehensively reviewed a flash drive containing all the CCTV video clips which RCCL says it preserved from the cruise.

---

[7] Plaintiffs' initial motion was based on the Court's inherent authority, and it did not discuss Federal Rule of Civil Procedure 37(e). After a hearing in which the Undersigned mentioned Rule 37(e), Plaintiffs filed [ECF No. 385] an unopposed motion for leave to file an amended spoliation motion concerning the CCTV and VDR, and the Undersigned granted [ECF No. 387] that motion.

a. <u>Facts About The VDR</u>

As explained by RCCL, the VDR system collects data from various sensors aboard the vessel and then stores the information in an externally-mounted protective storage unit designed to withstand a catastrophic marine incident. [ECF No. 392, pp. 1-2]. Unlike the CCTV video, which can be seen from the bridge, the VDR is not monitored. It is not an investigative tool and is not used for investigative purposes. Instead, RCCL says, the VDR is useful in the event of the total loss of a vessel. Moreover, RCCL contends that the device is "not user-friendly and not easy to extract data from." [ECF No. 392, p. 2].

Plaintiffs say they sought VDR recordings from the bridge because they would contain conversations by the captain and crew about the voyage. Significantly, according to Plaintiffs, the VDR "would reflect any course corrections or alterations that were made in relation to the storm threat." [ECF No. 276, p. 2]. Plaintiffs link the importance of the VDR to their theory that "improper pre-voyage planning and improper voyage course corrections took place, resulting in Anthem's sailing into a force 5 hurricane." [ECF No. 276, p. 2].

Plaintiffs contend that Captain Claus Andersen testified that he ordered the VDR to be preserved. They cite deposition excerpts where he said that he "gave the order to capture the VDR" on the way back into Bayonne, New Jersey. [ECF No. 276, p. 5]. They also refer to other deposition excerpts where Captain Andersen said that he was able to

hear through the VDR "certain things" that went on and were recorded. [ECF No. 276, p. 8].

According to Plaintiffs, RCCL produced VDR recordings but they were largely inaudible and "thus improperly preserved." [ECF No. 276, p. 3]. However, they also say that First Officer Gerry Ellis testified that, "although difficult, he was able to access the VDR recordings and gather the information he needed for his investigation." *Id.* at p. 3.

In its response to Plaintiffs' amended motion, RCCL represents that the VDR was preserved and saved after the cruise, "but, for unexplained reasons, Royal Caribbean could extract only certain portions of voice recordings from the VDR." [ECF No. 392, p. 2]. It noted that the only readable data are small portions of the voice recordings.

RCCL explained that its personnel spent weeks trying to recover additional data from the VDR but were unsuccessful. Moreover, it also advised that it solicited the help of the device's manufacturer, but the company (SAM Electronics) could not recover any additional data either.

RCCL noted that it is unaware of any companies which periodically check or audit VDR performance. It further explained that it tried to put Plaintiffs' counsel in touch with SAM, but they never followed up with SAM. At the hearing, Plaintiffs' counsel conceded that he did not follow up and try to speak directly with SAM, the VDR manufacturer -- but explained that he viewed that prospect as a futile exercise.

In their Reply [ECF No. 393], Plaintiffs emphasize that RCCL did not explain how or why the VDR became corrupted. They claim that Gerry Ellis reviewed the VDR in order to create a preliminary analysis report. They similarly argue that "VDR transcripts were somehow made from recordings of the Captain's announcement, evidencing that the VDR was intelligible to some extent." [ECF No. 393, p. 6].

At the hearing, Plaintiffs' counsel contended that Mr. Ellis said it was relatively easy to retrieve data from the VDR, while RCCL's counsel said Mr. Ellis' position was that it was difficult. Because the parties have different interpretations of what Mr. Ellis said during his deposition about the VDR, the Undersigned will quote the relevant excerpts:

**Q.** What part did the VDR play in your investigation of this incident?

**A.** Voice, voice recordings from the bridge.

**Q.** And what about video recordings on the bridge?

**A.** No, we were -- as I mentioned before, they are very, these VDR systems. They are not designed for analysis like this. So it's **user unfriendly** very difficult for us to extract data.

**Q.** Were you able to extract the voice recording?

**A.** We were able to get periods of or **sections** of voice. It's a huge amount of data. So one of the reasons that I interview shoreside is to pin down exactly where I need to go search in the VDR.

**Q.** Okay. So the time periods that you looked in the VDR, were you able to hear what went on?

**A.** Yes. There were **certain things** I was looking for, yes.

**Q.**   Do you know why the copies of the VDR we were provided were generally inaudible?

**A.**   Like I said, they are **very user unfriendly**. We spent weeks trying to get data from them, and we successfully were getting voice, and that's it, really.

**Q.**  Who manufactured the VDR in this case?
**A.**   It was made -- the trade name is Danelec, but its parent company is SAM Electronics.

**Q.**  SAM Electronics?

**A.**  Yes.

**Q.**  And you had conversations with the company about accessing?

**A.**  Yes.  We tried to get their help, to help us, **without much success.**

**Q.**  And was a warranty claim made on the VDR?

**A.**  I don't know.

**Q.**   Was the system changed to -- as a result of your inability to access all the information, did they change the VDR on the ship?

**A.**   I don't think so. I don't know for sure, but I don't think so. As I said before, really the intent of the VDR is in case of a loss, like a black box in an aircraft.  It's not really designed for investigation purposes.

**Q.** In case of a loss, you would want to access the video, the data, and the voice; correct?

**A.**  I didn't say that, but yes.

**Q.**  Well, you understand that it's --

**A.**   They are very difficult to access for, other than the manufacturer. If there's a real loss, such as the Alfaro incident, then the manufacturer will

work with the NTSB to get whatever they can from them, but they are really very difficult to operate.

**Q.** Did you report to any of your superiors the fact that you had **difficulty** accessing the information on the VDR?

**A.** Yes. It's well known. In all the investigations we performed, VDRs are not designed for that purpose. They are **inherently difficult to extract data from.** (emphasis supplied).

[ECF 179-6, pp. 30 - 33 (emphasis supplied)].

    b. <u>Facts About The CCTV</u>

The 200 CCTV cameras distributed throughout the vessel are viewable from the bridge, are recorded continuously throughout the 72-hour voyage, and are stored on a DVR. They record only video; there is no audio. The CCTV does not show the interiors of the passenger cabins, as cameras are not placed in the cabins. The passengers were confined to their cabins during the worst part of the storm, for approximately 12 hours.

The record concerning the CCTV and what portions have been preserved is confusing and has changed over time. But RCCL's amended description of the length of the CCTV clips is *still* incorrect.

Plaintiffs' initial spoliation motion concerning the CCTV alleged that they received only 18 clips totaling **only 26 minutes** of video. [ECF No. 276]. In its initial response, RCCL claimed that it produced "multiple clips totaling **nearly 30 minutes**." [ECF No. 298, p. 2]. At a July 9, 2019 hearing on the instant motion, Plaintiffs' counsel referenced "these **28** minutes" of video. [ECF No. 419-1, p. 46]. And RCCL's counsel confirmed that "**slightly less than half an hour**" of CCTV clips were produced to

Plaintiffs. [ECF No. 411, p. 15 (emphasis added)]. RCCL's counsel later agreed that no RCCL attorney reviewed any CCTV from the cruise "other than the 26 or 28 minutes" provided to Plaintiffs' counsel. [ECF No 411, p. 61].

Immediately after that hearing, RCCL delivered to my chambers a courtesy copy of what was represented to be the CCTV video clips which it had previously produced to Plaintiffs. But that flash drive contained **92 minutes** (not 26 or 28) of CCTV video clips. [ECF No. 410].

Given this significant discrepancy, the Undersigned directed RCCL to submit a detailed, comprehensive explanation of the anomaly (and other odd circumstances surrounding the flash drive given to the Undersigned). [ECF No. 410]. RCCL submitted a response, which included an affidavit from Haim Shrayer, an employee in RCCL's Global Security Department, holding the title of "Lead, Security Technology and Newbuild." [ECF No. 419-2].

RCCL's memorandum and affidavit explained that two primary factors caused the confusion over the length and nature of the CCTV clips which were preserved, produced to Plaintiffs, and provided to the Court.

First, RCCL says the "parties all mistakenly referred to the **number of clips** in the briefing and at the hearing (23 clips of CCTV video) instead of the actual *time* length of all of the CCTV video, which is approximately **140 minutes**." [ECF No. 419, p. 2 (emphasis added)]. Second, RCCL explained that the flash drive it brought to the

hearing and gave to me "inadvertently did not contain all of the CCTV video that was produced to Plaintiffs." *Id*. RCCL then conventionally filed [ECF No. 421] an amended flash drive containing what is represented to be almost 140 minutes of CCTV video clips and provided a courtesy copy to the Undersigned.

But the clips on the amended flash drive do not total 140 minutes. They total 91 minutes and 31 seconds, approximately slightly more than an hour and a half. So why is RCCL still contending that the clips total 140 minutes?

It's difficult to determine with certainty, but one logical explanation for at least a large amount of the discrepancy concerns the presence of a black screen, with no visible video, on clip 21. The image-free black screen is from 4:08 to 48:17, which means that more than 40 minutes of the approximate 50-minute difference is likely attributable to the black screen being included in RCCL's total. But that still leaves an unexplained difference of approximately nine minutes. RCCL has not explained this new anomaly and the Undersigned is at a loss to discern an explanation.[8]

So, by way of summary, the visible portions of the preserved video clips total 1 hour, 31 minutes, and 31 seconds.

---

[8]     The Undersigned has viewed the amended flash drive and confirmed that it does in fact contain some clips not on the initial flash drive.

Regardless of RCCL's incorrect calculation of the total time encompassed by the video clips which actually show images, Plaintiffs have not challenged RCCL's explanation that it previously produced (in two productions) the CCTV clips.

In its supplemental memorandum, RCCL advised that "there is no retained CCTV video that Plaintiffs were not given." [ECF No. 419, p. 5]. Similarly, it represented that "there are no different versions of the CCTV video" and "Plaintiffs have the version that was preserved." *Id.* at p. 6.

Moving past the mix-up surrounding the length of the preserved and visible CCTV clips, the Undersigned notes that, according to Plaintiffs' Amended Motion, Captain Andersen testified that he ordered the CCTV and VDR records to be preserved and that "all" video from February 6 through February 10 should have been preserved "based on his order and the nature of the incident." [ECF No. 388, p. 3].

The Undersigned has reviewed Captain Andersen's testimony and it is unclear whether he personally ordered that "all" CCTV video be preserved. The following questions and answers were cited by Plaintiffs: "Q. Did **you** preserve all of the video from the CCTV as well? A. Yes, that is done **by the security department**." [ECF No. 276-3, p. 44 (emphasis added)].

Captain Andersen later explained that all the video *should* be preserved if things were preserved correctly:

> Q. And I will leave this, after this question. You would agree with me that the CCTV and VDR footage and audio and data, if it was preserved

correctly, is something that Royal Caribbean should have from February 6th through the 10th; correct?

A. If the -- if the system was working the way it is designed, we should have it.

Q. The CCTV cameras that are on the bridge, they show the navigation screens; true?

A. True.

Q. Okay. And again, if that CCTV footage was properly preserved, then we should have the CCTV footage from February 6th through the 10th; correct?

A. The -- correct.

[ECF No. 276-3, p. 56].

To be sure, Captain Andersen did technically say, in an indirect way, in response to a question, that the Security Department preserved "all" video. He did not, however, say that he personally ordered it preserved. He surmised that all video should have been preserved if someone had taken steps to preserve all the CCTV.

Moreover, Plaintiffs focused on Captain Andersen's testimony that he reviewed the CCTV afterward "showing some scary photos or movies." [ECF No. 388, p. 3]. The deposition page Plaintiffs reference for this "scary" comment [ECF No. 276-3, p. 56] does not, however, say anything about that.

In any event, Plaintiffs' articulated suspicion is that "it is likely the Defendant chose not to produce the CCTV's because they were indeed scary and would potentially

impact the jury's appreciation of the violent ship movements which caused the Plaintiffs' injuries." [ECF No. 388, p. 3].

Plaintiffs' Amended Motion also contains excerpts from the Captain Ellis deposition and Staff Captain Williams' onboard interview. Specifically, Captain Ellis said:

> Q. That CCTV footage -- what CCTV footage did you review?
>
> A. Footage of the center images of the waves over the bow, hitting the windows. [Id. p.44]
>
> Q. Okay. And there's no company policy or any requirement that CCTV be kept?
>
> A. We instruct -- as investigators, <u>we instruct them to secure any **relevant** CCTV</u>. [Id. p. 45]

[ECF No. 388, p. 8 (emphasis added)].

Staff Captain Williams said that there were two other vessels in the vicinity at the time [ECF No. 276-5, p. 19], a comment which Plaintiffs deem significant because the CCTV clips they received did not contain footage of the other ships. But it is far from certain that the CCTV would have captured those ships on its cameras during the storm.

RCCL produced to Plaintiffs 23 CCTV clips, which it now says (incorrectly)[9] total approximately 140 minutes. [ECF No. 419]. Of that, a substantial amount of the video

---

[9]      The Undersigned is not saying, directly or implicitly, that RCCL is intentionally making misrepresentations to the Court about the length of the CCTV clip flash drive or

clips are taken from the stern-facing camera showing the weather conditions and wave height. RCCL represents that it has no retained CCTV video other than the clips produced to Plaintiffs.

The CCTV clips are from 3:34 p.m. on February 7, 2016 to 1:08 a.m. on February 8, 2016. According to RCCL, "that was the worst part of the storm." [ECF No. 419, p. 7].

As noted, the Court has viewed the video, and the charts below provide an overview of what is on the compilation of CCTV clips and the corresponding file names for each clip.

**Table I: Clip Information and Description**

| CLIP | DATE | TIMESTAMP | CLIP LENGTH | CAMERA LOCATION | DESCRIPTION |
|------|------|-----------|-------------|-----------------|-------------|
| 1 | 2/7/2016 | 21:40:44 | :15 | Deck 5 – Embarkation deck facing aft | Rough waves crashing against deck, deck chairs slamming against ship and railings |
| 2 | 2/7/2016 | 21:40:44 | :14 | Deck 5 – Railings by aft lifeboat #9 | Waves crashing against deck, deck chairs slamming against ship and railings |

is purposefully trying to mislead the Court (or Plaintiffs). Because the Court can (and did) watch the CCTV flash drive and can easily tally the total time, it would be strategically illogical for RCCL to at this point purposefully provide an inaccurate representation about the total length of the clips. The Undersigned cannot reach any definite conclusions explaining the continued inaccuracies, other than to note that mistakes sometimes multiply and that "Murphy's Law" -- i.e., "if anything can go wrong, it will" -- appears to have taken residence in defense counsel's offices in this case in connection with the CCTV clips evidence.

| 3 | 2/7/2016 | 23:02:59 | :11 | Deck 5 – Starboard aft railing, gangway opening, embarkation deck facing forward | Waves crashing against deck, damaging railing and moving deck chairs |
|---|---|---|---|---|---|
| 4 | 2/7/2016 | 20:47:59 | 1:37 | Deck 14 – Pool deck | Flooding on deck, deck chairs and garbage cans thrown side to side |
| 5 | 2/7/2016 | 21:46:54 | :07 | Deck 14 – Pool deck starboard | Glass tables sliding on deck and shattering |
| 6 | 2/7/2016 | 21:48:00 | 1:09 | Deck 18 – Engine casing looking aft (Interior hallway) | Interior glass doors swinging open and closed, one door shattering |
| 7 | 2/7/2016 | 21:48:00 | 1:50 | Deck 18 – Engine casing looking aft (Interior hallway and art gallery) | Two people walking, artwork swaying, table and chairs sliding and colliding, three employees walking |
| 8 | 2/7/2016 | 21:48:00 | 1:49 | Deck 18 – Engine casing looking aft (Interior hallway and art gallery) | Two people walking, artwork swaying, employee moving artwork, table and chair sliding and colliding, employees walking and taking photos/videos |

| 9 | 2/7/2016 | 21:48:00 | 1:15 | Deck 18 – Engine casing looking aft (Interior hallway) | Employees walking, large planter tumbles over and breaks |
|---|---|---|---|---|---|
| 10 | 2/7/2016 | 21:48:00 | 1:12 | Deck 18 – Engine casing looking aft (Interior staircase) | Employees placing towels on the floor near stairs, ceiling panel falls |
| 11 | 2/7/2016 | 21:48:00 | 1:40 | Deck 18 – Engine casing looking aft (Overlooking pool area) | Strong winds, deck chair falling from upper deck |
| 12 | 2/7/2016 | 21:48:00 | 1:38 | Deck 18 – Engine casing looking aft (Deck overlooking pool area) | Deck chairs and furniture thrown around, glass railing panel shattering, deck chair falling to lower deck |
| 13 | 2/7/2016 | 21:48:00 | 3:12 | Deck 18 – Engine casing looking aft (Deck overlooking pool area) | Deck chairs and furniture tossed around by the wind |
| 14 | 2/7/2016 | 21:48:00 | 4:01 | Deck 18 – Engine casing looking aft (Radar/satellite system) | Piece of radar/satellite system breaking off and flying away |
| 15 | 2/7/2016 | 21:21:59 | :13 | Inside bridge | Employees holding on to |

| | | | | | equipment while ship sways |
|---|---|---|---|---|---|
| 16 | 2/7/2016 | 21:21:59 | :37 | Inside bridge wing | Waves crashing against bridge wing |
| 17 | 2/7/2016 | 20:40:00 | 2:25 | Main pool – Band stand facing H2O Zone | Water in pool splashing, large piece of radar/satellite system falling into pool |
| 18 | 2/7/2016 | 20:37:59 | 3:38 | Engine casing looking forward (radar/satellite system overlooking pool area) | Radar/satellite system breaking apart and flying away |
| 19 | 2/7/2016 | 20:37:59 | 9:58 | Stern | Rough waves hitting ship and camera |
| 20 | 2/7/2016 | 20:59:59 (The time noted on the clip is 4-5 p.m.) | 48:19 | Stern | Rough waves hitting ship and camera |
| 21 | 2/7/2016 | 21:59:59 (The time noted on the clip is 5-6 p.m.) | 4:07 (Video ends at 4:07, black screen from 4:08-48:17) | Stern | Rough waves hitting camera |
| 22 | 2/7/2016 | 21:21:59 | 1:14 | Bridge wing camera overlooking the front of the ship | Rough waves hitting the front of the ship |
| 23 | 2/7/2016 | 20:34:59 | :50 | Stern | Rough waves hitting camera |
| **TOTAL TIME** | | | **1:31:31** | | |

**Table II: Clip Numbers with Corresponding File Names**

| CLIP NUMBER | FILE NAME |
|---|---|
| 1 | Deck 5 Railings Broken_05.05.0598 Embark.Deck facing Aft STB_07Feb2016_214044_07Feb2016_214100 |
| 2 | Deck 5 Railings By LB# 9_05.05.0582 c Aft LB#9 PS_07Feb2016_214044_07Feb2016_214100 |
| 3 | Deck 5 Stbd AFTRailing- Gangway Opening_05.05.0596 Embark Deck Facing Fwd STB_07Feb2016_230259_07Feb2016_230310 |
| 4 | Deck 14 Pool_14.04.1003 Pool Deck PS_07Feb2016_204759_07Feb2016_205000 |
| 5 | Deck 14_14.05.1012 Pool Deck STB_07Feb2016_214654_07Feb2016_214704 |
| 6 | Dk 18 Sattelite 2_18.06.1185 Engine Casing Looking Aft _07Feb2016_214800_07Feb2016_220200 (2) |
| 7 | Dk 18 Sattelite 2_18.06.1185 Engine Casing Looking Aft _07Feb2016_214800_07Feb2016_220200 (3) |
| 8 | Dk 18 Sattelite 2_18.06.1185 Engine Casing Looking Aft _07Feb2016_214800_07Feb2016_220200 (4) |
| 9 | Dk 18 Sattelite 2_18.06.1185 Engine Casing Looking Aft _07Feb2016_214800_07Feb2016_220200 (5) |
| 10 | Dk 18 Sattelite 2_18.06.1185 Engine Casing Looking Aft _07Feb2016_214800_07Feb2016_220200 (6) |
| 11 | Dk 18 Sattelite 2_18.06.1185 Engine Casing Looking Aft _07Feb2016_214800_07Feb2016_220200 (7) |
| 12 | Dk 18 Sattelite 2_18.06.1185 Engine Casing Looking Aft _07Feb2016_214800_07Feb2016_220200 (8) |
| 13 | Dk 18 Sattelite 2_18.06.1185 Engine Casing Looking Aft _07Feb2016_214800_07Feb2016_220200 (9) |
| 14 | Dk 18 Sattelite 2_18.06.1185 Engine Casing Looking Aft _07Feb2016_214800_07Feb2016_220200 (10) |
| 15 | Inside Bridge @0422_12.01.0876 Bridge MID_07Feb2016_212159_07Feb2016_212218 |
| 16 | Inside Bridge Wing_12.01.0882 Bridge STB_07Feb2016_212159_07Feb2016_212300 |
| 17 | Main pool_15.04.1007 Band Stand Facing H2O Zone STB_07Feb2016_204000_07Feb2016_204300 |

| 18 | Satelight_18.05.1183 Engine Casing Looking Fwd _07Feb2016_203759_07Feb2016_204400 |
|---|---|
| 19 | Stern camera changed the angle_03.07.1194 Stern MID_07Feb2016_203759_07Feb2016_205030 |
| 20 | Stern Camera from 4 to 5 PM._03.07.1194 Stern MID_07Feb2016_205959_07Feb2016_220030 |
| 21 | Stern Camera from 5 to 6 PM._03.07.1194 Stern MID_07Feb2016_215959_07Feb2016_230030 |
| 22 | Wave hitting bridge wing camera_12.01.1175 Bridge Wing STB_07Feb2016_212159_07Feb2016_212300 |
| 23 | Wave hitting sturn at 3.45 pm._03.07.1194 Stern MID_07Feb2016_203459_07Feb2016_203600 |

According to the declaration from RCCL's security technology leader, the 23 video clips begin at approximately 3:35 pm (EST) on February 7, 2016 and end at approximately 1:09 am (EST) on February 8, 2017, for a total time covered of approximately 9 hours and 33 minutes. [ECF No. 419-2].

    c.  <u>Representations at the Hearing</u>

Plaintiffs' counsel confirmed that his clients are seeking damages only for psychological injuries and that their use of the term "medical conditions" and "the injuries" in their Amended Spoliation Motion refers only to psychological consequences. [ECF No. 411, pp. 13-14].

RCCL's counsel explained that the duration of any CCTV camera's video (before being automatically overwritten) varies according to how frequently the camera operates, and he provided estimates. If a camera is in a high-traffic area, then the video,

if not preserved, could be overwritten in eight to fourteen days. In less-trafficked areas, the video might not be overwritten for thirty days.

According to RCCL, none of the CCTV is retained for more than thirty days in the ordinary course of business, pursuant to its retention policy. However, RCCL can, and does, preserve CCTV clips (and makes sure they are not overwritten) when there is an incident or accident.

No one at RCCL directed that all 14,400 hours of video be preserved. Instead, the captain said that "relevant" video of the storm should be preserved. [ECF No. 411, p. 18]. The captain's directive was then communicated to the security department, which, in turn, preserved relevant video. The security department employees used "a bit of judgment" to determine which video to preserve. *Id.*

The CCTV images are automatically stored on a computer drive, which is automatically overwritten unless a preservation instruction is provided, in which case a download extracts and maintains a copy of the portions to be preserved. *Id.* at pp. 21, 24. For the cruise in question, the captain gave a directive that "representative video" be preserved. *Id.* at p. 26. The directive was given within a day or two of the ship "hitting the heavy weather." *Id.* at p. 27.

RCCL's counsel explained at the hearing that no specific person decided which videos from which cameras would or should be preserved. Instead, the captain ordered representative clips to be preserved, the security department had discretion to select the

cameras and the images, and the security officers worked with the IT Department. *Id.* at p. 31.

RCCL is not aware of any documents, including emails, text messages or tweets, which were generated in connection with the captain's directive that representative CCTV video be preserved. *Id.* at p. 32. Counsel predicted that the captain likely called on his radio or telephone and gave the instruction to the chief security officer.

Other than ordering that representative video be preserved, the captain did not issue any criteria to help security officers determine how many minutes of CCTV video to preserve or to pinpoint the specific subject matter or cameras. *Id.*

Counsel provided the following additional details:

So I believe what I can say to you with confidence is that it happened like this. The ship's officers, the security and the IT know which cameras have a **representative view.** They **chose** from those cameras **enough footage** to show to their own shoreside superiors and to anyone else who might want to see it a representative clip.

I cannot answer your question honestly as to whether any type of committee occurred, but I believe, again, from what I understand of the process, it was captain told chief of security, someone from security went to IT, they picked representative cameras, they **got enough to where they felt like it represented what happened**, and that was how it was done.

And enough is a **very subjective determination**. But again, this was just about getting **representative video.**
. . .

There was **no incident** that was being addressed here, and that is critical to this discussion. It's not like Sally slipped on a wet spot. Let's make sure we get the video of Sally slipping. This was the ship got into heavy weather. The captain wanted representative video captured and retained.

26

The chief security officer was told. Security interfaced with IT. They got what they believed to be representative.

Whether it was 19 minutes, 28 minutes or 300 minutes was decided by the person who was tasked with getting representative. **If he or she felt they had captured representative, then that was what was given**.

*Id.* at p. 33 (emphasis added).

RCCL says it does not know why most of the data on the VDR is not audible. Describing the audio as "horrible," counsel advised that the data is "terrible" and that "you can hardly hear anything." *Id.* at p. 36. RCCL worked on the VDR for "weeks" in an effort to retrieve more and better-quality data from the VDR, but those efforts were unsuccessful. At most, RCCL was able to retrieve "little snippets of information," which were produced to Plaintiffs. *Id.* at p. 36.

RCCL rejected the Plaintiffs' theory that it tried to sanitize the CCTV video clips and preserve only video which did not reflect the worst of the storm. *Id.* at pp. 40-41. In fact, RCCL said the preserved CCTV clips do not help its litigation position because they show "violent activity, big waves, nasty weather, waves crashing, the ship listing and things slamming around." *Id.* at pp. 45-46.

RCCL's counsel also noted that the VDR was a new, state-of-the-art recorder but both sides are ultimately stuck with a largely useless VDR dataset even though instructions were given to preserve it and even though the VDR was actually downloaded and preserved. *Id.* at pp. 36-37.

Plaintiffs' counsel argued that the captain knew that there were reports of injury to passengers while he was still on the cruise. Counsel further advised that the captain later said, in his deposition, that he heard that some passengers feared for their lives. Counsel said the captain did not specifically know what types of physical injuries he heard about while still aboard ship. *Id.* at p. 49. Plaintiffs' counsel also advised that medical logs mention physical injuries being sustained by passengers. *Id.* at pp. 50-51.

Plaintiffs' Miami-based counsel claimed that he had a communication with a defense attorney who advised him that RCCL and its counsel "were reviewing it [the preserved CCTV] to see what's relevant." *Id.* at p. 64. Counsel said this purported comment startled him because it was not the defense's job to determine which portions of the CCTV were relevant because RCCL was already under a Court Order to produce all the CCTV it had preserved. *Id.* at p. 65.

The same Miami attorney also represented to the Court that Captain Ellis said in his deposition that he reviewed the VDR "and was able to gain from the VDR **everything** he was after." *Id.* (emphasis added). But as outlined above, Captain Ellis advised that it was exceedingly *difficult* to extract usable data from the VDR.

RCCL noted that Plaintiffs never sought a corporate representative deposition and likewise never requested depositions of the chief security officer, any security officer, the IT supervisor or any IT employee. *Id.* at p. 72.

d.  Post-Hearing Developments

At the hearing, and as later memorialized in a written Order [ECF No. 402], the Undersigned required the parties to follow up and provide additional information and documents. The Undersigned will list each assignment and then explain how the responsible party handled the directives:

First, the Undersigned required Plaintiffs to file the relevant pages of Captain Andersen's deposition transcript where he heard reports of injuries to passengers while the cruise was still underway. The Order gave Plaintiffs the option of simply stating which pages of the deposition transcript contain the testimony about injuries. The Order also required Plaintiffs to file the pages from the medical logs where physical injuries sustained by passengers on the cruise are mentioned.

In response, Plaintiffs filed [ECF No. 404] excerpts of Captain Andersen's deposition from the instant case, excerpts of his deposition in a related case (*Simpson v. RCCL*), excerpts from medical logs from the *Anthem*, excerpts of Captain Andersen's interview with the Bahamas Maritime Authority, and the complaints in two other related cases (*Simpson* and *DeLuca v. RCCL*).

In the deposition excerpt from *Simpson*, Captain Andersen testified that he knew of four passengers who reported to the medical facility with "injuries less than first aid." [ECF No. 404-1, p. 4]. He also explained that he did not during the cruise know that two passengers reported injuries which led to surgery. In a deposition taken in the

instant case, Captain Andersen testified that he spent hours on deck the day after the worst part of the storm speaking with passengers and "some were very scared, other ones were not that scared, some claimed they were not scared at all, other ones said they were terrified." [ECF No. 404-1, p. 8].

The first page of the medical records from the *Anthem* reflects 34 reports of injuries from passengers, with complaints ranging from "ribs" and "neck and shoulder" to "head." [ECF No. 405-1, p. 9]. That page does not explain whether the passenger visited the on-board medical facility. The "statement of guest" column provides a summary of the purported cause, according to the passenger. All statements relate to the storm, such as "boat rocked, walking to cabin" to "ship suddenly shifted – fell." *Id.* The second page of the two-page document lists 37 passengers with complaints ranging from "contusion" to "cut/laceration." *Id.* at 10. Of those 37 passengers, 28 are described as "did not visit medical facility." *Id.* The primary factor for all 37 passengers on the second page is "sea or weather conditions" and the severity for all 37 is described as "treatment shoreside or first aid." *Id.*

The excerpt from the statement to the Bahamas Maritime Authority includes Captain Andersen's statement that four injuries were reported during the storm and 21 injuries reported over the next three days. [ECF No. 405-1, p. 12]. The statement does not contain a date on the pages excerpted, but it notes that it is a "continued" interview which was taken aboard the *Anthem*. *Id.* The captain also testified that "guests were

enjoying themselves" after the storm and that he "never saw any panic among crew or among guests." *Id.* He also said, "the days after of walking the ship, talking to the guests, I have . . . yet to receive any negativity from our guests, not one." *Id.*

The Order also required Plaintiffs to file copies of communications from defense counsel in which they advised Plaintiffs' counsel that the attorneys and/or RCCL would be reviewing the CCTV and *would* be determining what is relevant for purposes of producing portions of the CCTV footage. The assignment was given because Plaintiffs' Miami counsel said he had a conversation or communication about that with one of RCCL's outside defense attorneys. If the allegation is true, then it would be fundamentally inconsistent with RCCL's stated position that the decision on which CCTV portions to preserve had *already* been made (on the ship, during the cruise) and that all of the preserved video had been produced. In other words, RCCL did not make decisions about which portions of the preserved CCTV were relevant for purposes of determining what segments to produce to Plaintiffs' counsel because it says that *all* preserved CCTV was produced. Therefore, a defense attorney's alleged comment that RCCL was reviewing the saved CCTV to select relevant portions would be illogical.

In response, **Plaintiffs did not file any documents.**

The Order also required RCCL to submit affidavits or declarations about decisions concerning the preservation of "representative" samples of the CCTV. In response, RCCL filed the declarations of Captain Andersen, Moshe Cohen (the Chief

Security Officer onboard the ship on the cruise at issue), and Vishal Bhosale (a current Deputy Security Officer who served as Guest Security Supervisor on the cruise at issue). [ECF Nos. 425-1; 425-2; 425-3].

The three declarations were consistent, and the Undersigned will highlight the more-important points:

The Chief Security Officer is in charge of the Security Department on the ship. The CCTV video is controlled and saved by the security personnel. The Bridge Team told the Security Department to save CCTV video representing the worst of the storm conditions. The Bridge Team did not instruct security officers on which cameras to watch, how long to watch the CCTV, or what video to save. Those decisions were made by the Security Department.

There were two computers in the Security Office on the *Anthem of the Seas* where the CCTV is streamed and saved. The cameras are typically not watched live and were not watched live during the storm.

Typically, CCTV video overwrites in 15 days in the normal course of business pursuant to Royal Caribbean's retention policy. In order to save the CCTV and prevent it from being overwritten in the ordinary course of business, security officers must watch the video on one of the two monitors and then save it. Saving (or preserving) can be done by electronically transmitting a very small size file to the shore side office in Miami or by saving it to an external device like a hard drive. For the cruise at issue, only

a representative portion of the CCTV video was preserved on an external drive because RCCL's security officers believed that there were no particular serious injuries or incidents which would otherwise require preserving specific video footage.

The Security Department selected which CCTV video to preserve. Multiple factors were considered. Security personnel were on duty during the storm itself helping passengers. They had first-hand knowledge about what happened on the ship. They used that knowledge to select the cameras they might want to review for representative footage. For example, they knew that a large vase tipped over in the ship and that chairs were blown around on the deck of the ship, so they viewed video from cameras which filmed those events. Similarly, they also knew that waves came up to certain areas on the front and sides of the ship, so they wanted to capture video of that.

Their purpose was not to save video of everything that happened on the ship during the storm on the ship. Rather, they tried to obtain representative CCTV video clips to fairly reflect what was going on during the storm.

The security officers also wanted to preserve some representative video of the listing of the ship and the sea conditions. That is why a significant portion of the video is from cameras pointed toward the stern of the ship during the storm. At bottom, the security officers were searching for video to show shoreside operations the worst part of the storm.

The security officers saved CCTV video which they believed represented the worst of the storm conditions. They did not save all of the CCTV video that they watched or that existed because they believed the saved video was an accurate and sufficient representation of the storm conditions and the effect on the ship.

Most of the video is from the outside of the ship during the storm because that was where most of the weather activity occurred and where its impact could most readily be seen. Most, if not all, of the guests were in their cabins during that time, and there were no cameras in the cabins. Additionally, they thought the wind conditions were best represented by the cameras showing the outside of the ship.

Because the security officers were busy attending to passengers and issues on the ship during the remainder of the voyage and when the ship returned to port, one security officer (i.e., Bhosale) stayed in the security room and watched for representative CCTV video. Sitting at one of the two computer monitors in the security office, Bhosale watched approximately 5 hours of CCTV video to select the clips that were saved. No one specifically told Bhosale which cameras to look at, which certain periods of time to focus on when making his selections, or how much video to watch or save.

RCCL's security officers did not delete or alter any CCTV video. After making his selections, Bhosale saved the CCTV video on the computer and then on an external

hard drive. He did not watch or save any additional CCTV after the ship returned to port in Bayonne, New Jersey.

The Order also required RCCL to file the pages of Captain Andersen's deposition transcript where he testified about instructing the crew to preserve "representative" samples of the CCTV.

In response, RCCL did not provide any excerpts from Captain Andersen's prior deposition transcript. Instead, it submitted three declarations, one of which is from Captain Andersen. [ECF No. 425-3]. In this newly-submitted declaration, the captain said that he "told the bridge team to work with the Security Department to get **representative** CCTV video to **generally** demonstrate the storm conditions." [ECF No. 425-3, p. 1 (emphasis added)].

The Order required Plaintiffs to file the pages of the captain's deposition transcript where his testimony about CCTV preservation did not use the term "representative" or used a completely different phrase.

In response, Plaintiffs filed an excerpt from Captain Andersen's deposition in *Simpson*, where another Plaintiff's attorney asked him, "did you preserve **all** of the video from the CCTV as well" and the captain answered, "Yes, that is done **by the security department**." [ECF No. 415-1, p. 3 (emphasis added)].

Based on my review of the amended flash drive containing the 23 CCTV clips, the arguments asserted by RCCL, and the explanations contained in Mr. Shrayer's

declaration [ECF No. 419-2], the Undersigned entered a supplemental Order requiring RCCL to submit an affidavit or declaration answering precise questions about its ability to preserve more than 91 minutes of CCTV and the scope of its knowledge concerning when the CCTV data was in fact actually overwritten. [ECF No. 424].

In response, RCCL filed another declaration from Haim Shrayer and one from George Purdy (Senior Vice President of Marine Operations for RCCL). [ECF No. 433]. It also submitted copies of the Heavy Weather Log and the Deck Logs.

The supplemental declarations explain that the *Anthem* did not miss a scheduled cruise or cancel any cruises after the storm at issue. It returned to its New Jersey port on February 10, 2016 and the United States Coast Guard and the Bahamas cleared it to sail on its next regularly scheduled cruise, leaving on February 13, 2016. The *Anthem* underwent onboard repairs while in its Bayonne, New Jersey port, including the replacement of glass panels and ceiling tiles and repairs to the steering clutches on the Azipod propulsion system.

RCCL's supplemental affidavits and exhibits explain that RCCL can determine the force of the winds and the height of the waves during the CCTV clips which were preserved by reviewing the clips and from reviewing the Deck Log and Heavy Weather Log. Mr. Purdy's declaration includes a detailed timeline of events, pinpointing the sea conditions, wave heights, and true wind speeds.

Moreover, Mr. Purdy's declaration further explains that RCCL does in fact know for certain that the preserved CCTV clips show the storm "at its absolute worst." [ECF No. 433-2, p. 5]. For support, Mr. Purdy points to specific time entries on the clips, along with the specific conditions (e.g., wind gusts up to 145 knots and sea conditions of 45.9 feet). Therefore, Mr. Purdy expressed his belief that additional clips would not have "produced evidence more helpful to Plaintiffs' claims." *Id.* at p. 6.

Mr. Shrayer's declaration conceded that RCCL does not know exactly when the CCTV from the cruise at issue was overwritten. Nevertheless, he noted that it was not overwritten "for at least 15 days" and that RCCL believes it was overwritten "within 30 days." [ECF No. 433-1, p. 2]. Finally, he acknowledged that RCCL security officers or other employees or vendors "could have" preserved additional portions of the CCTV after the *Anthem* returned to its New Jersey port "as long as it is done prior to the overwriting period, which begins at 15 days." *Id.* at pp. 2-3.

e. The Parties' Contentions

i. **Plaintiffs' Position**

Plaintiffs argue that RCCL should have preserved **all** of the CCTV and VDR recordings in light of the Captain's purported order (that "all" CCTV be preserved, an allegation which Plaintiffs say would have led to the saving of 14,400 hours of video), RCCL's standard operating procedures, the "profound incident at issue," and RCCL's

"awareness of potential investigation and litigation concerning the incident." [ECF No. 388, p. 3].

They further contend that RCCL incorrectly views the missing CCTV footage and VDR data to be "irrelevant" and challenge RCCL's perspective that the "few snippets of waves" it produced is sufficient. *Id.* at p. 8. Plaintiffs contend that the decision on which CCTV clips to preserve "is not up to the Defendant." *Id.* They say they are prejudiced by the missing CCTV footage "to show the total picture and the ferocity of the winds and waves, which caused the Plaintiffs to fear for their lives." *Id.*

Plaintiffs contend that there are no readily available substitutes for the missing CCTV or VDR and that the loss of this information has generated significant prejudice to them. Similarly, they say that the 91 minutes of preserved CCTV is not an acceptable alternative for their contention that they should have the ability to review all 14,400 hours of CCTV and **determine for themselves** which portions are relevant or representative.

They also argue that RCCL "knew or should have known of possible litigation at the time these recordings were in existence based on common sense, precedent and the almost immediate investigation and legal filings." *Id.* at p. 9. According to Plaintiffs, "it is clear that they [the CCTV and the VDR] have been destroyed or **purposefully hidden**" and that this has "effectively hampered the Plaintiffs' ability to fully illustrate and support its case in chief." *Id.* at pp. 8-9 (emphasis supplied).

### ii. RCCL's Position

RCCL's principle contentions were summarized earlier in this Order (pages 3-4). However, the Undersigned will underscore some additional, more-nuanced positions:

RCCL says it never made a decision to preserve "all" CCTV because "there was no indication at the time that all footage was necessary to be preserved." [ECF No. 392, p. 3]. It argues that Plaintiffs "seriously misconstrue" the deposition testimony of Captain Andersen and other RCCL employees. And it contends that "there was no discrete 'incident' to preserve CCTV for." *Id.*

RCCL further contends that Plaintiffs' motion is "unsurprisingly supported only by their hyperbolic attacks and out-of-context deposition testimony." *Id.* at p. 16.

RCCL takes the position that it did not have a duty to preserve *any* CCTV video at all -- even if the captain had heard of one or more passengers who had sustained physical injuries. RCCL's view is that the passengers were confined to their rooms, the CCTV cameras were not in their rooms, and there could not be any CCTV of the passengers getting injured in their cabins.

Focusing on proportionality, RCCL says it is unreasonable to preserve more than 14,000 hours of CCTV video from 200 cameras "because of some minor physical injury." [ECF No. 411, p. 53]. Similarly, RCCL says that there is no CCTV video which would show "what they experienced in their cabin physically to themselves, how much they rock in a given cabin" or "what they saw out their window." *Id.* at p. 55.

In addition, RCCL describes the CCTV clips which were preserved as "very provocative video." *Id.* It also contends that the representation letter from Plaintiffs' counsel did not provide it with enough information to trigger a retention duty, and it highlights the absence of a preservation demand in either letter from Plaintiffs' counsel. *Id.* at p. 59.

## II.     Applicable Legal Standards and Analysis

### a.   An Order, Not a Report and Recommendations

"Even [where] a movant requests a sanction that would be dispositive, if the magistrate judge does not impose a dispositive sanction," then the order is treated as not dispositive under Federal Rule of Civil Procedure 72(a). *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519-20 (10th Cir. 1995); *see also QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 767, 683 n.2 (S.D. Fla. 2012) (explaining that a magistrate judge has authority to enter a sanctions order, as opposed to a report and recommendations, when sanctions are denied); *Williford v. Carnival Corp.*, No. 17-21992, 2019 WL 2269155, at *1 (S.D. Fla. May 28, 2019) (entering order on spoliation motion involving x-rays which cruise ship could not produce after the x-rays were taken in an onboard clinic with a machine attached to a computer).

Although this ruling is an Order, the parties may, of course, pursue objections.

Pursuant to Rule 72(a), a party may object to a magistrate judge's decision of a non-dispositive matter. Fed. R. Civ. P. 72(a). "The district judge in the case must

consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Id.; see also* 28 U.S.C. § 636(b)(1)(A). This standard of review is "extremely deferential." *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co., Inc.*, No. 12-CV-81397-KAM, 2015 WL 11921411, at *1 (S.D. Fla. July 6, 2015) (citing *Tolz v. Geico Gen. Ins. Co.*, No. 08-80663-CIV, 2010 WL 298397, at *3 (S.D. Fla. Jan. 19, 2010)). "A finding is clearly erroneous only if 'the reviewing court, after assessing the evidence in its entirety, is left with a definite and firm conviction that a mistake has been committed.'" *Sun Capital Partners*, 2015 WL 11921411, at *4 (quoting *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1523 (11th Cir. 1997)).

Or, as the Seventh Circuit has put it: "[t]o be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Elec. Motors v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988). "The mere fact that a reviewing Court might have decided the issue differently is not sufficient to overturn a decision when there are two permissible views of the issue." *Pendlebury v. Starbucks Coffee Co.*, No. 04-80521CIV-MARRA/JO, 2007 WL 4592267, at *1 (S.D. Fla. Dec. 28, 2007). "[T]he 'clear error' exception must be rarely invoked." *Cox Enters., Inc. v. News-Journal Corp.*, 794 F.3d 1259, 1272 (11th Cir. 2015).

b. <u>Federal Rule of Civil Procedure 37(e)</u>

Federal Rule of Civil Procedure 37(e) provides:

(e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1)    upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2)    only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37 (emphasis added).

The Advisory Committee's notes to the 2015 amendment explain that the newly amended rule "forecloses reliance on inherent authority or state law to determine when certain measures would be used" for the loss of electronically stored information. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Therefore, it would be inappropriate to analyze the spoliation sanctions motion concerning CCTV and VDR using the common law inherent power authority (even though the parties included that discussion in their briefing). Instead, Rule 37 (e) controls.

Rule 37(e) significantly limits a court's discretion to impose sanctions for ESI spoliations. As outlined in *In Re: Abilify (Aripiprazole) Products Liability Litigation*, it

"authorizes courts to impose sanctions for destruction of ESI where <u>four conditions</u> are met." No. 3:16-md-2734, 2018 WL 4856767, at *2 (N.D. Fla. Oct. 5, 2018) (emphasis added).

As a preliminary matter, the rule applies only to ESI, so the first inquiry is whether ESI has been lost. Assuming that the alleged spoliation does indeed involve ESI, then three additional questions must be resolved. First, should the spoliated ESI have been preserved in the anticipation or conduct of the litigation? Second, is the loss of the ESI due to the party's failure to take reasonable steps to preserve the ESI? Third, can the ESI be restored or replaced through additional discovery? Fed. R. Civ. P. 37(e). Where the "[a]nswer to any of [the three additional] questions . . . is 'no,' . . . a motion for spoliation sanctions or curative measures must be denied." *Living Color Enters., Inc. v. New Era Aquaculture, Ltd*, No. 14-cv-62216, 2016 WL 1105297, at *4-5 (S.D. Fla. Mar. 22, 2016).

The rule has two categories of relief: those in subsection (1) and the more-consequential ones in subsection (2). Fed. R. Civ. P. 37(e)(1), (2). The sanctions available in subsection (2) require the equivalent of bad faith (i.e., the "intent to deprive"). But **both** categories of relief, including the "no greater than necessary to cure the prejudice" type in subsection (1), require that the preliminary **four factors** be established. *Id.* The following points, all discussed in the Advisory Committee Notes, help inform the realistic, practical assessment of the third factor (i.e., whether the party "failed to take

reasonable steps to preserve" the ESI) and any potential consequences.

Using the placement of issues discussed in the Advisory Committee Notes to the 2015 amendment, the following points assist the analysis:

1. The rule applies only to ESI and only when ESI is lost.

2. "Perfection in preserving all relevant electronically stored information is often impossible." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

3. Similarly, the rule "recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection." *Id.*

4. The rule is "inapplicable when the loss of information occurs despite the party's reasonable steps to preserve." *Id.*

5. "[I]nformation the party has preserved may be destroyed by events outside the party's control – the computer room may be flooded, a 'cloud' service may fail, a malign software attack may disrupt a storage system, and so on." *Id.*

6. If ESI information is lost because a party failed to take reasonable steps to preserve it, then "the initial focus should be on whether the lost information can be restored or replaced through additional discovery." *Id.* If the information "is restored or replaced, no further measures should be taken." *Id.*

7. A court may resort to (e)(1) measures "only 'upon finding prejudice to another party from loss of the information.'" *Id.*

8. The rule "does not place a burden of proving or disproving prejudice on one

party or the other." *Id.*

9. The more-stringent measures (deemed "specified and very severe") found in (e)(2) rejects cases which "authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence." *Id.*

10. "Negligent or even grossly negligent behavior" does not logically support the inference that lost evidence was "unfavorable to the party responsible for the loss or destruction of the evidence" because "information lost through negligence may have been favorable to either party, including the party that lost it." *Id.*

11. Subdivision (e)(2) "does not include a requirement that the court find prejudice to the party deprived of the information" because the required intent finding also supports "an inference that the opposing party was prejudiced by the loss of information that would have favored its position." *Id.*

12. Courts should use caution in using the (e)(2) measures. Finding the requisite intent does not require a court to adopt any of the (e)(2) measures. The "remedy should fit the wrong" and the "severe measures" should "not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss." *Id.*

13. The Committee Notes for the 2015 Amendment explain that the possibility of the parties "present[ing] evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may *consider* that evidence, along

with all the other evidence in the case, in making its decision . . . would be available under subdivision (e)(1) if no greater than necessary to cure the prejudice." *Id.* (emphasis added). But that means that all of the four prerequisites must be established before this comparatively modest measure could be used. Conversely, this measure would **not** be available if one or more of the four elements had not been established.

Now that the four prerequisites and other legal considerations have been listed and some of the practical realities surrounding ESI have been mentioned, the Undersigned will address them in the order used in the rule itself.

### i. Does the Alleged Spoliation Involve *ESI*?

There is no dispute over the fundamental classification that the CCTV and VDR are in fact ESI. For all practical purposes, both parties agree on this point, which now appears to be non-controversial. In their Amended Motion, Plaintiffs contend that the CCTV and VDR are ESI, subject to a Rule 37 analysis, but then argue, in the alternative, that the Court can use the inherent authority doctrine to impose sanctions if the Court were to determine that either or both the CCTV and VDR are not ESI. The Undersigned disagrees. Because the evidence is ESI, only Rule 37 (e) can be used to impose sanctions; inherent authority is unavailable.

Similarly, in its opposition, RCCL observed that the Eleventh Circuit has not yet expressly addressed whether Rule 37(e) controls the issue, so it included a legal

discussion under both the inherent authority doctrine and the federal rule. But it also cited to case law authority holding that CCTV is ESI. Because only Rule 37(e) applies, the Undersigned will not alternatively analyze the sanctions motion under an inherent authority perspective.

### ii. Should the ESI have been preserved?

The Undersigned must determine whether the CCTV and VDR should have been preserved, and, if so, how much of the 14,400 hours of CCTV should have been preserved. As explained in the Advisory Committee Notes to the 2015 Amendment, "a variety of events may alert a party to the prospect of litigation." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. This issue can also be framed with another question: was the party under a duty to preserve?

RCCL is correct in saying that the instant case is unlike a garden-variety personal injury lawsuit, where it is usually easy and simple to understand where **the incident** occurred and to pinpoint the one or two CCTV cameras which would have the five minutes or so of relevant video. In those instances, the incident is at a specific spot, such as the handrail leading into the shallow end of a pool, and a specific camera is likely to have filmed the plaintiff getting injured. In those situations, cruise ships know there is a duty to preserve the CCTV video which captured the slip and fall. And they know that litigation is anticipated because they invoke the work product doctrine to discovery requests for incident reports prepared about those incidents during the cruise.

But this multi-plaintiff lawsuit does not concern the same type of incident (and therefore does not concern the same type of designated location on the ship to pinpoint on one or two specific CCTV cameras). In a way, the incident is the **entire storm**, and the relevant areas to see on the video are from the entire ship. But CCTV video would not directly show any plaintiff getting injured during the worst part of the storm because he or she was in a CCTV-free cabin during the worst part of the storm (and because the injuries here are all psychological, rather than physical).

The preserved CCTV video does portray the weather conditions, which a jury could evaluate when assessing the credibility of a plaintiff's claim. If, for example, a plaintiff here claims to have been thrown against a cabin wall two dozen times during the worst of the storm, then a CCTV clip showing the ship in 180 mph winds might support that claim, while a clip showing only 60 mph winds might not support the claim (and might even undermine it).

Similarly, if an autistic child plaintiff were to claim extreme mental health damages because he was traumatized during the storm and feared for his life, then a video showing the ship in 30 mph winds could easily be evaluated differently than a video showing 180 mph winds.

RCCL is correct in saying that it did not know for certain during the cruise that any particular passenger had sustained significant injuries during the cruise. Indeed, most of the matters mentioned in the medical logs are from passengers who never went

to the on-board medical facility for medical treatment. That scenario is different than the more-common situation where a specific, known, identifiable passenger slips and takes a hard fall, the security officer is summoned, and the passenger is taken to the onboard clinic for immediate medical treatment. In those types of everyday incidents, the cruise ship anticipates litigation when the injury occurs, and its staff knows to preserve the CCTV video (and it knows which camera video to save).

But the Undersigned rejects RCCL's contention that at no time was it under any type of duty to preserve any CCTV video at all. The storm was intense, and the crew knew that some passengers had complained of minor injuries. In addition, the crew was aware that some passengers feared for their lives and had mentioned those fears to the ship's employees.

The 91-minute CCTV video clip is a cringe-worthy sample of what the ship encountered during the worst part of the storm. RCCL should have known that at least one, and probably more, of the passengers would be pursuing litigation. When sections of a satellite are ripped off their frame because of the hurricane-strength winds, large vases are smashed to the ground, and 50-foot waves are churning around the vessel, it is clear to anyone with experience in the cruise industry that *some* type of litigation would arise from the cruise. The Undersigned therefore finds that RCCL was under a duty to preserve, and that the duty arose as soon as the worst part of the storm was over.

RCCL's position that it was never under a duty to preserve any CCTV video is

inherently inconsistent with the obvious fact that it did in fact preserve *some* CCTV video (i.e., approximately 91 minutes). The decision to preserve representative CCTV was made while the *Anthem* was still at sea, before it returned to Bayonne, New Jersey.

But even if RCCL was not under a duty at *that* time (i.e., by the time the ship returned to port), it was absolutely under a preservation duty once it received the first letter from Plaintiffs' Miami counsel. The mere fact that the letter did not expressly advise RCCL to preserve the CCTV does not mean that RCCL can feign ignorance and pretend that it was shocked that the attorney would later demand video of the ship's experience in the storm. The letter was sent in time for RCCL to have taken steps to have preserved at least some of the additional CCTV it had not preserved.

Because RCCL did preserve some CCTV, the issue is actually more refined than the basic question of whether it was under a duty to preserve CCTV. The more-artful and more-precise question is: did RCCL have a duty to preserve **more** than the 91 minutes it preserved?

That is a thorny question, to be sure.

The answer will not pinpoint a specific number of minutes which RCCL was under a duty to preserve. Instead, the issue is whether more than 91 minutes of representative CCTV video clips *should* have been preserved.

To be sure, more than 91 minutes *could* have been preserved. That is a truism about CCTV video, even for a garden-variety incident. If a passenger slipped on the

deck next to the railing leading into the shallow end of a swimming pool, then 30 minutes of CCTV video showing that specific spot could have been preserved, but a cruise ship's decision to preserve only five minutes does not necessarily mean that it breached its duty to preserve.

In other words, the mere fact that a party had the ability to preserve more ESI does not necessarily mean that a decision to preserve less is evidence of a breach of the duty to preserve.

The ESI preservation issue for the CCTV is different than the more-frequent issue of what happens if ESI is inadvertently lost or destroyed, such as through a lightning storm which wipes out a computer hard drive. Here, RCCL made an intentional decision to not preserve all 14,400 hours of CCTV video and to instead preserve (from automatic overwriting) only a far-smaller, representative sample of the CCTV available to it.

Plaintiffs argue that all 14,400 hours of video should have been preserved. But this appears to be illogical and impractical on its face. First, the worst part of the storm lasted approximately nine to twelve hours, so there seems to be no duty to preserve CCTV video for times other than the 12 hours (as those 12 hours consist of the "incident," to the extent that a portion of the storm itself is the incident). So, that would generate, at best, a duty to preserve 12 hours of video from 200 cameras. That yields a maximum potential preservation of 2,400 hours, not 14,400 hours.

Second, some unknown number of those cameras would not necessarily depict portions of the ship where the impact of the storm could be seen. So the broadest duty to preserve would have to be discounted further again, to remove the video from the CCTV cameras not filming relevant portions of the storm.

And third, there would not automatically be a duty to preserve *duplicative* video. To the extent that more than one camera depicted the same general scene, the duty to preserve would likely not encompass video from cameras depicting the identical event. Thus, to provide a hypothetical illustration, if 10 CCTV camera were facing out from the stern and filming the conditions of the stern, then video from 9 of those 10 CCTV cameras would (in the absence of other, unusual circumstances) probably not be needed.

The parties have not advised the Court of the specifics concerning the second and third points described immediately above.

Litigants do not have a duty to preserve any and all evidence, but only that which is potentially relevant. Moreover,

> [E]ven when litigation is reasonably foreseeable, 'a corporation under a duty to preserve is not required to keep every shred of paper, every e-mail or electronic document, and every backup tape . . . In essence, the duty to preserve evidence extends to those employees likely to have relevant information—the key players in the case, and applies to unique, relevant evidence that might be useful to the adversary.'

*Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 740-41 (N.D. Ala. 2017) (quoting *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 517-18 (S.D.W. Va.

2014)).

RCCL had no duty to preserve the **entirety** of the ship's CCTV for the entire cruise. *See Mitchell v. Royal Caribbean Cruises, Ltd.*, No. 12-CV-22734, 2013 WL 12066018, at *2 (S.D. Fla. May 7, 2013) (holding there was no authority for the proposition a cruise line had to preserve an entire day's worth of CCTV footage, an assumption it deemed "a rather dubious one in most cases"). RCCL preserved representative CCTV footage of the waves, wind, and weather conditions impacting the ship. There was no reason for RCCL to preserve every second of footage from all 200 cameras on its ship. That would not be proportional. *Cf. Concord Boat Corp. v. Brunswick Corp.*, No. LR–C–95–781, 1997 WL 33352759, at *4 (E.D. Ark. Aug. 29, 1997) ("[T]o hold that a corporation is under a duty to preserve all e-mail potentially relevant to any future litigation would be tantamount to holding that the corporation must preserve all e-mail . . . Such a proposition is not justified.").

This view is confirmed by the *Sedona Principles.* Federal courts often turn to the *Sedona Principles*, a foundational guide for e-discovery issues issued by the Sedona Conference (a research and educational institute composed of leading judges, attorneys, academics and experts) to help resolve ESI discovery issues. *Romero v. Allstate Ins. Co.*, 271 F.R.D. 96, 106 (E.D. Pa. 2010). The Sedona Conference's recent updates to the *Sedona Principles* reflects this commonsense approach.

Specifically, Principle 5 provides:

The obligation to preserve electronically stored information requires reasonable and good faith efforts to retain information that is expected to be relevant to claims or defenses in reasonably anticipated or pending litigation. However, it is **unreasonable** to expect parties to take **every conceivable step** or disproportionate steps to preserve **each** instance of relevant electronically stored information**.**

*The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for*

*Addressing Electronic Document Production*, Principle 5, 19 Sedona Conf. J. 1, 17 (2018)

(emphasis added).

Comment 5.e to Principle 5 provides: "Preservation efforts need not be heroic or unduly burdensome." *Id*. Comment 5.g provides that "[a]ll ESI does not need to be 'frozen.'" *Id*. The additional comments made under 5.e are particularly relevant to the scenario at issue in Plaintiffs' CCTV spoliation motion:

Civil litigation should **not** be approached as if information systems were crime scenes that justify forensic investigation at **every** opportunity to identify and preserve **every** detail. Theoretically, a party **could** preserve the contents of wastebaskets and trash bins for evidence of statements or conduct. Yet, the burdens and costs of those acts are apparent and no one would argue that this is required. There should be a similar application of reasonableness to preservation of ESI.

Even though it may technically be *possible* to capture vast amounts of ESI during preservation efforts, usually this can be done only at great cost. ESI is maintained in a wide variety of formats, locations, and structures. Many copies of the same ESI may exist in active storage, backup, or archives. Computer systems manage data dynamically, meaning that the ESI is constantly being cached, **rewritten,** moved, and copied. For example, a word processing program usually will save a backup copy of an open document into a temporary file every few minutes, overwriting the previous backup copy. In this context, imposing an absolute requirement to preserve **all** ESI would require shutting down computer systems and making copies of data on each fixed disk drive, as well as other media that

normally are used by the system. Costs of litigation would routinely approach or exceed the amount in controversy. In the ordinary course, therefore, the preservation obligation should be limited to those steps reasonably necessary to secure ESI for the fair and just resolution of the matter in dispute.

*Id.* (emphasis added).

Therefore, the Undersigned is convinced that RCCL was not under a duty to preserve all of the CCTV video. But deciding the issue of whether RCCL preserved a sufficient representative sample of the CCTV video is not dependent on the specific number of minutes which were preserved. Instead, it focuses on the nature and significance and proportionality of the portions preserved. For example, RCCL could have preserved 10 hours of CCTV which focused mostly on interior walkways and did not adequately depict the decks, waves, wind and damage to the vessel. Had that occurred, RCCL would have breached its duty to preserve ESI -- even though 10 hours of CCTV is substantially more than 91 minutes.

To be sure, the percentage of the available CCTV video which was retained is only a small ratio of what could have been preserved. Nevertheless, after carefully watching every second of the 91 minutes of preserved CCTV, the Undersigned concludes that a sufficient sample was preserved. *Cf. Berger v. Home Depot USA, Inc.*, No. SA-CV-10-678, 2010 WL 11558000, at *6 (C.D. Cal. Oct. 7, 2010) (finding defendant did not spoliate ESI by recycling some of its disaster recovery tapes).

The Undersigned acknowledges that a different conclusion could be reached.

Nevertheless, the accuracy of my view that 91 minutes is sufficient is ultimately not problematic here -- because Plaintiffs have also not demonstrated the existence of two other required factors.

### iii. Was the ESI lost because RCCL failed to take reasonable steps to preserve it?

As clarified in the advisory committee notes, the rule does not demand perfection in preserving all relevant ESI. The rule requires *reasonable* steps, and the Undersigned finds that RCCL did take reasonable steps when it decided to preserve a representative sample of CCTV footage totaling 91 minutes. Unlike a more-typical cruise ship lawsuit involving a specific incident, such as a passenger slipping in a precise location, there is no one incident which should have been preserved. Instead, the *overall* weather condition during the worst part of the storm is the so-called incident which should have been preserved on the CCTV -- and it was. There might be disagreement over the issue of whether 91 minutes is sufficient or whether 110 minutes should have been saved or whether some other amount of CCTV should have been preserved. But the Undersigned finds that RCCL took reasonable steps, under the circumstances.

Preserving two or three or more hours of equally representative CCTV clips would have been reasonable. But the mere fact that RCCL preserved less does not make its decision ***unreasonable***. On the other end of the spectrum, preserving all 14,400 hours of video would have been unreasonable and disproportional.

There are no hard and fast rules establishing a specific cutoff point for how many minutes of CCTV must be preserved in order to be reasonable. It would be difficult, if not impossible, to come up with some specific number because the reasonableness also depends on the quality and fairness of the clips. Three hours of clips from the early part of the storm showing modest wind and waves is probably less reasonable than 15 minutes of representative clips during the nastiest part of the storm.

Recognizing the uncertainty inherent in deciding whether a sampling of CCTV clips is representative enough to clear the reasonableness hurdle, the Undersigned finds that RCCL's preservation of this specific compilation, under this precise scenario, is reasonable.

For the VDR, most of the data was corrupted, but not because RCCL failed to take reasonable steps. The captain directed that the VDR be preserved, and his order was carried out. The corruption of the VDR data cannot be attributed to RCCL's failure to take reasonable steps. VDR is not a user-friendly device and was not intended for civil discovery in a lawsuit not involving a ship which sunk. RCCL and the Plaintiffs have the identical information from the VDR and the manufacturer was unable to retrieve more data. Whatever event or events caused the VDR data to be largely corrupted cannot fairly be blamed on RCCL.

### iv. Is the lost ESI, evidence which cannot be restored or replaced?

The missing or overwritten CCTV was replaced, in effect, by the representative

samples which were preserved.

### v. Prejudice

Assuming that all four prerequisites for any type of spoliation sanctions were met (and they were not), Plaintiffs would still need to demonstrate prejudice in order to obtain even the milder-type sanctions available in subsection (1). Plaintiffs have not been prejudiced enough to warrant sanctions. They have 91 minutes of CCTV video clips which depict the ship undergoing a horrific storm with hurricane-strength winds. Moreover, they have portions of the VDR which could be extracted, and they have weather logs, maps, forecasts, and other data. To be sure, Plaintiffs would *rather* have more CCTV clips and they would *prefer* to have more data from the VDR, but their strategic inclinations are not sufficient to create the prejudice necessary for ESI spoliation sanctions under the rule.

### vi. Intent to Deprive (a/k/a Bad Faith)

Plaintiffs want the Court to permit the jury to reach a presumption about the overwritten CCTV clips and the corrupted portions of the VDR data. Because Plaintiffs have not established the four requirements for any type of sanction, it is unnecessary to discuss the specific adverse inference remedy.

The Undersigned notes that it is unclear what type of specific presumption the Plaintiffs would even want the jury to reach. The rule explains that a jury could "presume that the lost information was **unfavorable**" to the spoliating party. Fed. R.

Civ. P. 37 (emphasis added). Unlike a situation where one specific item, like a purportedly defective chair, was destroyed, the requested presumption here would not be that the overwritten CCTV video depicted the storm because the preserved CCTV clips *already* show that. So, what would be the practical effect of a presumption that the overwritten clips were "unfavorable" to RCCL?

It appears that Plaintiffs' requested presumption would be that the overwritten CCTV clips would show an even-more intense storm. But, as explained in the declarations submitted by RCCL, the preserved clips did, in fact, show the worst part of the storm.

Nevertheless, in an abundance of caution, the Undersigned will briefly discuss the bad faith requirement for the specific sanction mentioned in the motion (i.e., a permissive presumption).

RCCL did not have an intent to deprive Plaintiffs of either the CCTV or the unavailable portions of the VDR data. If RCCL did have such an intent, then it is logical to assume that it would not have preserved the 91 minutes of jarring video clips which it produced to Plaintiffs. Had RCCL wanted to deprive Plaintiffs of useful CCTV evidence, then it would have permitted *all* of the CCTV to be overwritten and would not have preserved *anything*. Alternatively, it might have preserved only those video clips showing comparatively modest weather. The 91 minutes is an adequate sample which represents the harsh weather conditions at issue.

In addition, it is inconsistent for Plaintiffs to tout the supposed value of the overwritten CCTV clips when their own attorney never asked RCCL to preserve them until long after the lawsuit was filed.

Perhaps RCCL's decision to preserve only 91 minutes of CCTV clips was negligent. And perhaps it was even grossly negligent (even though the Undersigned deems that highly unlikely). That type of conduct, though surely not worthy of an award for minimum competence, is insufficient to meet the purposefully-difficult standard of <u>intent to deprive</u>.

Plaintiffs' request for a presumption against RCCL is inconsistent with the guidance, provided by the advisory committee notes, that "courts should exercise **caution**, however, in using the measures specified in (e)(2)." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (emphasis added); *see Stovall v. Brykan Legends, LLC*, No. 17-2412, 2019 WL 480559, at *4 (D. Kan. Feb. 7, 2019) ("Although defendant's failure to take steps to preserve the ESI [i.e., surveillance video] may be negligent, even grossly negligent, nothing in the record suggests defendant intentionally lost the video."); *see also Romero v. Regions Fin. Corp.*, No. 18-22126, 2019 WL 2866498, at *5-9 (S.D. Fla. July 3, 2019) (denying spoliation motion for destruction of video surveillance evidence -- which occurred when a security investigator reviewed the tape and chose to preserve only a portion of the tape -- due to the inability to make a finding of intent concerning video footage for the entire day and noting that the

amended version of the rule rejects cases which authorized sanctions based on a finding of negligence or gross negligence).

### III.     Conclusion

For the reasons discussed above, the Undersigned denies [388] Plaintiffs' Amended Spoliation Motion on CCTV and VDR.[10]

**DONE AND ORDERED** in Chambers in Miami, Florida, on August 12, 2019.

_____
Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Jose E. Martinez
All Counsel of Record

---

[10]     As mentioned earlier, any party may appeal this Order by filing Objections, as outlined by Southern District of Florida Local Magistrate Judge Rule 4(a).